IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


STACY CLARK,                    ) CASE NO. 5:25-cv-00106
                               )
            Plaintiff,         ) JUDGE PATRICIA GAUGHAN
                               )
    versus                     )
                               ) DEPOSITION OF
KANDY FATHEREE, et al.,         )
                               ) STACY CLARK
            Defendants.        )


- - -


        Deposition of STACY CLARK, Plaintiff

herein, called by the Defendants for Cross-Examination

pursuant to the Federal Rules of Civil Procedure, taken

before the undersigned, Sandra Johnson, a Registered

Professional Reporter and Notary Public in and for the

State of Ohio, at the Russell M. Pry Building,

1180 South Main Street, Suite 241, Akron, Ohio, on

Monday, August 11, 2025, at 9:26 a.m.


- - -

Page 2

1    APPEARANCES:

2

        On Behalf of the Plaintiff:
3
            Stuart G. Torch, Esq.
4            Employment Law Partners, LLC
            4700 Rockside Road, Suite 530
5            Independence, Ohio 44131
            216.382.2501
6            stuart@employmentlawpartners.com

7

        On Behalf of the Defendants:
8
            John Christopher Reece
9            Assistant Prosecuting Attorney
            Summit County Safety Building
10            53 University Avenue
            Akron, Ohio 44308
11            330.643.8577
            jreece@prosecutor.summitoh.net
12

13
    ALSO PRESENT:
14
            Kandy Fatheree
15
            Larry Brown, Chief Deputy of Administration
16

17
                            - - -
18

19

20

21

22

23

24

25

Page 3

1                          I N D E X

2

3    EXAMINATION BY                              PAGE

4    Mr. Reece                                     5

5

6    PLAINTIFF'S EXHIBITS MARKED/FIRST REFERENCED

7    None

8

9    DEFENDANTS' EXHIBITS MARKED/FIRST REFERENCED  PAGE

10   A, Bates 000266                               16

11   B, Bates 000063-000064                        17

12   C, Stacy R. Clark Appointment as a Special    25
         Deputy Sheriff
13
     D, Bates 001485-001487                        40
14
     E, Bates 002277-002281                        43
15
     F, Three Reports of Investigation             46
16
     G, Bates 000458-000464                        51
17
     H, Bates 002165-002181                        54
18
     I, Composite Document, 37 Pages               58
19
     J, Two-Page Document on Sheriff Steve Barry   68
20       Letterhead

21   K, Bates 001494-001498                        73

22   L, Letter Dated January 31, 2014, With        74
         Attached Letter Dated May 7, 2014
23
     M, Bates 000032-000034                        78
24
     N, Email Chain, Six Pages                     80
25

Page 4

1  DEFENDANTS' EXHIBITS MARKED/FIRST REFERENCED    PAGE

2  O, Bates 000022 and 000021                        83

3  P, Memo From Chief Larry Brown                    86

4  Q, One Page Typed Document                        87

5  R, Defendant Kandy Fatheree's (Official and       95
      Individual Capacity) First Set of
6     Interrogatories and Requests for
      Production of Documents
7
   S, Medical Records (Confidential - Subject       108
8     To Protective Order)

9

10                          - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1   WHEREUPON,

2                        STACY CLARK,

3        after being first duly sworn, as hereinafter

4        certified, testified as follows:

5                         - - -

6                    CROSS-EXAMINATION

7   BY MR. REECE:

8   Q.   Okay.  We're here today on Case 5:25-cv-106,

9        Stacy Clark versus Kandy Fatheree, et al., for the

10       deposition of Stacy Clark by agreement of counsel.

11           Do you prefer Stacy or Ms. Clark or...?

12  A.   Stacy's fine.

13  Q.   Stacy?

14  A.   Yes, sir.

15  Q.   Stacy, we met briefly when I let you in the door.

16       My name's Christopher Reece.  I represent Kandy

17       Fatheree and Summit County in the lawsuit that you

18       filed.

19           Have you ever had your deposition taken

20       before?

21  A.   No.

22  Q.   Well, you probably went over some of this with

23       your attorney.  I'm going to ask you a series of

24       questions on different topics, some background

25       questions, some questions about your hiring and

Page 6

1      assignments with the sheriff's department, some

2      questions about your disciplinary history with the

3      sheriff's department, some questions about your

4      special deputy commission, some questions about

5      your special deputy job at -- is it Bissell

6      Elementary School?

7  A.  Right.

8  Q.  "Bissell" or "Bissell"?

9  A.  Bissell Elementary, yes, sir.

10 Q.  And your attorney provided me some medical records

11     regarding some counseling and treatment that

12     you've had.  I'm going to probably ask you a few

13     questions about those.

14          If you don't understand one of my

15     questions, tell me you don't understand it and

16     I'll try to clarify it for you.  I'm not here to

17     trick you.  This is a discovery deposition.  And

18     the word "discovery" means you have information, I

19     need to discover it.

20          So let's try not to talk over each other.

21     Let me finish my question.  I'll give you as long

22     as you need to answer the question.

23          We need to avoid -- or you need to avoid

24     certain things like uh-huh and uh-uh.  Give

25     yes-or-no answers.  Because it's difficult for the

Page 7

```
 1        court reporter to take that down, and it's even

 2        more difficult to go back and read.  "Is that a

 3        yes or is that a no?"

 4              We have the luxury of taking breaks.  You

 5        know where the restrooms are.  The only thing I

 6        would ask is that we won't take a break right in

 7        the middle of a question.  "Can I take a break?"

 8              What did you do in preparation for

 9        today's deposition other than meeting -- did you

10        meet with your lawyer?

11   A.   Yes, I did.

12   Q.   I don't want to know anything that you and your

13        lawyer discussed, but did you review any documents

14        in preparation for your deposition?

15   A.   No, I did not.

16   Q.   Okay.  So when I ask you some questions and give

17        you some documents about your disciplinary file,

18        you didn't review those in advance?

19   A.   No.

20   Q.   Did you discuss your deposition today with anybody

21        except -- outside of your lawyer?

22   A.   No, sir.

23   Q.   So your full name's Stacy Clark?

24   A.   Yes, sir.

25   Q.   What's your date of birth?
```

```
 1    A.    2/1/70.

 2    Q.    Just in general, where were you born and where did

 3          you grow up?

 4    A.    I was born here in Akron, and I grew up in

 5          Tallmadge.

 6    Q.    Okay.  What is your current address?

 7    A.    127 Van, V-A-N, Evera, E-V-E-R-A, Road.

 8    Q.    You want to spell that again?

 9    A.    It's Van, V-A-N --

10    Q.    Yeah.

11    A.    -- Evera, E-V-E-R-A --

12    Q.    Got it.

13    A.    -- Road in Tallmadge.

14    Q.    How long have you lived at that Van Evera address?

15    A.    Since 2019.

16    Q.    Do you own that property or do you rent?

17    A.    I own.

18    Q.    Do you have a mortgage on it?

19    A.    I do.

20    Q.    Who lives at that Van Evera residence with you?

21    A.    My middle son Samuel.  Do you want his last name

22          as well?

23    Q.    Yeah, that's fine.

24    A.    A-H-W-A-J-E-E, and my youngest son Benjamin.  Same

25          last name.
```

Page 9

```
 1   Q.   What are their ages?  There's your trick question.
 2   A.   Sammy is 22 years old and Benjamin is 20.
 3   Q.   Do you have any other children besides Samuel and
 4        Benjamin?
 5   A.   Yes.
 6   Q.   And another son or daughter?
 7   A.   I have another son.  His name is Edward.  Same
 8        last name.
 9   Q.   How old is Edward?
10   A.   Twenty-four.
11   Q.   So Samuel and Benjamin live with you?
12   A.   Yes.
13   Q.   Have they lived with you since the beginning of
14        the year?
15   A.   Benjamin just moved back into the residence I want
16        to say about June, if I remember correctly.
17   Q.   I recall seeing that name in some of the
18        paperwork.  Is it -- pronounce the last name for
19        me.
20   A.   "Owagee."
21   Q.   "Owagee"?
22   A.   Yes, sir.
23   Q.   Mr. Ahwajee was a -- he was a deputy sheriff,
24        wasn't he?
25   A.   Yes, sir.
```

```
 1   Q.   You were married to him?

 2   A.   Yes, sir.

 3   Q.   How long were you married to -- I don't know his

 4        first name.

 5   A.   Edward.

 6   Q.   Edward.  How long were you married to Edward?

 7   A.   Five years.

 8   Q.   Approximately when was that?

 9   A.   We were married in 2003.

10   Q.   Are you married now?

11   A.   No.

12   Q.   Have you been married since 2008?

13   A.   No.

14   Q.   Does Samuel or Benjamin or Edward rely on you for

15        financial support?

16   A.   Yes.

17   Q.   To what extent?  Explain.

18   A.   My middle son Samuel is autistic.  He does work

19        part-time, but he will not be able to perform

20        advanced work, so he relies on my income.

21   Q.   Okay.

22   A.   And right now my oldest son Edward relies on my

23        assistance.

24   Q.   What does that mean?  Like groceries, car

25        payments, rent?  What --
```

```
 1   A.   When he needs money, I give him money.

 2   Q.   Okay.  Does your ex-husband Edward support the

 3        three children?

 4   A.   No.

 5             Can I -- let me back up with that,

 6        because "support" could mean him staying there.

 7        Edward, my oldest son, is living with his father

 8        right now.

 9   Q.   Okay.

10   A.   But as far as monetary, no.

11   Q.   Speaking of that -- well, let me ask you this:  Do

12        you have any other family that lives in the area

13        that you consider to be a witness in this case?

14   A.   Yes, sir.

15   Q.   Who?  Somebody that might have information that I

16        need to discover.  Do you have any siblings?

17   A.   I do, but we don't talk about this case.

18   Q.   Okay.  And I'm not interested in -- I'm only

19        interested in if they potentially could be a

20        witness in the case.

21   A.   As of right now, sir, all I can say is I don't

22        think so.

23   Q.   Okay.  Fair enough.  Has anybody else besides your

24        two sons lived at the Van Evera address since the

25        first of the year?  Has anybody lived there with
```

Page 12

1       you besides your two sons?

2   A.  No.

3   Q.  What is your source of income right now?

4   A.  My retirement.

5   Q.  Your retirement from Summit County?

6   A.  Yes.

7   Q.  How much is your pension or your retirement with

8       Summit County?

9   A.  I clear about $3,000 a month.

10  Q.  What does -- what does "clear" mean?  That's net,

11      or you make --

12  A.  That's approximately what I get monthly in income

13      from the Summit County Sheriff's Office in

14      retirement, PERS.

15  Q.  After taxes.

16  A.  Correct.

17  Q.  Okay.  Do you receive any money from your service,

18      from your military service?

19  A.  Yes, sir.

20  Q.  How much money do you receive from that?

21  A.  Approximately $700.

22  Q.  $700 a month?

23  A.  Yes, sir.

24  Q.  I'll skip ahead and ask you a question that I

25      might have asked at the end of the deposition, but

Page 13

```
 1        you've told me your income.  Are you having -- are
 2        you able to live on that income?  Are you paying
 3        your bills, so to speak?
 4    A.  I'm a little behind right now.
 5    Q.  In what regard?
 6    A.  I'm behind on the mortgage payment and some of the
 7        credit cards.
 8    Q.  Do you have any plans, as we sit here today, to
 9        find additional employment?
10    A.  Yes, sir.
11    Q.  Setting aside law enforcement, do you have any
12        ideas?  Are you looking for a second job or --
13    A.  Yes, sir.
14    Q.  -- a job?
15    A.  I'm sorry.  I didn't mean to --
16    Q.  No, no.  That's fine.
17    A.  -- interrupt you.  Yes, sir.
18    Q.  What do you have in mind?
19    A.  I would like to continue my career in law
20        enforcement.
21    Q.  Any thought to getting a job other than law
22        enforcement?
23    A.  No, sir.
24    Q.  Why not?
25    A.  It's my passion.  It's what I've done for 30
```

Page 14

```
 1        years.  It's what I know, it's what I breathe,
 2        it's what I eat.
 3   Q.   If you can't get a job -- so if you're unable to
 4        find a job in the law enforcement field, are you
 5        just going to try to make ends meet?
 6   A.   I'm going to have to have some sort of income,
 7        additional income.
 8   Q.   But you're locked in exclusively to law
 9        enforcement?
10   A.   Like I said, sir, it's my passion, it's my career,
11        it's what I know.
12   Q.   I'm sorry about this.  I swallowed it down the
13        wrong pipe.
14             I'm going to ask you a little bit about
15        your educational background and your employment
16        background, but -- I have a cheat sheet, because
17        in your personnel file, you filled out an
18        employment application way back when you applied
19        at the -- for the job at the Summit County
20        Sheriff's Office, so I know the answers.
21             You graduated high school.  Tallmadge
22        High School?
23   A.   Yes, sir.
24   Q.   What year was that?
25   A.   1988.
```

1   Q.   What did you do after graduating in 1988?

2   A.   I went to the military, United States Air Force.

3   Q.   And how long were you in the Air Force?

4   A.   I did four years active duty, and then I went into

5        the Reserves, so that was an additional 10 years.

6        During that time, I was reactivated for the war

7        for Kosovo, and I was also reactivated for --

8        after September 11th.

9   Q.   Okay.  And you were honorably discharged?

10  A.   Yes, sir.

11  Q.   Is it considered retired?  I mean --

12  A.   No, sir.

13  Q.   Would you say you're -- you're not retired?

14  A.   No, sir.

15  Q.   Okay.  What kinds of things did you do during your

16       four years of active duty?

17  A.   I was in the Security Forces division, which is

18       gate guard, patrol and investigations.

19  Q.   So at some point you separated from the military,

20       correct?

21  A.   Yes, sir.

22  Q.   I think I saw that your first law enforcement job

23       was with Clermont County?

24  A.   Yes, sir.

25  Q.   So you came out of the Reserve -- or you came out

```
 1        of the military and applied with Clermont County?
 2   A.   Yes, sir.
 3   Q.   And what did you do with Clermont County?
 4   A.   May I also add that in between the military and
 5        Clermont County I started taking classes at Akron
 6        University.
 7   Q.   Okay.
 8   A.   But once I applied for Clermont County and got the
 9        position, then I withdrew from Akron University.
10   Q.   And you were hired as a deputy sheriff at Clermont
11        County?
12   A.   I was hired as a detective.
13   Q.   How long were you with Clermont County?
14   A.   Approximately two years.
15   Q.   Okay.  I'm going to start marking a few of these
16        things.
17             (Defendants' Exhibit A was marked
18          for identification.)
19   Q.   Stacy, I've handed you what I have marked as
20        Defendants' Exhibit A.
21             Did you attend OPOTA when you were
22        employed by Clermont County?
23   A.   Yes, sir.
24   Q.   Okay.  You finished in August of '93?
25   A.   Yes, sir.
```

Page 17

```
 1    Q.   So apparently, according to the date on this
 2         letter I'm about to hand you from then-Sheriff
 3         Richard Warren, I'll mark it Defendants'
 4         Exhibit B, it looks like in '94 Summit County
 5         hired you as a deputy sheriff.
 6              (Defendants' Exhibit B was marked
 7               for identification.)
 8    Q.   Were you with Clermont County and you saw the
 9         position in Summit County?  How did that come
10         about?
11    A.   Well, I was working with the Clermont County
12         Sheriff's Office in their narcotics division.
13              MR. TORCH:  I need a copy.
14              MR. REECE:  Oh, I'm sorry.  I was
15               wondering why I had an extra copy.
16              (Handing.)
17    A.   I'm sorry.
18    Q.   No.
19    A.   When I was working in narcotics as a -- or in
20         Clermont County as a narcotics detective, we had a
21         class, a basic narcotics class that occurred down
22         in Clermont County, and that's when I met a group
23         of people from Summit County narcotics, and they
24         said that they could really use me in Summit
25         County, and so I applied and received the
```

Page 18

```
 1        position.

 2  Q.    And that was -- according to the letter, that was

 3        the beginning of December of 1994?

 4  A.    Yes, sir.

 5  Q.    So when you started in 1994 -- I guess -- I'm

 6        thinking about marking these.

 7              I have these various employment

 8        appointments every four years with Summit County.

 9        What did you do when you were first hired at

10        Summit County?

11  A.    I was assigned to the narcotics division.

12  Q.    And how long did you spend time with the narcotics

13        division?

14  A.    Approximately 2000, late 2000.

15  Q.    So '94 through 2000?

16  A.    Yes, sir.

17  Q.    What kinds of things did you do for the narcotics

18        division?

19  A.    Investigated crimes of narcotics and worked

20        undercover.

21  Q.    Where did you go from the narcotics division?  Did

22        you transfer out?

23  A.    Yes, sir.

24  Q.    Where did you go from there?

25  A.    Community policing.
```

```
 1   Q.   Was that by choice?  Was that something you wanted
 2        to do?
 3   A.   Yes, it was my choice.
 4   Q.   How long were you in -- I'm not going to hold you
 5        to specific dates, but how long were you in
 6        community policing?
 7   A.   Approximately two years maybe, I hope.  Please
 8        don't --
 9   Q.   What kinds of --
10   A.   -- hold me to it.
11   Q.   No, that's fine.  What kinds of things did you do
12        in community policing?
13   A.   I was assigned with bicycle patrol up in -- where
14        the -- Boston Heights area, and then they ended up
15        not utilizing that position anymore.
16   Q.   So at some point after two years or so you
17        transferred out of community policing?
18   A.   Yes, sir.
19   Q.   Where did you go from there?
20   A.   I believe I went to the court services division.
21   Q.   What responsibilities or job responsibilities did
22        you have for court services when you were there?
23   A.   Custody and control over the inmates for court.
24   Q.   The ones that go to court?
25   A.   Yes, sir; transport.
```

1   Q.   How long were in court services; do you recall?

2   A.   I don't.

3   Q.   Two years, 5 years, 10 years?  I'm not -- I'm not

4        going to hold you to a specific date.

5   A.   (No response.)

6   Q.   Do you recall transferring out of court services?

7   A.   Yes, sir.

8   Q.   Okay.  Where did you go from there?

9   A.   I went to the jail.

10  Q.   Which is called corrections?

11  A.   Yes, sir.

12  Q.   Did you go there by choice or were you transferred

13       there?

14  A.   I also worked civil division, but I -- and that

15       was before the jail in 2009.  I remember that for

16       the fact that we had to give concessions, and I

17       was transferred out of civil division back to the

18       courthouse and then to Summit County Jail.

19  Q.   At some point when we reviewed your disciplinary

20       file and some disciplinary incidents, I saw that

21       at some point, I think it was in 2013, you signed

22       a settlement agreement and you got transferred to

23       the jail.  Is that -- is that the same time that

24       you went to the jail?

25  A.   I believe so.

Page 21

```
 1   Q.   So you didn't go, then you went back.  Are we
 2        talking about the same thing, that you
 3        involuntarily went to the jail, went to
 4        corrections?
 5             MR. TORCH:  And I'll just say, if you
 6          know, you know.  If you don't know --
 7   A.   I don't know.  I'm sorry.
 8             THE WITNESS:  Thank you.
 9   A.   Because --
10   Q.   That's fine.
11   A.   I apologize.
12   Q.   Yeah.  Yeah, I mean, we can piece it all together
13        through your personnel file.  I just recall seeing
14        that after a series of incidents at Disability --
15        what is it, Developmental Disability, DD Board,
16        whatever you call it, that you signed an agreement
17        and took a transfer to the jail.
18   A.   No, sir.  I went back to the courthouse.
19   Q.   Okay.  Okay.  So at some point you left
20        corrections, and where did you go from there?
21   A.   Detective bureau.
22   Q.   And ultimately you retired from the detective
23        bureau.
24   A.   Yes, sir.
25   Q.   Do I understand that?  Okay.
```

```
 1                   Again, I'm just trying to make a record
 2          of your -- you know, your history with Summit
 3          County and your assignments and things of that
 4          nature.
 5                   I also saw in going through these various
 6          appointments that we have Sheriff Warren, Sheriff
 7          Alexander, Sheriff Barry and Sheriff Fatheree.
 8                   You served your time -- or "served your
 9          time."  You were employed under the regime of four
10          sheriffs; is that correct?
11     A.   Yes.
12     Q.   Do I have them correct?  Warren, Alexander, Barry
13          and Sheriff Fatheree, correct?
14     A.   Yes, sir.
15     Q.   Any opinion about Sheriff Warren?  Did you -- did
16          you like working under him?
17     A.   Honestly, sir, no matter what sheriff I worked
18          under, I did my job to the fullest.  It wasn't a
19          matter of liking or not liking.  I did my job.
20     Q.   Later on I might ask you some questions about your
21          political affiliation or support of -- in the last
22          election with Barker -- Shane Barker, correct?
23     A.   Yes, sir.
24     Q.   Did you spend any time -- when you worked under
25          these three sheriffs, Warren, Alexander or Barry,
```

Page 23

```
 1        did you participate in any political activities
 2        for them?
 3   A.   I did go to the parties that they had prior to the
 4        election, yes, sir.
 5   Q.   I mean, throughout your career when you worked
 6        under sheriffs, did you consider yourself
 7        politically active?  Did you go walk in parades
 8        with them --
 9   A.   No.
10   Q.   -- put up signs for them, hammer in signs --
11   A.   No, sir.
12   Q.   -- hand out literature?  You don't consider
13        yourself -- you didn't consider yourself
14        politically active for any of them?
15   A.   No, sir.
16   Q.   And I think based on an answer you gave me to a
17        written question, I kind of got the sense that you
18        weren't very politically active in support of
19        Shane Barker, were you?
20   A.   I don't understand the question.
21   Q.   You didn't -- you didn't hammer in -- hammer in
22        signs for him or anything of that nature, did you?
23   A.   I displayed signs on my property and two of my
24        families' properties and attended one of the
25        parties previous to election.
```

1   Q.   Right.  I'm going to explore that a little later,

2        but that was the extent of your support for --

3   A.   Yes, sir.

4   Q.   -- for him?  So ultimately you retired, my notes

5        say, November 30th of 2021; is that correct?

6   A.   Yes, sir.

7   Q.   Was that a planned retirement?  Was that a date

8        you had your sight set on or...?

9   A.   There were some changes in the retirement system

10       that sped up the retirement a little earlier than

11       what I anticipated.

12  Q.   What were your plans?  Here comes retirement day.

13       I mean, what did you have in mind at that point?

14       Were you going to try to --

15  A.   Prior to retirement, I wanted to ensure that I was

16       able to become a special deputy and have income

17       after retirement.

18  Q.   And what efforts did you make?  What did you do to

19       ensure that?

20  A.   I spoke --

21  Q.   Did you talk to the sheriff?

22  A.   I'm sorry.  I spoke with -- I didn't mean to

23       interrupt you.

24  Q.   No, that's fine.

25  A.   I spoke with Captain Scott Cottle, who was my

1       supervisor within the detective bureau, and

2       expressed that I would like to become special

3       deputy, and he asked if he wanted me to talk to

4       the sheriff or if I wanted to talk to the sheriff,

5       and I told him it didn't matter to me.  [Sic.]

6               And he spoke with her, and eventually I

7       received the information that she was going to

8       give me my commission for a special deputy.

9                    (Defendants' Exhibit C was marked

10          for identification.)

11   Q.  I'll hand you what I marked, Stacy, as Exhibit C.

12               November 30th, 2021.  This appears to be

13       your employment as a special deputy sheriff; is

14       that correct?

15   A.  Yes, sir.

16   Q.  So you had some communications with Scott Cottle

17       about this.  Did you ever have any direct

18       communications with Sheriff Fatheree about this?

19   A.  Yes, sir.

20   Q.  What kinds of things did you discuss with her?

21   A.  I scheduled -- they scheduled a meeting with the

22       sheriff, and at that time I met with her, and she

23       said she'd give me my commission.

24   Q.  Did she express any, I'll say, expectations?

25   A.  Her expectations.

Page 26

1    Q.   And what did she say?

2    A.   That she wanted to stay in as a sheriff for

3         another eight years.

4    Q.   So what was and what is your understanding of a

5         special deputy?  You're appointed by the sheriff,

6         correct?

7    A.   Yes, sir.

8    Q.   And you serve at the will of the sheriff.  Do you

9         understand that?

10   A.   No, sir.

11   Q.   No, sir, what?  Tell me --

12   A.   I don't understand "at the will" means.  [Sic.]

13   Q.   Meaning that according to the policy, which I'll

14        mark and show you, that the sheriff can

15        decommission a special deputy at any time for any

16        reason.

17   A.   Yes, sir.

18   Q.   You understand that?

19   A.   Yes, sir.

20   Q.   Was that clear to you when you became a special

21        deputy?

22   A.   Yes, sir.

23   Q.   Do you understand what I think I understand, which

24        is a special deputy for the Summit County

25        Sheriff's Office is not an employee of Summit

```
 1      County?  Do you agree with that?

 2  A.  No, sir.

 3  Q.  Why not?

 4  A.  I am under the color of the sheriff and work as

 5      the sheriff as her extension in law enforcement.

 6      I was also covered medically when I was injured.

 7      And I don't know for sure, but I don't believe you

 8      can have Workman's Comp on somebody that is not an

 9      employee.

10  Q.  Well, we'll leave that -- obviously that's

11      probably a legal issue.  I guess I would

12      respectfully disagree.

13              But you did not get -- you did not have

14      health insurance from Summit County when you were

15      a special deputy; is that correct?

16  A.  Correct.

17  Q.  You had to get your own health insurance?

18  A.  Yes, sir.

19  Q.  You were not paid by Summit County, were you?

20  A.  Besides my retirement check --

21  Q.  Correct.

22  A.  -- and the money I made working different jobs,

23      yes.

24  Q.  Yes what?  What does that mean?  Yes, you were

25      paid by Summit County?
```

1  A.  Yes, sir.

2  Q.  And my understanding is, and you correct me if I'm

3      wrong - let's get a mutual understanding here -

4      that you were paid under a system called Detail

5      Kommander.

6  A.  Yes, sir.

7  Q.  That's not the Summit County payroll.

8  A.  Prior to Detail Kommander, they -- I was paid by

9      Summit County.  They got this Detail Kommander

10     after I had been in as a special deputy.

11 Q.  Okay.  But it was more -- wasn't it -- wouldn't

12     that have been more of Summit County passing

13     through the money?

14         You work an extra job for somebody,

15     Blossom or Bissell Elementary School.  I mean,

16     those extra jobs pay money, and then the money is

17     transferred to you, correct?

18 A.  Yes, sir.

19 Q.  So when I called Summit County payroll and I said,

20     "Was Stacy Clark an employee of you from 2021 till

21     the present?" the answer I got was, "No.  She was

22     never an employee of Summit County."

23         Do you have any reason to dispute that?

24 A.  I believe I was an employee of Summit County.  I

25     was required to volunteer time to work at the

```
 1          jail, to assist the other deputies, and I believe

 2          I was considered an employee of the Summit County

 3          Sheriff's Office during that -- my special deputy

 4          time.

 5     Q.   Well, I guess we'll leave that as a legal issue.

 6          The answer I got was no.  I don't know what to

 7          say, other than -- how were you paid through

 8          Detail Kommander?  How did that work?

 9     A.   I don't know, sir.  I'm not the administrator of

10          the payroll.

11     Q.   Well, it's a payroll system where the vendor, the

12          extra job, the people that want special deputies,

13          they pay into this Detail Kommander system.  It's

14          a software system, and then you get paid through

15          that.  Is that how you got paid when you worked

16          Bissell?

17     A.   Yes.  I don't know the transition that occurs

18          before it gets into my account besides the Detail

19          Kommander.

20     Q.   How did you get money?

21     A.   Showed up in my bank account after I worked.

22     Q.   It wasn't a deposit through Summit County, was it?

23     A.   I don't know, sir.  It was Detail Kommander.

24          That's how I got paid.  I don't know how to answer

25          that.
```

1   Q.   Right.  When you were a special deputy, did you

2       make any Workers' Compensation claims?

3   A.   Yes, sir.

4   Q.   For what?

5   A.   I was injured while I was working as a school

6       resource officer at Bissell Elementary.

7   Q.   When was that?  We're going to -- I want to

8       discuss with you your time at Bissell, because I

9       have -- I actually have your time sheets.  Your

10      attorney provided them to me.  And I saw in '20 --

11      the spring of '23 your -- you had full time sheets

12      working there, but in the fall of '24 it kind of

13      tailed off and William Lee filled in for you.

14          Was the ankle injury sometime in between

15      the spring of '23 and the fall of '24?

16   A.   Yes, sir.

17   Q.   What happened?

18   A.   I broke my ankle on July 31st.

19   Q.   Of what year?

20   A.   Of 2024.  Thank you.

21   Q.   '4, right.  At the school?

22   A.   No, sir.

23   Q.   Okay.  So you said you made a Workers'

24      Compensation claim because you were injured at

25      Bissell.  Where did you injure your ankle?

Page 31

```
 1   A.   At home.

 2   Q.   In July of '24.  So it was not work related?

 3   A.   No.

 4   Q.   How did -- explain to me how it was a Workers'

 5        Compensation claim.

 6   A.   That claim was not a Workman's Compensation --

 7   Q.   Okay.

 8   A.   -- claim.

 9   Q.   Okay.  So you broke your ankle in July of '24.

10        When did you make a Workers' Compensation claim

11        related to the work at Bissell?

12   A.   My -- during -- my injury at Bissell Elementary

13        was nothing to do with my ankle.  I hurt my knee

14        at Bissell Elementary.

15   Q.   Oh.  Doing what?

16   A.   I was escorting a student with another aide, and

17        the student wrapped his legs in between my legs

18        and made me fall without being able to brace

19        myself.

20   Q.   Like intentionally?

21   A.   Yes.

22   Q.   So he was trying to take you down or something?

23   A.   Yes, sir.

24   Q.   When was that?  Was that the school year of -- the

25        school year of fall of '24?
```

Page 32

```
 1   A.   No, sir.

 2   Q.   Okay.  So it was before the ankle injury?

 3   A.   Yes, sir.

 4   Q.   We've got a knee injury at Bissell and then an

 5        ankle injury in the summer of '24.

 6   A.   The knee injury was not during the summer of 2024.

 7        The ankle injury was the summer of 2024.

 8   Q.   Correct.  So the knee injury could have been the

 9        spring of '23?

10   A.   Correct.

11   Q.   How often would you go hands-on with a student

12        like that?  I mean, was that an anomaly or was

13        that something that --

14   A.   It was an anomaly.

15   Q.   Yeah?

16   A.   Yes, sir.

17   Q.   Because what's Bissell?  An elementary school?

18   A.   Yes, sir.

19   Q.   What brought that about?  What --

20   A.   I --

21   Q.   I guess I'm curious.

22   A.   I was just walking through the hallways doing my

23        rounds, and an aide had an unruly student and

24        asked for my assistance in getting them escorted

25        into one of the behavioral classrooms.
```

```
 1   Q.   Okay.  I'm sorry if I'm jumping around, but while

 2        we're hot on the topic, so to speak, so you broke

 3        your ankle in July of '24.

 4              I don't know.  School starts so early

 5        these days, I mean, August.  Were you able to

 6        start the fall of '24 at Bissell with a broken

 7        ankle?

 8   A.   No, sir.

 9   Q.   Okay.  So when I see those time sheets and I see

10        Jerome -- is it Hall and William Lee?

11              MR. REECE:  Do I got the name right?

12              SHERIFF FATHEREE:  (Nodded head up and

13           down.)

14              MR. REECE:  Yeah.

15   Q.   I saw a lot of time sheets where they were filling

16        in for you.

17   A.   Yes, sir.

18   Q.   And that was the fall of '24.

19   A.   I don't know who filled in exactly except for

20        Deputy Lee.

21   Q.   Yeah.  They seemed to like him, the principal and

22        the teachers.

23   A.   Is that a question?

24   Q.   Well, I'll ask you about it later.

25              What other -- what do you want to call
```

1     them?  Extra jobs?  Special deputy jobs?  I saw

2     Blossom Music Center as one.

3          What kind of things -- did you do

4     anything besides Bissell and Blossom Music Center

5     as a special deputy?

6  A.  I assisted in parades and worked at the jail for

7     my required time.

8  Q.  You mean assisted in parades like crowd control or

9     blocking off intersections?

10  A.  Yes, sir.

11  Q.  Okay.  Jumping ahead a little bit, how did the

12     Bissell Elementary School job come about?  What,

13     they post a job I understand, or did you see a

14     posting for one and you say, "Hey, I want that

15     one"?

16  A.  I was contacted by Captain Scott Cottle and asked

17     if I would be interested in working at Bissell

18     Elementary as a school resource officer.  There

19     was another school, Wilcox Elementary, that was

20     also within Twinsburg that I worked at.

21  Q.  So you show up at Bissell.  Do you have to go to

22     some sort of school resource officer training?

23          I'm familiar with Akron Police Department

24     and their school resource officers, and I think

25     most of them are certified or something like that.

1           Did you have to get certified?

2    A.    I don't believe I had to be certified because I

3          worked prior to, but then I did get certified.

4    Q.    As a school resource officer?

5    A.    Yes, sir.

6    Q.    What does that entail?  What did you have to do?

7    A.    It was an online Zoom class for a week.

8    Q.    Did you replace somebody at Bissell or was this

9          the first time they had a school resource officer?

10   A.    No, sir.  The school resource officer that had

11         previously been there I believe left to run for a

12         political position in Twinsburg, so they needed

13         coverage.  That's my understanding.

14   Q.    Right.  What kinds of things -- I'm jumping ahead

15         again, but I want to, so bear with me.

16              What kinds of things does a school

17         resource officer do at an elementary school?  What

18         do you do during the day?

19   A.    I -- after -- I would go out to the bus in the

20         morning time, when the kids get out of school and

21         make sure that the parent line was running

22         smoothly and everybody was doing what they were

23         supposed to do afterwards.

24              I would secure the -- the doors would be

25         secured, and I would walk around and do door lock

1       checks and do walks throughout the school during

2       the daytime.

3             During lunchtime I sat with the children

4       and went out to recess.  But during the times of

5       classroom, my responsibility was just walking

6       through.  I didn't interrupt any classes or

7       anything.

8  Q.   What were the hours?  Seven to 3 or something?

9  A.   Approximately 7:30 to 3:30, 8 to 4.  It depended.

10  Q.   Have you ever filed bankruptcy?

11  A.   Yes, sir.

12  Q.   When did you file bankruptcy?

13  A.   I believe it was in 2007.

14  Q.   Which would have been the time you were married to

15       Edward?

16  A.   Yes, sir.  Going through my divorce.

17  Q.   Did you both file for bankruptcy or just you?

18  A.   I believe just me.  I don't know if he's filed

19       bankruptcy.

20  Q.   Was that the only time you filed?

21  A.   Yes, sir.

22  Q.   Have you ever undergone any alcohol or drug

23       dependency care counseling?

24  A.   No.

25  Q.   Last fall, the fall of 2024, who was your general

```
1          physician, general doctor?

2     A.   Can you repeat the question?  I'm sorry.

3     Q.   You know, we all have a general physician.  Who

4          was your doctor in the fall of 2024?

5     A.   Veterans Affair.

6     Q.   Okay.  So of all those -- of those assignments

7          that you had at court services, community

8          policing, court services, when you were assigned

9          to the Summit County Developmental Disability, DD

10         Board, which one of the assignments was that?  Was

11         that considered --

12    A.   The assignment --

13    Q.   -- court services?

14    A.   -- was through court services --

15    Q.   Okay.

16    A.   -- yes, sir.

17    Q.   How did that assignment come about?  Was that

18         something you bid on or you --

19    A.   Yes, sir.

20    Q.   What did that entail?  What did you do when you

21         were assigned -- let me back up.

22              How long were you there assigned to the

23         DD Board?

24    A.   I would say approximately a year.

25    Q.   Why did they need a deputy?  What did you do?
```

Page 38

```
 1   A.   I walked around the building.  They had preschool

 2        children in there, so they wanted to have law

 3        enforcement presence because of it being a

 4        preschool.

 5   Q.   Was that five days a week?

 6   A.   Yes, sir.

 7   Q.   Who was your supervisor there outside of the chain

 8        of command?  I mean, not a lieutenant or a -- was

 9        there a supervisor at the DD Board that...?

10   A.   I'm not sure who would be considered my supervisor

11        since my supervisors are all in the sheriff's

12        office and I report to them.

13   Q.   Was there a guy named Tom, Tom Brown?

14   A.   Yes, sir.

15             What's his last name?

16   Q.   Was it Brown?

17   A.   I don't know his last name.

18   Q.   Tom --

19   A.   I don't -- that doesn't sound right.  I know it's

20        Tom, but I don't know his last name.  I can't

21        think of it.

22   Q.   Well, when things went a little sideways at the DD

23        Board, I saw an interview with a guy.  His name's

24        Tom.

25             So which one of these assignments -- it's
```

Page  39

```
 1        work, so I don't know if you'd use the word

 2        "enjoy."  Did you have a favorite between

 3        narcotics, community policing, court services,

 4        jail, corrections, detective bureau?

 5   A.   I loved it all, sir.

 6   Q.   Yeah.

 7   A.   I made the most of every position that I was at.

 8   Q.   Did you ever have any difficulties, personal

 9        disagreements or difficulties with your chain of

10        command under any of those divisions; "I didn't

11        like that sergeant" or "I didn't like that

12        lieutenant" or something of that nature?

13   A.   I don't know how to answer that.

14             My personal opinions of my colleagues?

15        There's different assets to each person, and

16        there's also some that might not be as helpful.

17        Different styles.

18   Q.   Right.

19             Jerome Hall, that's the guy's name.  He

20        filled in at Bissell, William Lee and Jerome Hall.

21             Why are you smiling?

22   A.   Would you prefer I didn't?

23             MR. REECE:  What are we on?  A, B, C --

24        D?

25             THE COURT REPORTER:  Mm-hmm.
```

Page 40

```
 1                    (Defendants' Exhibit D was marked
 2              for identification.)
 3    Q.   Stacy, I'm going to hand you what I've marked as
 4         Defendants' Exhibit D.  I can tell you this is a
 5         special deputies policy.  It became effective in
 6         2021.
 7              The reason I mark it is because if you go
 8         to page 2 of 3, it was what I was asking you about
 9         earlier, which is Roman numeral II (B).
10              According to the policy, the sheriff
11         reserves the right to suspend or revoke any
12         commission or to reclassify any special deputy at
13         the sheriff's discretion.
14              So special deputies, at least from
15         2021 -- I can tell you, that was -- that same
16         language was in the prior policy.  But at least in
17         2021 when you were serving as a special deputy,
18         the sheriff had the right to suspend or revoke
19         your commission at her discretion; is that
20         correct?
21    A.   Correct.
22    Q.   And she did that in this case, didn't she?  She
23         exercised that discretion to revoke your
24         commission; is that correct?
25    A.   I don't know how to answer that.
```

Page 41

```
 1    Q.   Well, I guess you can either agree or disagree.

 2    A.   My suspension or relocation [sic] of my commission

 3         was due to my attending the party of Shane Barker

 4         on November 5th, Election Day.

 5    Q.   But my question is, she had the discretion to

 6         revoke your commission according to this policy,

 7         and she did just that, didn't she?  She exercised

 8         that discretion.

 9    A.   She did.

10    Q.   Do you know whether Sheriff Fatheree has exercised

11         that discretion and rescinded or revoked or did

12         not renew other special deputies' commissions?  Do

13         you know if she's done that?

14    A.   Yes, sir.

15    Q.   And that was well within her discretion to do that

16         as sheriff, correct?

17    A.   I'm not sure of the circumstances, sir.

18    Q.   This folder here we're probably going to spend

19         some time on because it represents what I'll call

20         your disciplinary file.  It was given to me like a

21         52-card pickup as they say.  It took me a while to

22         organize it like this, but I think I've organized

23         it into a number of different what I'll call

24         disciplinary events throughout your years, and I

25         want to go through each one of them one by one.
```

Page 42

```
 1   A.   Yes, sir.

 2   Q.   I asked you at the beginning -- you didn't have an

 3        opportunity to review each one of these incidents,

 4        right?

 5   A.   No, sir.

 6   Q.   Do you remember them?  Do you have an independent

 7        recollection of --

 8   A.   As much as I can, yes, sir.

 9   Q.   Okay.  Well, I mean, there's reports on each one

10        of them, so maybe that'll trigger your memory or

11        something of that nature.  But before I get into

12        these, why don't we take about a five-minute break

13        because I need to take a five-minute break.  Are

14        you good with that?

15   A.   Yes, sir.

16              MR. REECE:  All right.  Let's take a

17           break.

18                   (A recess was taken.)

19   BY MR. REECE:

20   Q.   Stacy, the point of going through these

21        disciplinary incidents isn't to rehash them and do

22        you agree or disagree, do you agree or disagree.

23        The point is, they're in your file, and I'm just

24        going to review them to see if you recall them.

25              I mean, you can't unring the bell.
```

1          They're in your disciplinary file, and I'm here to

2          ask you about them.  So that's the point of this

3          whole exercise.  Okay?

4     A.   Yes, sir.

5     Q.   I tried to put them in chronological order.

6          That's not how they were given to me.

7                    MR. REECE:  A, B, C, D -- E?

8                    THE COURT REPORTER:  Yes.

9                    (Defendants' Exhibit E was marked

10            for identification.)

11    Q.   I'm going to hand you what I've marked as

12         Defendants' Exhibit E.  And I want to give you an

13         opportunity --

14                    MR. TORCH:  Why don't you look through

15            it.

16    Q.   Yeah, go ahead.

17    A.   (Complying.)

18    Q.   Okay.  Stacy, you've had a moment to kind of read

19         through that.  I know it's -- let me ask you this:

20         Do you recall this investigation in 2006 about

21         this reported theft of Vicodin pills?

22    A.   No, sir.

23    Q.   You don't remember this?

24    A.   No, sir.

25    Q.   Did reading -- does reading through it now refresh

Page 44

1       your memory?

2   A.  I remember the incident, but I was not a part of

3       the investigation.

4   Q.  Okay.  What caught my eye was on Bates stamp 2278.

5       See those little Bates stamps at the bottom?

6   A.  Yes, sir.

7   Q.  In 2006, Sergeant Edward Ahwajee -- am I saying it

8       correctly?  That was your ex-husband?

9   A.  Yes, sir.

10  Q.  He schedules an appointment to speak to Allyson

11      Leonard to give some additional information about

12      his wife, Deputy Stacy Clark, abusing prescription

13      drugs.

14              Was there -- was there some talk about

15      you abusing prescription drugs back in 2006?  I

16      mean, why would -- do you have any reason to know

17      why your ex-husband -- or was he your husband at

18      that time?

19  A.  We were going through our divorce.

20  Q.  "I have more information about Stacy abusing

21      drugs."

22              Do you have any reason to know what

23      motivated him to do that?

24  A.  We had a very bad divorce.

25  Q.  What -- the underlying allegation in this is that

1        Nikki Lappin said you stole or took 17 pills, 17

2        Vicodin pills instead of the two she gave you

3        permission to take.  Did you do that?

4   A.   No.

5   Q.   But it was investigated, correct?

6   A.   Yes, sir.

7   Q.   Was it a misunderstanding that 17 pills were

8        missing, if you recall?

9   A.   Like I said, the divorce was really, really bad.

10  Q.   What caught my eye too was one of the paragraphs

11       on 2279 Bates stamp that said Stacy was put on

12       speakerphone, and Stacy stated she was sorry for

13       taking the pills and she would repay her when she

14       gets her Darvocet prescription filled.

15  A.   I'm trying to find where you're reading, sir.  I'm

16       sorry.

17  Q.   (Indicating.)

18  A.   Down here.  Okay.

19  Q.   Nikki states she called Stacy the next day and

20       handed the phone to Kim to talk to her, and Stacy

21       apologized for taking the Vicodin pills.

22  A.   No, sir.

23  Q.   Did you take them?

24  A.   No, sir.

25  Q.   Did you apologize for taking them?

Page 46

```
 1   A.   No, sir.

 2   Q.   Okay.  But, nevertheless, this is an investigation

 3        into it --

 4   A.   Yes, sir.

 5   Q.   -- that you had allegedly taken the Vicodin pills.

 6        Okay.

 7                  (Defendants' Exhibit F was marked

 8             for identification.)

 9   Q.   Stacy, I'm going to hand you what we've marked as

10        Exhibit F.  That's a lot of paper.  But it's a lot

11        of paper because there's three separate reports of

12        investigation in here.

13                  This happened in 2007.  And my

14        understanding was it started because there was --

15        an investigator from the Ohio State Board of

16        Pharmacy began to investigate a nurse named Thomas

17        Werner at the Falls Pain Management Center in

18        Cuyahoga Falls.

19                  Do you remember that investigation in

20        2007?

21   A.   Some of it, yes, sir.

22   Q.   Okay.  And this is extensive.  And, you know, in

23        all fairness, if you want to take some time and

24        read through it, that's fine, but I can tell you

25        that there's a report of investigation by Thomas
```

Page 47

1       Miksch, there's a report of investigation by

2       Lieutenant Richard Paolucci, and there's a report

3       of investigation from the Ohio State Board of

4       Pharmacy investigator.

5               And there was some talk that you were --

6       there was an allegation that you were -- some

7       fraud on your part to try to get some

8       prescriptions filled by this Thomas Werner, who

9       was a nurse.  Do you remember that?

10  A.   I do.

11  Q.   And according to the cover letter, on August 6th

12       you were placed on administrative leave pending

13       the outcome of this.  And it looks like according

14       to the second page, 1881, the investigation went

15       until August 23rd when the investigation

16       concluded.

17               Do you remember being on administrative

18       leave during this investigation?

19  A.   I don't remember, sir.

20               But in my paper for 82, is it empty on

21       purpose?

22               MR. TORCH:  (Nodded head up and down.)

23               THE WITNESS:  Okay.

24  Q.   What, 1882?

25  A.   Yes, sir.

1   Q.   Yeah, it's blank.

2   A.   Thank you.

3   Q.   What do you remember?  Tell me in your own words.

4        I mean, I've read this.  I understand what the

5        allegations were.  But what did you understood --

6        understand the allegations were between you and

7        Thomas Werner, this nurse?

8   A.   I was in pain management at Western Reserve

9        Hospital, and I received my prescriptions, and I

10       had filled my prescriptions, and I lost a bottle

11       of pills.  I could not find them anywhere.  So I

12       called back to find out what I needed to do, and

13       the nurse told me to come back in and they would

14       redo the prescription, which is what happened.

15  Q.   What had happened prior to 2007, particularly

16       August of 2007?  What kinds of things were you

17       going through pain management for?

18  A.   Back issues.

19  Q.   Okay.  Work-related back issues?

20  A.   No, sir.

21  Q.   I think the allegations in this were that you

22       tried to deceive Mr. Werner -- or Nurse Werner,

23       and he was dispensing these prescriptions without

24       the authority to do it.

25            Did you ever attempt to deceive that

Page 49

1       nurse, Tom Warren -- Werner?

2   A.  No.

3   Q.  What was your relationship with this Werner at the

4       time?

5   A.  He was the nurse that worked at the pain

6       management clinic.

7   Q.  Right.  Well, something raised enough eyebrows

8       that there were three separate investigations into

9       it.  Do you agree to that?

10              MR. TORCH:  Objection.

11              You may answer.

12  Q.  Well, Lieutenant Richard Paolucci at page 1883,

13      Report of Investigation of the Ohio State Board of

14      Pharmacy at 1893 by Robert Cole, and a third

15      Report of Investigation of the same incident by

16      Thomas Miksch.  This one doesn't have a Bates

17      stamp on it.  Something prompted three reports of

18      investigation.

19  A.  Sir, I believe it's all one investigation, just

20      different reports.

21  Q.  It warranted three people performing an

22      investigation, three separate investigations;

23      would you agree?

24  A.  No, sir.

25  Q.  Okay.  Did you receive any -- I don't think I saw

Page 50

1      that you received any discipline or anything came

2      about these; is that right?

3  A.  No, sir, because it was unfounded.

4  Q.  This investigation was on the heels of the 2006

5      investigation where your now-ex-husband talked

6      about "I have some information about Stacy abusing

7      drugs."

8           I mean, was there talk about you abusing

9      prescription drugs or prescription painkillers at

10     that time?  Was there some concerns in the

11     department about that?

12 A.  From my ex-husband.

13 Q.  All fabricated on his part?

14 A.  Yes, sir.

15 Q.  What motivated him to do that?  Just this divorce?

16 A.  Yes, sir.

17 Q.  So he was trying to paint a picture of you as

18     abusing prescription drugs?

19 A.  Yes, sir.

20 Q.  None of it had any truth?

21 A.  No, sir.

22 Q.  Were you taking prescription painkiller drugs?

23 A.  Yes, sir.

24 Q.  Medications I should say.

25 A.  Yes, sir.

1    Q.   Because according to this printout from the Ohio

2         State Board of Pharmacy -- ultimately, did you

3         stop going to the Cuyahoga Falls Pain Management

4         Clinic?

5    A.   Yes, sir.

6    Q.   Why?

7    A.   Because Dr. Bressi was my last date with his

8         patients.

9    Q.   What did you think about the investigation?  I

10        mean, they put you on administrative leave for a

11        couple weeks.

12   A.   I'm not sure I understand the question.

13   Q.   I mean, you're placed on administrative leave and

14        you're under investigation by the Ohio State Board

15        of Pharmacy for trying to obtain prescriptions by

16        deceit.  Did that upset you?

17   A.   Of course.

18   Q.   Did you -- did you get a lawyer?  Did you seek

19        counsel from anybody?

20   A.   No, sir.

21   Q.   And ultimately nothing came of it.

22   A.   Correct.  It was unfounded.

23             (Defendants' Exhibit G was marked

24          for identification.)

25   Q.   I'll hand you what I've marked as G.  This is from

Page 52

1          2009.  You can go ahead and read it.

2                    I guess I can talk while you're reading

3          it or I can be quiet while you're reading it.

4                    My understanding is it came about from a

5          writ of execution.  You were to go collect some

6          restitution from this Wickens Enterprises, and you

7          met with Mr. Johnson and collected this $784.35 in

8          cash, but you didn't surrender it immediately.

9          That's my understanding of what happened here.  Is

10         that what happened?

11    A.   Yes, sir.

12    Q.   Instead, you went on vacation.

13    A.   No, sir.

14    Q.   Why didn't you immediately surrender the funds

15         back?

16    A.   I was injured shortly after being at that

17         business, and I went to my doctor, which my

18         supervisors were aware of, and they put me on

19         restriction, and so I went home.  And all my

20         paperwork and everything was still in my patrol

21         car, so when Deputy Bailey came to pick it up, it

22         was in my car.  I gave it to him, and he took it

23         downtown.

24    Q.   I have an understanding and it's written in here

25         somewhere that in between that time too you also

Page 53

1      went on vacation.

2   A.  I don't remember a vacation, sir.

3   Q.  It's on the last page.  464 is the Bates stamp.

4       She didn't surrender the funds to the sheriff's

5       civil office until August 18, 2009.  Deputy Clark

6       had been on sick leave and vacation during that

7       time period.  Clark's failure to surrender the

8       funds in a timely manner violated rules and

9       regulations and the sheriff's order.

10               Do you recall the incident?

11  A.  I do recall the incident, but I do not recall

12      going on any vacation.  And maybe I used vacation

13      time during my sick time if my sick time was low.

14      I don't know, sir.

15  Q.  Nevertheless, there was some discipline that came

16      out of this violation of the rules and regulations

17      order -- the sheriff's orders in there that funds

18      shall be deposited immediately on a daily basis

19      except if it's a weekend.

20               So the sum and substance of it was

21      failure to surrender funds collected in a writ of

22      execution; is that right?

23  A.  "Court Ordered for Secure Money" is what they have

24      as a subject and the policy that was violated.

25  Q.  Where would the money have been?  In your car?

Page 54

```
 1   A.   Yes, sir.

 2   Q.   Unsecured?

 3   A.   I had a garage.  We could pull our cars in our

 4        garage and leave our items in the car.

 5   Q.   Okay.  Again, you know, we can sit here until the

 6        end of tomorrow rehashing it, but I just want to

 7        make a record that that was one of the incidents

 8        of discipline.  Fair enough?

 9   A.   Yes, sir.

10   Q.   Okay.  I'm going to hand you what's been -- what

11        I'm going to mark as H.

12             (Defendants' Exhibit H was marked

13          for identification.)

14   Q.   I can give you a little one-sentence preview.

15        This has to do with you reporting your service

16        weapon stolen to give you some context, 2010.

17        Ring a bell?

18   A.   Yes, sir.

19   Q.   Okay.  Good.  A lot to read there.

20   A.   Yes, sir.

21   Q.   So this Aaron McGhee was staying with you?  That's

22        what it says.

23   A.   Yes, sir.  Not for a length of time.

24   Q.   Right.  So you called Bertina King at the Akron

25        Police Department.  You suspected Aaron McGhee
```

1          might have stole your gun and committed a bank

2          robbery?

3     A.   I was unsure what happened.

4     Q.   That's what I'm reading here.

5     A.   Yes, sir.

6     Q.   Okay.  Tell me what you remember about it.  I

7          mean, I've read this, and if somebody wants to go

8          back, they can read this too after -- it's an

9          exhibit to your deposition.

10              But you suspected someone had stolen your

11         .9 millimeter; is that correct?

12    A.   Yes, sir.

13    Q.   How would that come about?  Wasn't it secured?

14    A.   In my house.

15    Q.   Not secured enough that it showed up missing,

16         right?

17    A.   When I arrived home, my door was unlocked and

18         open.  The lights were all on, the TVs were on,

19         and my gun was gone and Aaron was not there, Aaron

20         McGhee.

21    Q.   Okay.  Where would -- let's just surmise that

22         Aaron McGhee took your gun.  Where would he have

23         taken it from?  Do you secure it when you're at

24         home?

25    A.   It would have been in my bedroom.

Page 56

```
 1   Q.   Okay.  So part of the discipline that -- you know,
 2        skip forward to the end.  Part of the discipline
 3        in this was not notifying the proper people when
 4        it was missing, when you discovered it is missing;
 5        is that correct?
 6   A.   Yes.
 7   Q.   You have a duty to notify a supervisor, "Hey, I
 8        can't find my gun.  Someone took my gun."  And you
 9        also -- I think you have an obligation or duty to
10        notify the local law enforcement, which would have
11        been Tallmadge, "My gun is missing."
12             Ultimately, what do you remember?  How
13        did it resolve itself?  Did you get the gun back?
14   A.   Yes, sir.
15   Q.   Who had the gun?
16   A.   I don't remember.
17   Q.   Okay.  Someone returned it though?
18   A.   Yes, sir.
19   Q.   Okay.  Well, you know, the details of it, it goes
20        on and on.  I mean, it looks like a pretty
21        detailed investigation, including some interviews.
22             I guess I'm more interested at least of
23        building a record, as we say.
24             At 2178, page 2178 Bates stamp, there was
25        violations that came about this.  You received
```

Page 57

1      some discipline, which is failure to report

2      immediately to the division commander, failure to

3      report to the proper authority that your gun had

4      been missing, and I think something -- if I recall

5      correctly in reading this, and I read it over the

6      weekend, something about showing up at the jail

7      for work but not having your weapon with you.  Is

8      that correct?

9  A.  Yes, sir.

10 Q.  Why are you laughing?

11 A.  It sounds absolutely ridiculous, but I knew we

12     couldn't have our guns in the jail, and I had not

13     been working there long enough to know that they

14     can send you out to go do things, and I honestly

15     didn't take my gun.

16 Q.  Okay.  Well, did -- you can look back on it now.

17     I mean, I guess I get why you're laughing about it

18     now, but at the time, it certainly prompted an

19     investigation.

20             I mean, this is -- this would take an

21     hour to read if you sat down and read every line

22     and verse.

23             So they thought it was significant enough

24     to investigate it that your weapon showed up

25     stolen, missing or whatever it was.  Do you agree

Page 58

```
 1          with that?
 2   A.     Yes, sir.
 3   Q.     It prompted an investigation.
 4   A.     Yes, sir.
 5   Q.     Which resulted in discipline.
 6   A.     Yes, sir.
 7   Q.     We'll agree on that.
 8   A.     Yes, sir.
 9   Q.     All right.
10                (Defendants' Exhibit I was marked
11             for identification.)
12   Q.     This one that I'm marking as Exhibit I, it might
13          get a little tricky, and I'll tell you why,
14          because it actually includes four different
15          incidents.
16                Why are you smiling at me again?
17   A.     I'm sorry.
18   Q.     Well, these are disciplinary matters.  Are they
19          funny?  I mean, am I --
20   A.     No, sir.
21   Q.     Okay.  When we go through all these, what's your
22          understanding of other deputy sheriffs, the number
23          of formal disciplines they have?  How do you think
24          your file compares to the other deputy sheriffs?
25   A.     I can't answer that question, sir.
```

Page 59

1  Q.    Right.  Well, let's go through these.

2              You'll see starting at the first page of

3        this -- this was broken down into four different

4        incidents actually.  I'll give you the overall

5        view here.

6              There was an accident on MRDD Board's

7        property, there was inaccurate time sheets for two

8        days, there was an Incident #3 where you left the

9        DD Board to assist with what people are calling an

10       eviction - call it what you want - and then the

11       fourth one was a failure to obey an order which

12       was given to you not to discuss this investigation

13       with anybody.

14             That's what -- I'll tell you, you can

15       take a few minutes and read it, but that's what

16       Incident #1, Incident #2, Incident #3 and Incident

17       #4 reads.

18             And you'll see that on the first couple

19       pages that's the summary of the four incidents,

20       and then what follows is -- it's more broken down.

21             So let's start with Incident #1.  There

22       was an accident -- you got into an accident on

23       MRDD Board property and you failed to report it or

24       submit all the required paperwork for the crash.

25       Do you remember that?

Page 60

```
 1   A.   I do.

 2   Q.   That was in 2013.  Is that synopsis on page 1544,

 3        is that synopsis where it says Incident #1 --

 4        right there (indicating).

 5   A.   This one (indicating)?

 6   Q.   Yeah, right there (indicating).

 7   A.   Yes.

 8   Q.   -- is that accurate?

 9   A.   It's not all accurate, no, sir.

10   Q.   Okay.  Did you get in the accident?

11   A.   Yes, sir.

12   Q.   Did you report it?

13   A.   Yes, sir.

14   Q.   What do you claim is not accurate about it looking

15        back on it?

16   A.   As soon as -- my patrol car rolled into the garage

17        door.  The bumper bar bent in the garage door

18        causing the damage.

19             I immediately reported it to the

20        maintenance that is in charge of DD, and I

21        reported it to Tom whatever his last name was, and

22        then I called my supervisor, Gerone French, and

23        reported it to him.

24             At first I called Sergeant -- it was --

25        he was a Sergeant Cummings that worked -- was
```

Page 61

1       working at the courthouse during the time.  I

2       called him and told him what happened, and he said

3       he was no longer working at the courthouse.  He

4       had transferred out.  Told me I needed to report

5       it to Sergeant French, so I reported it to

6       Sergeant French.

7   Q.  The following month, which is what -- this

8       collective report of Incident #2 they call it, was

9       that you -- you were not suspected, I think you

10      actually did leave your post at the MRDD Board and

11      went to 736 Bettes Avenue and helped with a friend

12      of yours, Angela Hays, evict some people that were

13      staying in one of her homes.  That's my

14      understanding.  Does that sound right?

15  A.  That was the allegation, yes, sir.

16  Q.  Okay.  When you say "that was the allegation," was

17      it accurate?

18  A.  I was not evicting anybody from the home, sir.

19  Q.  Right.  Well, I know.  The verb "eviction" is used

20      in this meaning -- it sounds like an eviction,

21      like you have some papers to evict someone.

22              But you went in uniform and assisted your

23      friend, Angela Hays, in removing some people from

24      one of her properties; is that correct?

25  A.  No.

Page 62

```
 1   Q.   What's not correct about that?

 2   A.   I was with Angela.  She's disabled, and she had

 3        squatters in her house, and I went with her for

 4        her safety.  She spoke with the people in the

 5        house and we left.  Nobody was evicted or removed

 6        from the residence.

 7   Q.   You had no legal authority from any court to go do

 8        that, did you?

 9   A.   No, I did not.

10   Q.   But you were in uniform?

11   A.   I was.

12   Q.   What was it?  To like bully them?

13   A.   No, to ensure the safety of my friend, who had

14        squatters living in her house.

15   Q.   Did you have permission to leave your post at the

16        MRDD Board?

17   A.   I have.  [Sic.]

18   Q.   You had permission to leave?

19   A.   I have [sic] permission to leave.  I did not have

20        to stay at the DD Board.

21             I would have to go downtown.  I'd have to

22        do different reports, paperwork.  I would have to

23        leave, and they wouldn't replace me there.

24   Q.   Later on in that at page 1564, then-Lieutenant

25        Fatheree gave a statement because there was --
```

1        there was some discussion or there was some

2        concern about you leaving the MRDD post and

3        whether you had the authority to leave -- at any

4        time to leave, and Lieutenant -- then-Lieutenant

5        Fatheree said, Deputy Clark was never permitted to

6        leave her post.  The only time she was allowed to

7        leave her post was if she was sick or had the

8        leave preapproved.  Deputy Clark is required to

9        stay on the grounds to make security rounds and

10       check doors.

11              Was there some kind of a disagreement

12       about whether you had the authority to just up and

13       leave your post at the MRDD Board?

14   A.  There must be, because I was instructed to go do

15       things during that time, whether it was to bring

16       paperwork downtown, my time slips, whatever

17       paperwork that needed to be brought downtown.  I

18       could leave for lunch.  I did not have to be

19       there.  I was allowed to go home for lunch if I

20       wanted to.

21              That was clear with the people at DD and

22       my supervisors at the courthouse at that time.

23       They did not replace me when I left.

24   Q.  Did you -- I know we're trying to go on memory

25       here from 2013.  Did you get permission to go try

Page 64

1          to help this friend of yours, Angela Hays?

2     A.   I did not.

3     Q.   You did not get permission to do that?

4     A.   I did not.

5     Q.   You were disciplined for that, correct?

6     A.   Yes, sir.

7     Q.   The guy's name is Tom Jacobs.  I guess that was

8          the last name you were searching for.

9               But there's an interview in here with Tom

10         Jacobs.  It starts at page 1561.  And it caught my

11         attention because, you know, Jacobs seems to say,

12         you know, you were to notify him every time you

13         left the property, and Jacobs seems to be upset

14         about you leaving the property without permission

15         to the point where he called Randy Briggs and

16         asked to have you replaced.  Do you recall that?

17    A.   No, sir.  I knew I got in trouble and I was sent

18         back down to the courthouse.

19              I remember having to do an investigation

20         while I was down there and actually arrest an

21         employee --

22    Q.   Right.

23    A.   -- and seize weapons from his apartment.  So that

24         was also part of -- and my supervisors were well

25         aware that I was leaving during that time.

1    Q.    Well, at page 1562, this is Mr. Jacobs' interview,

2          it said, Mr. Briggs also asked Mr. Jacobs if he

3          thought Deputy Clark was doing a decent job.  Mr.

4          Jacobs told Mr. Briggs he had a lot of

5          reservations about her because she liked to bring

6          in some drama to the workplace and she also liked

7          to talk to some of the employees and has gotten

8          into some problems because it was not her role to

9          investigate employee issues.

10               Did you ever have any conversations with

11         Mr. Jacobs, Tom Jacobs, about that?

12   A.    No.

13   Q.    "I asked Mr. Jacobs why he called Mr. Briggs

14         asking him to have Deputy Clark replaced."

15               Do you know that Tom Jacobs wanted to

16         have you replaced at the MRDD?

17   A.    I don't remember that.

18   Q.    Well, at least his interview here, he seemed to

19         express some dissatisfaction with Randy Briggs.

20         Do you remember Randy Briggs?

21   A.    I do.

22   Q.    About your services at the MRDD.  You weren't

23         aware that Mr. Jacobs was unhappy with you?

24   A.    Not until the investigation into the allegations

25         that are in this investigation.

Page 66

```
 1    Q.    Incident #3 on Exhibit --

 2                MR. REECE:  What was that, I?  What was

 3          that?

 4                THE COURT REPORTER:  I.

 5    A.    Sixty-three?

 6                MR. TORCH:  Exhibit I.

 7    Q.    I.

 8    A.    I'm sorry.

 9    Q.    Incident #3.  If you want to go back to page 1546,

10          I'll try to move this along.

11                During the internal investigation, I

12          guess of the eviction, so to speak, it was also

13          determined and verified by Deputy Clark's own

14          statements that on March 28th and March 29th you

15          left two hours early and four hours early and did

16          not work your entire shift.  You failed to submit

17          the proper application for leave forms, and you

18          failed to mark your time sheet accordingly.  Do

19          you remember that?

20    A.    I do not.

21    Q.    Well, ultimately you were disciplined for it.

22    A.    Yes, sir.

23    Q.    I think it blossomed into a larger investigation

24          into your time sheets is what I -- at least that's

25          what my takeaway was from it.
```

Page 67

1           While this investigation was going on of

2      the eviction, of your time sheets and that, the

3      fourth incident was that you were ordered not to

4      discuss the matter with anyone.

5           Go to page 1576.

6   A.  (Complying.)

7   Q.  It talks about your supervisor.  At the end of

8      your interview, you were told not to discuss the

9      case with anyone, and you disobeyed that order and

10     talked to Angela, another friend named Angela,

11     Denise Thrasher and Sergeant Cummings about it,

12     which was a direct disobedience of an order not to

13     the discuss the matter.

14           Those are the four matters that Exhibit I

15     encompass:  failure to report a traffic accident,

16     inaccurate time sheets with no application for

17     leave, left the DD Board to assist with an

18     eviction, and then when those were being

19     investigated, you disobeyed an order not to speak

20     about it.

21           On April -- in April of that year when

22     this was all going on, the director of the DD

23     Board informs the Summit County Sheriff's Office

24     they no longer was in need of Clark's services

25     because of performance issues.

Page 68

1          Do you remember separating from the MRDD?

2    A.    I do.

3    Q.    Do you remember whether you were told it was over

4          your performance issues?

5    A.    I would assume it would be over my performance

6          issues according to the investigation.

7    Q.    Right.  In fact, it even blossomed into a

8          predisciplinary hearing in May of that year where

9          they found just cause for discipline, and instead

10         of being terminated, you entered into a settlement

11         in lieu of termination.  Do you remember that?

12   A.    I do.

13   Q.    Well, I'm going to mark it so we don't have to go

14         from memory.

15   A.    Is it okay if I take a break?

16   Q.    Yeah, sure.

17   A.    Thank you.

18              (A recess was taken.)

19              (Defendants' Exhibit J was marked

20           for identification.)

21   BY MR. REECE:

22   Q.    Stacy, I'm going to hand you what now we've marked

23         as Exhibit J.

24              So here's what I know about this:  I know

25         this doesn't have a date on it, which is weird if

Page 69

1       you ask me.

2                   MR. REECE:  Is there a date on it?

3                   MR. TORCH:  Yeah, second page.  This

4            settlement shall be final and is effective

5            and executed this --

6                   MR. REECE:  Ah.

7                   MR. TORCH:  I don't know what the date

8            is, but some date in June of 2013.

9                   MR. REECE:  Right.

10   Q.   So, Stacy, what I understand was, those incidents

11        that we just talked about at the MRDD resulted in

12        some discipline, and here's what I have written

13        down.  You tell me whether you agree.

14                   The result of the hearing in May was the

15        existence of just cause for discipline; however,

16        instead of being terminated, Ms. Clark entered

17        into a settlement agreement with the sheriff's

18        office, which is that exhibit before you.

19                   Does that sound right about what happened

20        in May of 2013?  Was there talk of terminating

21        you?

22   A.   There's another incident after that that brings in

23        the termination.  This wasn't finished.  This

24        didn't -- I don't remember going -- this going

25        into effect before I got in trouble and then

Page 70

1       terminated.

2   Q.  At the jail.

3   A.  Correct.

4   Q.  Right.  Well, I'm going to ask you about that,

5       because I have that -- I have that here.  And

6       that's January 31st of the next year.

7               This is May of '13 where there was some

8       talk about terminating you and you entered into

9       this settlement agreement that you would agree to

10      be transferred to the county jail and do 25

11      days -- wait a minute, a 20-day suspension.

12  A.  I just don't believe that this was completed,

13      because I never ended up having to enter into a

14      chemical dependency place.  I didn't have to do

15      that.  And I don't remember -- I don't remember

16      honestly what everything was, but I remember that

17      not happening.  And I don't remember how many days

18      I ended up serving in suspension.

19  Q.  Where does it say chemical dependency on this?

20  A.  Number 4.

21  Q.  Oh.  I read it three or four times.  I didn't read

22      that.

23              Well, you went from the DD Board to the

24      jail.

25  A.  To the courthouse.

Page 71

```
 1    Q.   Okay.  So this is incorrect?  You weren't
 2         transferred to the Summit County Jail?
 3    A.   I was transferred to the Summit County Jail after
 4         this incident, I believe.
 5    Q.   Okay.  Because I believe that when we jump forward
 6         in a minute and we talk about this January 31st,
 7         2014, termination, that happened when you were at
 8         the jail.
 9    A.   Correct.
10    Q.   Okay.  So --
11    A.   When did the incident occur though?
12    Q.   At the jail?
13    A.   Correct.
14    Q.   I don't know.  I'm going to ask you about that.
15    A.   Okay.
16    Q.   Because oddly enough, there's termination papers
17         and reinstatement papers, but there's no report
18         about what happened at the jail, so hold tight on
19         that.
20    A.   Yes, sir.
21    Q.   I want to talk about this first of all.
22              Back in June of 2013, you entered into
23         this agreement.  That's your signature, right --
24    A.   Correct.
25    Q.   -- Stacy Clark?  And in lieu of being terminated,
```

Page 72

1      you agreed to be transferred to the Summit County

2      Jail and do 20 days' suspension.  That's what this

3      says.

4   A.  Yes, sir.

5   Q.  Okay.  You never followed through on number 4,

6      completion of the chemical dependency service?

7   A.  No, sir.

8   Q.  Well, why would that be in here?

9   A.  I don't know.

10  Q.  It seems kind of -- because there was no concern

11     about chemical dependency, and why would you put

12     it in an agreement?  Why would you sign it?

13  A.  It had nothing to do with the investigation.  I

14     don't understand why it was in there, and I know I

15     didn't do that, so I don't know, sir.

16  Q.  You don't recall when you signed this back in

17     June --

18  A.  I do see my signature on the date, yes, sir.

19  Q.  Yeah.  -- saying, "Why is that in there?  I'm not

20     going to go get chemical...."  Was there a

21     concern?  I mean --

22  A.  There must have been some kind of -- I don't know,

23     sir.  I can't answer that.  I apologize.  I'm

24     sorry.

25  Q.  Okay.  So you transferred to the jail.  We'll

Page 73

1      agree with that.

2  A.   Yes, sir.

3  Q.   And this is going to be K.

4           (Defendants' Exhibit K was marked

5        for identification.)

6  Q.   All right.  Like I said, I tried to keep these in

7      chronological order.

8           This resulted in some discipline in

9      October of '13.  You can go ahead and read it, but

10     my cheat sheet notes say you left your post early

11     without shift supervisor's permission and without

12     submitting paperwork after an IA meeting.  You

13     left the building without returning to your post.

14     Time sheets reflected you worked the entire shift.

15          Aside from reading this and me just

16     explaining it to you, does that ring a bell that

17     you were --

18  A.   It does.

19  Q.   Do you remember this?  This would have been when

20     you were in the corrections bureau.

21  A.   Yes, sir.

22  Q.   So the summer of '13 you signed that agreement and

23     you go to corrections.  The fall of '13 -- we just

24     went through a time sheet discipline.

25          And then I'm going to mark this and

Page 74

1       you're going to explain this to me.

2               (Defendants' Exhibit L was marked

3          for identification.)

4   Q.  This is L.  Take a look at L.  This is in your

5       disciplinary file, but there's no underlying

6       report of investigation or paperwork.

7               So on January 31st of '14, Steve Barry,

8       the sheriff at the time, refers to a disciplinary

9       hearing and you were found to be in violation of a

10      rule and regulation, and your employment with the

11      Summit County Sheriff's Office is hereby

12      terminated effective January 31st.

13              What was the underlying incident?

14      What -- why was there a disciplinary hearing?

15  A.  This, I believe, is in reference to me leaving --

16      there was a deputy that was sexually harassing

17      deputies and inmates, and I had confided into

18      another deputy of what had happened to me, and she

19      reported it to somebody and they came down to

20      investigate.

21              So they told me that I was being relieved

22      from shift, and Deputy Wheeler came down and

23      relieved me.  And it was within a half an hour of

24      us leaving for the day.  So he relieved me of my

25      shift.

```
 1              I grabbed all my things and I went

 2      upstairs and I met with Lieutenant Limbert, and

 3      she was asking me about these events that has

 4      happened to me, and after we got done talking, I

 5      went back -- I went to leave, and I went back and

 6      I asked her if she wanted me to go down and, like,

 7      just try to assist in the investigation, because

 8      every time I was around this person, there was

 9      issues, and she said she did not want me to do

10      that, and so then I left because I was properly

11      relieved by Deputy Wheeler, and then she told me

12      she didn't want me to go back downstairs to be a

13      part of that, and so I left for home.  And it was

14      like 15 minutes before --

15  Q.  So you're --

16  A.  -- shift ending.

17  Q.  You're pointing to that Exhibit K.  This is

18      related to this?

19  A.  Yes.

20  Q.  Okay.  So K is related to L that you left early?

21  A.  Yes.

22  Q.  So the disciplinary hearing that Sheriff Barry is

23      referencing in Exhibit -- are you all right?

24  A.  (Nodded head up and down.)  Sorry.

25  Q.  So in '14, the sheriff terminated you because of
```

Page 76

1       leaving -- the leaving early incident --

2   A.  Correct.

3   Q.  -- correct?

4   A.  Correct.

5   Q.  And then as a result of some arbitration, the

6       third page of Exhibit L talks about reinstating

7       you, which is May 7th of '14.  You are reinstated

8       to your position of deputy sheriff.  And the

9       middle page of that exhibit is an arbitration

10      order.  Arbitrator Marvin Feldman, he reinstated

11      you.

12          Do you recall that in the spring of 2014?

13  A.  Yes, sir.

14  Q.  Paragraph 3 of that arbitration -- arbitrator's

15      order is what we call in the law world, what

16      everybody calls it, last chance agreement.

17          "The parties further agree that the

18      grievant shall be the subject of a last chance

19      agreement providing for a discharge if in fact the

20      grievant is found guilty of conduct which is the

21      predicate for discipline."

22          Did you know you were signing a last

23      chance agreement?

24  A.  Yes, sir.

25  Q.  What did you understand that to mean?

Page 77

```
 1   A.   If I was -- did something that was a policy

 2        violation, then it would obviously be

 3        investigated, and then if it was found that I was

 4        at fault, then the last chance agreement would go

 5        into effect where I would be terminated.

 6   Q.   When you were reinstated in May of 2014, did you

 7        go back to corrections?

 8   A.   Yes, sir.

 9   Q.   How long did you stay in corrections?  I mean, you

10        retired in, what, 2021?

11   A.   Yes, sir.

12   Q.   I have that retirement letter somewhere.

13   A.   In 2019 is when I went to the detective bureau.

14   Q.   2019?

15   A.   Yes, sir.

16   Q.   So from '14 till '19 you were in corrections?

17   A.   Yes, sir, with no discipline.

18   Q.   Pardon me?

19   A.   With no discipline.

20   Q.   With no disciplines?

21   A.   Correct.

22   Q.   Well, you were under a last chance, so that was a

23        smart move on your part.

24   A.   Yes, sir.

25   Q.   Why did you leave corrections and go to the
```

```
 1          detective bureau in '19?

 2    A.    That was my ultimate goal.  I was in the detective

 3          bureau in narcotics when I began, and I wanted to

 4          finish my career out in the detective bureau.

 5                    (Defendants' Exhibit M was marked

 6               for identification.)

 7    Q.    Did you like the detective bureau?  I mean, you

 8          were only there a short period of time, correct?

 9    A.    Until I retired, yes, sir.

10    Q.    This is the only performance evaluation.  This

11          appears to be maybe one of your last performance

12          evaluations from the detective bureau before you

13          retired.  It ended in December of '20, and you

14          retired in '21.

15                    The reason I'm marking it is -- who was

16          your -- who was your supervisor at the detective

17          bureau?

18    A.    Sergeant Lee Hoskins and Captain Scott Cottle.

19    Q.    What struck me was, in 2020 you're winding down

20          your career, and the grading of your quality of

21          work was only a 2, which says needs improvement.

22          And Captain Cottle's comment was, "I can't stress

23          enough to improve your time management and to not

24          take constructive criticism personally.  I still

25          believe you are not where you need to be at this
```

1       point in your detective bureau career."

2             Do you remember having that discussion

3       with Captain Cottle?

4  A.   Yes.

5  Q.   You said, I agree with Captain Cottle.

6  A.   No.  That is not my signature.

7  Q.   Oh.  Who would that be?

8  A.   I can't tell the handwriting.

9  Q.   Okay.  That's not you agreeing with him though?

10  A.   No, sir.

11  Q.   Okay.  What did you think of that assessment in

12       the detective bureau?

13  A.   It's exactly what it is.  It's a performance

14       evaluation to show me where I'm at, where I can

15       improve.

16  Q.   Right.  Did you have -- when you were in the

17       detective bureau -- I mean, I think -- did I ask

18       you this before?  Did you have your sight set on

19       2021 to retire?  Was that --

20  A.   No, sir.

21  Q.   When did you plan to -- can you remember -- what

22       did you plan to do back then?  Just continue on in

23       the detective bureau?

24  A.   Yes, sir.

25  Q.   So what prompted thoughts of retirement in 2021?

Page 80

1   A.   The changes in the OPERS system.

2            (Defendants' Exhibit N was marked

3        for identification.)

4   Q.   Stacy, this is Exhibit N I've marked.  It is an

5        email that talks about you being on the Brady

6        list.  Do you know what the Brady list is?

7   A.   Yes, sir.

8   Q.   What's your understanding of what it is?

9   A.   If you are dishonest -- there's a list that you --

10       if you are found dishonest, I would guess that you

11       would be put on a list for defense attorneys to

12       know that that information is there that you were

13       dishonest, and it's a list of people on that.

14  Q.   You know, I'm not aware that -- you know, if you

15       call over and you say, "Give me the list," I'm not

16       aware -- I don't know who has "the list."

17           So what I gave you in this exhibit is

18       some emails that say you were on the Brady list.

19       Michael Cody was counsel for the sheriff's

20       department in 2020.

21           Were you aware you were on the Brady

22       list?

23  A.   No.

24  Q.   When did you become aware you were on it?

25  A.   When Captain Cottle told me that I was on the

Page 81

```
 1        list.  And I asked who I needed to speak with, so
 2        I spoke with Mike Cody.
 3    Q.  And what did you learn?  Why were you on the list?
 4    A.  He didn't understand why I was on the list except
 5        for the investigations.  But at the same time, I
 6        was not dishonest in my investigations, I was
 7        truthful, and I didn't understand where it came
 8        from.
 9              I take accountability on my actions on
10        what I did, and I didn't understand why I was on
11        the list.  I didn't lie about anything.  And so
12        him and I talked about it, and it was never
13        resolved.
14              I don't even -- I've never even seen the
15        list.  I don't know about -- I just know what I
16        was told about the list.
17    Q.  Right.  Have you seen that, what I handed you,
18        those emails?  I turned that over in discovery.
19    A.  Yes.
20    Q.  Well, somebody saw fit at some point -- at least I
21        see the dates on this as 2020.  I don't know if
22        this came from dishonesty over time cards,
23        dishonesty over -- I don't know.  I don't know the
24        source of it.
25              All I know is that the Brady list is a
```

Page 82

1       list of people who have been disciplined for or

2       found guilty of something dishonest.

3   A.  And I never found out what that was, sir.

4   Q.  Well, you know, that affects your ability to

5       testify in court.

6   A.  Yes, sir.  I was very upset about it.

7   Q.  So ultimately when you became a special deputy, if

8       you had occasion to make an arrest or something

9       like that, you weren't going to be able to go to

10      court.  You were on the Brady list, correct?

11  A.  I don't believe that's correct.

12  Q.  You remained on the Brady list when you were a

13      special deputy, correct?

14  A.  I don't know if -- how that works honestly.

15  Q.  Did you ever have an occasion to make an arrest as

16      a special deputy?

17  A.  Yes.

18                  Wait.  Yes.

19  Q.  Where?

20  A.  I'm going to say at Blossom Music Center.

21  Q.  Did you have to go to court for it?

22  A.  No.

23                  Yes.  Actually, I did.  It was in Stow

24      Municipal Court.

25  Q.  Was there some talk about -- did it ever come up

```
 1            that you were on the Brady list?  I mean, I'm

 2            still kind of confused as to how you found out.

 3     A.     Captain Scott Cottle called me in his office, and

 4            he said that they had found out that I was on the

 5            Brady list, and I asked who I needed to speak

 6            with, and I spoke with Mike Cody.

 7     Q.     And he confirmed that you were on it?

 8     A.     He said that he was compiling the list of names

 9            together and that I was to be added on it.  And

10            then I was removed from it and added on it, so I'm

11            not really sure.  Like I said, I've never actually

12            seen the list.

13     Q.     Yeah.  My understanding is that's the only list

14            I've seen cobbled together.

15                  Let's do this.  Let's put these together

16            as Exhibit O because they're related.

17                  (Defendants' Exhibit O was marked

18               for identification.)

19     Q.     Stacy, I've handed you what I've marked as

20            Defendants' Exhibit O.  And it's pretty

21            straightforward.  It appears to be your letter

22            informing the sheriff's office that you're

23            retiring and then their acceptance of it or their

24            acknowledgment of it.

25     A.     Yes, sir.
```

Page 84

```
 1   Q.   So November of 2021 -- I think we talked earlier
 2        in your deposition about you then pursuing the
 3        special deputy commission.
 4   A.   After I retired.
 5   Q.   After you retired.
 6   A.   Yes, sir.
 7   Q.   When -- so in 2022 you became a special deputy.
 8        What kinds of extra jobs were you working when you
 9        first became a special deputy?  You didn't start
10        at Bissell right away; is that correct?
11   A.   Correct.  I don't believe it was very much -- a
12        long time after that.  I remember working Blossom.
13        Christmastime there were stores that would
14        contract to have us.  Like at Dick's Sporting
15        Goods, I worked there.
16   Q.   Right.
17   A.   There were various jobs, sir.  I would have to
18        review my pay stubs.
19   Q.   So how did the -- did I ask you this before?  How
20        did the Bissell thing come about?  You know,
21        there's school years.  2020 -- 2022 you're a
22        special deputy.  My understanding is you were at
23        Bissell the school year of 22-23?
24   A.   Yes, sir.
25   Q.   Okay.
```

Page 85

```
 1   A.   And then 23-24.  And then fall of '24 is when I
 2        broke my ankle.
 3   Q.   Right.  How did the Bissell job come about?  You
 4        just saw a posting for it?
 5   A.   Captain Scott Cottle called me and asked me --
 6   Q.   That's right.
 7   A.   -- if I would be interested --
 8   Q.   That's right.
 9   A.   -- in the position.
10   Q.   So, again, I have your time -- I have the time
11        sheets, and I have them, you know, from '20 -- I
12        looked at the ones from the spring of '23, and
13        you're working most every day there.  But I've
14        marked these as Bissell from the fall of 2024.
15        These are Bissell time sheets from the fall of
16        2024.
17   A.   Not mine.  There would only be, I believe, one
18        time slip of me in fall of 2024.
19   Q.   Okay.  That was going to be the point of showing
20        you this, that --
21   A.   Okay.
22   Q.   -- most of them --
23   A.   I'm sorry.
24   Q.   I may still mark them, but if you just want to
25        tell me that.
```

Page 86

1         Most of them are Jerome Hall and William

2    Lee throughout the fall of '24.  Now I know you

3    broke your ankle in July of '24 --

4  A.   Yes, sir.

5  Q.   -- so you were unable to perform the SRO duties --

6  A.   Correct.

7  Q.   -- and responsibilities.

8         I have some -- I have some documents that

9    in the fall of 2024, particularly around October

10   of 2024, there were some communications between --

11   do you know who Matt Strickland is?

12 A.   Yes.

13 Q.   He's the business manager for Twinsburg City

14   Schools?

15 A.   Yes.

16 Q.   Let me mark this as an exhibit.

17         (Defendants' Exhibit P was marked

18      for identification.)

19 Q.   Have you seen this before?

20 A.   No.

21 Q.   These are the notes of Chief Larry Brown, whose

22   sitting down here at the end of the table.  And he

23   memorialized a telephone conversation that he had

24   with Matt Strickland.

25         So why don't you just go ahead and -- if

1          you haven't seen that, why don't you go ahead and

2          read it.

3     A.   (Complying.)

4     Q.   So what Larry Brown recalls in his notes here is

5          that he received a call from Matt Strickland, the

6          business manager, and is requesting your removal

7          from Bissler Elementary School.  Were you aware

8          that was going on?

9     A.   No.

10    Q.   Did you get any indication from anybody at Bissler

11         [sic] about their dissatisfaction with you in your

12         performance?

13    A.   No.

14    Q.   Do you know who Misty Johnson is?

15    A.   Yes.

16    Q.   Who is she?

17    A.   She's the principal of Bissell Elementary.

18    Q.   Misty Johnson, I've come to understand -- here,

19         I'll mark this for you, Q.

20              (Defendants' Exhibit Q was marked

21           for identification.)

22    Q.   So in the fall of 2024, there seems to be some

23         communications and conversations about maybe

24         trying to replace you with William Lee or Jerome

25         Hall.  Were you aware that was going on?

Page 88

```
 1   A.   No, sir.
 2   Q.   Okay.  I have now come to learn, and I need you to
 3        tell me what you remember about it, that you had a
 4        meeting, a sitdown with Misty Johnson, the
 5        principal.  Did you in the fall of 2024?
 6   A.   I wouldn't call it a meeting, but yes --
 7   Q.   Okay.
 8   A.   -- I had a conversation with Misty Johnson.
 9   Q.   Where was that?
10   A.   In the office area.
11   Q.   And what was the context of it?  Why did she call
12        you in?
13   A.   She stated that she had heard, and I'm not sure
14        because I didn't see any of these documentations
15        so I was unaware of it, that there was some kind
16        of communication about Bill Lee staying on at
17        Bissell, and she was very upset because nobody
18        came to her, that she was circumvented and that
19        there was no issue.
20   Q.   Well, you may come to learn this next week.  I
21        don't know if you're going to come to Sheriff
22        Fatheree's deposition or not.  But the principal
23        called Sheriff Fatheree and expressed how grateful
24        she was and appreciative she was with Williams and
25        the job he was doing.
```

1           So what I'm piecing together from all of

2      this Misty Johnson, Strickland calling Chief

3      Brown, the principal calling Sheriff Fatheree was

4      there was some sense of dissatisfaction with you

5      at Bissell and they wanted to move you out and put

6      William Lee in.  Did you get that sense?

7  A.   No.

8  Q.   That comes as news to you today?

9  A.   No, because afterwards when I had talked to her,

10      that was when I found out on that first Monday

11      after I came back to work.

12  Q.   What do you think Misty Johnson meant when -- I

13      understand that teachers were bringing concerns to

14      Misty Johnson, which prompted the meeting with

15      you.

16           Did you ever have conversations with

17      teachers?

18  A.   No.  And Mrs. Johnson did not express to me what

19      issues any teachers had and that she was very

20      dissatisfied that they had circumvented her and

21      said that there was an issue.  I don't know exact

22      -- that was it.

23  Q.   I don't know what that means.

24  A.   When Mrs. Johnson and I had our conversation --

25  Q.   Right.

Page 90

1  A.  -- and she said that -- about the teacher, and she

2      said, "I'm very mad because they circumvented me,"

3      and she didn't have any -- she didn't say that

4      there were any issues in my performance at all.

5           She just said that there was a letter

6      sent that circumvented what she -- nobody had said

7      anything to her, that this was all behind her back

8      is what she expressed to me.

9  Q.  But the teachers -- are you aware of any

10     complaints by the teachers about smoke breaks?

11 A.  No.

12 Q.  Did you take smoke breaks at Bissell?

13 A.  I did.

14 Q.  Did you think that was appropriate as an

15     elementary school?  Would you go outside to smoke?

16 A.  Correct.

17 Q.  In this exhibit, Misty Johnson says to Matt

18     Strickland that they, I presume that means the

19     teachers, felt she was overstepping her boundaries

20     with the students.

21           Did you have a conversation about what

22     she meant by that?

23 A.  No.

24 Q.  Do you think you were overstepping your boundaries

25     with the students?

Page 91

 1    A.    No.

 2    Q.    Getting too personal with them?

 3    A.    No.

 4    Q.    What does it mean about remain professional and

 5          seen around the building more?

 6                I mean, getting up out of your seat and

 7          walking around?

 8    A.    That's what she put in there.

 9    Q.    Did you ever have a conversation with Misty

10          Johnson where you said something to the effect

11          like, "It doesn't matter.  I'm not coming back

12          anyway.  My ankle is hurt" or something of that

13          nature?

14    A.    No.

15    Q.    And was your ankle preventing you from fulfilling

16          the SRO duty?

17    A.    By the end of the week, my ankle was very sore, so

18          I had called my supervisor and asked if they'd be

19          able to bring somebody back because of my ankle,

20          and I worked until Monday because they couldn't

21          get any -- or, no.  I called to see if somebody

22          would cover me on that Monday, which was November

23          4th, and I couldn't get coverage, so I worked that

24          day.

25                But I had talked to my supervisor and

Page 92

1      told her I had to go back off because my ankle was

2      not ready to continue all the walking I was doing

3      at the school.

4  Q.  Given your ankle injury, what -- I mean, what

5      kinds of special deputy duties were you able to

6      perform?  You couldn't work Blossom, could you?

7  A.  No, sir.

8  Q.  You couldn't work a parade.

9  A.  No, sir.

10 Q.  So what was your plan as far as the ankle and the

11     special deputy commission?

12 A.  To heal and get back to work.

13 Q.  So I showed you this communication and these

14     exhibits, and I told you that Sheriff Fatheree

15     received a phone call, which I had transcribed,

16     with Misty Johnson.  You didn't get a sense at all

17     that there was what I'd call dissatisfaction with

18     you at Bissell?  You didn't get any of that --

19 A.  No.

20 Q.  -- sense at all?  Shocked by it?

21 A.  I was honestly.

22 Q.  But you have no reason to doubt these people.

23 A.  I do.  I don't know who's saying what and what

24     they said, so I can't answer that.

25 Q.  Yeah.  Did you call -- is it Bill Lee or William

Page 93

1      Lee?

2  A.   Bill.

3  Q.   Did you call Bill and tell him to come over to

4       your house?

5  A.   He had to come over and pick up equipment from me.

6  Q.   Did you tell him "Don't take my job, please"?

7  A.   No.

8  Q.   Did you tell him teachers who had sent letters to

9       the superintendent saying you're smoking all the

10      time and not doing your SRO job?

11 A.   Did I tell him that?

12 Q.   I mean, you went over to his house?

13 A.   No.

14 Q.   Or he came to your house?

15 A.   Yes, to pick up equipment.

16 Q.   Did you say "Please don't take my job" or

17      something to that effect?

18 A.   No.  If I did, it would have been a joke.  I don't

19      know why I would have.  No.

20 Q.   Because they wanted --

21 A.   That's just weird.

22 Q.   Well, I mean, obviously I think -- well, not

23      obviously.  I won't say that.

24           I've come to discover that the people at

25      Bissell or the Twinsburg schools wanted Bill Lee

1      to be the SRO.  Did you put -- did you know that?

2  A.   I did not know that until I talked to Misty that

3       morning and she had told me how upset she was.

4           MR. TORCH:  Chris, before you move on

5           from Exhibit Q, I notice there's no Bates

6           number on it.  Do you know if it was produced

7           in discovery to us?  And you can check and

8           get back to me later if you're not sure.

9           MR. REECE:  I don't know.

10          MR. TORCH:  Okay.

11          MR. REECE:  But you're right, it doesn't.

12          MR. TORCH:  And there's other documents

13          that don't have Bates numbers, but I

14          recognize those.  This one I'm not sure I

15          recognize, Exhibit Q.

16          MR. REECE:  I don't know the answer to

17          that.  Sorry.

18          MR. TORCH:  Okay.

19  Q.   So in the fall of 2024 while whatever we just went

20       over was going on behind the scenes, so to speak,

21       there was also Shane Barker running against the

22       sheriff, correct?

23  A.   Correct.

24  Q.   Setting that aside, what was your professional

25       relationship with Barker?  Were you -- were you

Page 95

```
 1        friends?  Did you work together?  Were you

 2        friends?

 3   A.   We did not work side by side, but yes, he has been

 4        at the sheriff's office during the time frame I

 5        was at the sheriff's office as well.

 6   Q.   What did you think about him running against

 7        Sheriff Fatheree?

 8   A.   I thought he was the better candidate.

 9   Q.   Why is that?

10   A.   From my experience on working, just information

11        that was being expressed through different forums.

12                  (Defendants' Exhibit R was marked

13             for identification.)

14   Q.   I should have marked these at the beginning,

15        Stacy.

16                  These are -- these are written answers to

17        some discovery that I sent to you and your lawyer.

18        Let's first do the -- what us fancy lawyers like

19        to do, the last page.  Is that your verification?

20        You --

21   A.   Yes.

22   Q.   Yes.  You verified the answers to these

23        interrogatories?

24   A.   Yes.

25   Q.   Fair enough.  I guess you've got to do it.  I
```

Page 96

```
 1         mean....
 2                 We may jump around on a couple of these,
 3         but go to number 11 right now.
 4                 MR. TORCH:  Page 11 or Interrogatory No.
 5         11?
 6                 MR. REECE:  Interrogatory No. 11.  I'm
 7         sorry, Stuart.
 8    Q.   I asked about this at the outset of the deposition
 9         about --
10    A.   What do you mean by number --
11                 MR. TORCH:  No, no, no.  Let me --
12    A.   I don't know what an ogadory [sic] means.  I'm
13         sorry.
14    Q.   An interrogatory's a fancy word for a written
15         question.
16    A.   Oh, what the -- I'm sorry.  Yeah, the topic?
17                 MR. TORCH:  No. 11.  (Indicating.)
18                 THE WITNESS:  Okay.  Thank you.
19    Q.   We've got to talk in code.  We're fancy lawyers.
20                 Written question No. 11.  I asked you
21         about this early on in the deposition about the
22         extent of your political relationship with Shane
23         Barker, and your answer is, I requested and
24         displayed yard signs for myself and other
25         supporters.
```

Page 97

1                   How many yard signs?

2    A.    Three.

3    Q.    One in your yard?

4    A.    Correct.

5    Q.    And two for other people?

6    A.    Yes.

7    Q.    Like big yard -- big signs or smaller yard signs?

8          You know, sometimes they're --

9    A.    Big yard signs, I believe.

10   Q.    And you voted for him in the general election.

11   A.    Yes, sir.

12   Q.    And you attended an election night watch party.

13                 Do you have any evidence or information

14         that Sheriff Fatheree knew you took three yard

15         signs for him?

16   A.    I don't know that answer.

17   Q.    You don't know that she -- you don't have any

18         proof that she knew that you took three yard signs

19         for him?

20   A.    I do not, no.

21   Q.    Do you have any information or knowledge that

22         Sheriff Fatheree knew you voted for him?  And it's

23         a personal thing.

24   A.    I don't know that she knew who I voted for.

25   Q.    Okay.

Page 98

```
 1    A.    Nobody does but me.

 2    Q.    And do you have any information or knowledge or

 3          evidence that Sheriff Fatheree knew you attended

 4          an election night watch party for him?

 5    A.    Yes.

 6    Q.    What is that?  Well, how do you know she knew?

 7    A.    Because Captain Scott Cottle told me.

 8    Q.    So if she didn't know you took -- you have no

 9          evidence that she knew you took yard signs.  You

10          have no evidence that she knew you voted for him.

11          So the sole allegation left is that you believe

12          she knew you attended the election night watch

13          party.

14    A.    It's what Scott Cottle told me.

15    Q.    Do you have any reason to doubt or dispute the

16          fact that Sheriff Fatheree made a decision not to

17          renew your commission because of her

18          dissatisfaction with your performance at Bissler

19          Elementary?  Do you have any reason to doubt that?

20    A.    Yes.

21    Q.    Why?

22    A.    Because I've never been approached about my duties

23          except for positive feedback, not negative

24          feedback.

25    Q.    But the principal called her directly.
```

Page 99

```
 1   A.   I did not know that.

 2   Q.   Does that change your mind --

 3   A.   No.

 4   Q.   -- when the principal calls and expresses -- well,

 5        expresses how happy she is to have William Lee,

 6        Bill Lee?

 7   A.   She didn't express that to me.

 8   Q.   While we're on the subject of these Scott Cottle

 9        conversations, go to written question No. 12, the

10        next one.

11             "Scott Cottle told me on multiple

12        occasions that defendants had revoked my

13        commission because I supported Barker during the

14        election."

15             You didn't support Barker during the

16        election though.  You took a couple yard signs and

17        you voted for him.  Is that considered -- do you

18        consider that political support?

19             MR. TORCH:  Objection.

20             Go ahead and answer.

21   A.   Yes.

22   Q.   "He first told me this on November 18, 2024, in a

23        phone call."

24             What happened on November 18th that he'd

25        call you?
```

```
 1   A.   He called me on November 18th, was not leaving
 2        messages.  Called me like three times.  And then I
 3        called him back, and he said that he was not
 4        calling for a good reason, that it got back to the
 5        sheriff that I attended Barker's election party
 6        and that that meant that I didn't care if him,
 7        Larry, Kandy and Donna lost their jobs and that
 8        she was not going to -- she was going to rescind
 9        my commission.
10   Q.   Well, what significance is November 18th?  What
11        day was that?
12   A.   A Monday.
13   Q.   He told me again during a phone call on January
14        5th, 2025.
15             What prompted a telephone call on January
16        5th?
17   A.   I called -- after Captain Cottle had discussed
18        with me on November 18th why I was having my
19        commission rescinded, I had called to try to
20        schedule an appointment with the sheriff, and I
21        didn't get a returned phone call, so then I waited
22        another couple weeks because it was busy during
23        Christmastime, I understood that, so I called
24        again to get a meeting with the sheriff and again
25        was ignored.
```

```
 1                    So then I called Scott Cottle and
 2           expressed to him that the sheriff was not taking a
 3           meeting with me, and he told me that she would not
 4           take a meeting with me and she was not going to
 5           give me my commission back.
 6      Q.   You recorded that call?
 7      A.   I did.
 8      Q.   Did you tell Scott you were recording it?
 9      A.   No.
10      Q.   Why?
11      A.   I didn't have to.
12      Q.   I mean, why did you record it?
13      A.   Because I wanted evidence that I was fired for my
14           First Amendment right violation.
15      Q.   So do you dispute the fact -- do you dispute the
16           evidence of the dissatisfaction they had with you
17           at Bissler?  Do you dispute that?
18      A.   I do.
19      Q.   So if Matt Strickland and Misty Johnson both put
20           forward testimony that they were dissatisfied with
21           your performance and they wanted William Lee,
22           you'd have reason to dispute that?
23      A.   They never talked to me about it.
24      Q.   Well, do you have any reason to believe they
25           didn't talk to other people about it?
```

Page 102

1    A.    I can't answer that.

2    Q.    In Interrogatory No. 8, I asked you about -- to

3          identify what we call before-and-after witnesses.

4          That means people that knew you before and after

5          the incident that's at issue here, and those

6          people give testimony about how it changed you.

7          Who is Theresa Muncy?

8    A.    Theresa Muncy was a nurse that worked at the

9          Summit County Jail, and also I went to school with

10         her.

11   Q.    Who's Joel Christian?

12   A.    My ex-boyfriend.

13   Q.    And what do you mean about "drastic changes in my

14         mental health"?  What did you mean when you wrote

15         that?  What drastic changes have there been?

16   A.    Depression.  Didn't leave anywhere.  I stayed at

17         home.  I didn't go out.  I didn't take calls.  I

18         didn't talk to anybody.  I was extremely

19         depressed.

20   Q.    I have some medical records that your attorney

21         provided to me from the VA and from the Safety

22         Forces Center.  Am I saying it right, the Safety

23         Forces Center?

24   A.    Yes.

25                MR. TORCH:  And I believe we've marked

1              these as confidential under the protective

2              order.  I want that noted on the record.

3                   MR. REECE:  Correct.

4    Q.    Before I go over those medical records, which

5          might be when we wrap up, I want to talk about --

6          I asked you what efforts you made about job

7          hunting.  It's Interrogatory No. 2.  And I asked

8          you to describe your efforts you made to find

9          employment since your commission was revoked.

10                  Wayne County Sheriff's Office.  What

11         struck me about that answer about the Wayne County

12         Sheriff's Office is it didn't matter whether you

13         were a special deputy or not.  They only -- they

14         only employ full-time deputies; is that correct?

15   A.    The school resource officer positions were for

16         full-time deputies.

17   Q.    Okay.  Portage County Sheriff's Office.  I met

18         with Sheriff Zuchowski in February, and he

19         informed me that due to the OPOTA documentation of

20         termination, his office would not consider me.

21                  Is that what he told you?

22   A.    Yes.  He said after I got it taken care of, then

23         to come back and we can readdress it.

24   Q.    That termination designation, that's not Sheriff

25         Fatheree's words.  Do you know that?

Page 104

```
 1   A.   No, I don't know that.
 2   Q.   My understanding is, there's only so many choices
 3        you can pick from, and one of them isn't
 4        commission rescinded.  Termination's the only one
 5        that fits when someone separates.  Do you know
 6        that?
 7   A.   No.
 8   Q.   So when somebody reports -- when OPOTA reports
 9        that you were terminated, that's OPOTA's word.
10        That's not Sheriff Fatheree's word.  Do you know
11        that?
12   A.   No.
13   Q.   That comes as news to you?
14   A.   Yes.
15   Q.   Have you talked to anybody about having OPOTA
16        change their designation to something that maybe
17        says commission rescinded or commission not
18        renewed?
19   A.   No.
20   Q.   Does it change your belief or your attitude or
21        allegations when I tell you that the word
22        "termination" is an OPOTA word?
23   A.   No.
24   Q.   Will you agree with me that Sheriff Fatheree did
25        not terminate you?
```

```
 1   A.   I don't agree with that.

 2   Q.   Why not?

 3   A.   Because I was working, and Captain Scott Cottle

 4        told me that she was rescinding my commission due

 5        to the fact that I went to the party, Shane

 6        Barker's campaign party.

 7   Q.   And OPOTA calls that termination.

 8   A.   I don't know.  I answered that.  I'm sorry, I

 9        don't know what they have, who reports it.

10   Q.   The third one here, City of Tallmadge Police

11        Department.  In or about April of '25, I applied

12        for auxiliary officer positions.

13             What happened after you applied?

14   A.   I actually spoke with supervisor that does the

15        auxiliary, and he expressed what the pay scales

16        were, and it didn't seem feasible for me to be

17        able to work those positions.  They make like $14

18        an hour.

19   Q.   That wouldn't help?

20   A.   No, sir.

21   Q.   Well, you're looking for supplemental income,

22        right?  And you said you have a pension?

23   A.   Yes, sir.

24   Q.   And you have a pension through the military?

25   A.   No, sir.
```

Page 106

```
 1   Q.   I thought you said yes to that?

 2   A.   No, not a pension.

 3   Q.   Oh.  Any benefits from the VA?

 4   A.   Yes.  I get a check every month.

 5   Q.   Okay.  So between your pension and that check

 6        every month, you're searching for supplemental

 7        employment --

 8   A.   Yes.

 9   Q.   -- income, right?

10             In or about April of '25, I applied for a

11        correctional officer position at Heartland

12        Behavorial Health.

13             What happened with that?

14   A.   There was some issues with that.  But the person

15        that I was talking to, Pat Hunt, was getting the

16        information to me because he's a supervisor there

17        for me to get hired there, and the applications

18        that were online, he was having problems with his

19        IT person, and they couldn't get the paperwork

20        online for me to be able to fill out the

21        paperwork, and then he was let go at that point in

22        time.

23   Q.   You signed these in May of this year.  Have you --

24        have you done any other job hunting in, what would

25        it be, June, July, this month?
```

Page 107

```
 1   A.   Just networking with other law enforcement
 2        officers when they hear of anything locally that I
 3        could be able to apply for.
 4   Q.   And has anything come about?
 5   A.   No, sir.
 6   Q.   When was the last time you interviewed with
 7        somebody or followed up on a lead?
 8   A.   What's the date today?  August 10th?
 9   Q.   11th.
10   A.   11th.  It would have been last month in July,
11        beginning of July.
12   Q.   What did you do?
13   A.   I spoke with somebody that works for the Parks &
14        Services to get a job, get the application, start
15        that process.
16   Q.   Is that going on now?
17   A.   No, not yet.  It hasn't reached to that point.
18   Q.   Oh.  So getting back to this termination
19        designation, I mean, let's presume for the purpose
20        of this question that what I'm telling you is
21        accurate, that Sheriff Fatheree did not report
22        this as a termination.  Termination is OPOTA's
23        word.  Does that change your thoughts?
24             MR. TORCH:  Objection.
25             Go ahead.
```

Page 108

```
 1   A.    No.

 2   Q.    But she didn't terminate you.

 3   A.    I was told she terminated me and rescinded my

 4         commission, so that means that I was not able to

 5         work anymore.  That's termination of my position.

 6   Q.    Let's skip to this.

 7               MR. TORCH:  Can we take a break?  Or how

 8         much longer do you think you have?

 9               MR. REECE:  I was going to go through

10         these medical records.

11               MR. TORCH:  Can we take a short break?

12               MR. REECE:  Yeah.

13                  (A recess was taken.)

14   BY MR. REECE:

15   Q.    All right.

16               (Defendants' Exhibit S was marked

17         for identification.)

18

19

20

21         CONFIDENTIAL - ATTORNEYS' EYES ONLY

22

23

24

25
```

Page 109

1

2

3

4

5

6

7

8

9

10

11

12          CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12              CONFIDENTIAL - ATTORNEYS' EYES ONLY
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12          CONFIDENTIAL - ATTORNEYS' EYES ONLY
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 112

1

2

3

4

5

6

7

8

9

10

11

12             CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                     Page 113
    1

    2

    3

    4

    5

    6

    7

    8

    9

   10

   11

   12          CONFIDENTIAL - ATTORNEYS' EYES ONLY

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25
```

1

2

3

4

5

6

7

8

9

10

11

12                CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12          CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 116

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11                CONFIDENTIAL - ATTORNEYS' EYES ONLY

12

13

14

15

16

17

18

19

20

21

22

23

24   Q.   Sheriff Fatheree rescinded your commission back in

25        the end of 2024.  It's now August of 2025.  Is
```

```
 1        there -- is there a point, so to speak -- I mean,

 2        people lose employment every day in this country.

 3              Is there a point where you think you're

 4        going to be able to put that behind you and move

 5        on?

 6   A.   Emotionally, no, because it devastated me.  I

 7        loved my job.  I loved what I was doing.  And to

 8        sit there and put terminated.  It puts my

 9        integrity in question because I went to a campaign

10        party.

11              It's -- it's just horrific to me.  It's

12        just horrific.  I can't even comprehend that.

13   Q.   Do you think emotionally you're ever going to get

14        over this?  I mean, you know, like I said, there

15        comes a point.  What are you, 55, 56 years old?

16   A.   Fifty-five.

17              It hurts down deep in my heart.  I can't

18        answer that.  I don't know how long it will hurt.

19        But it hurts down deep in my heart.

20   Q.   Are you able to compartmentalize it during the

21        day?  Do you know what that means?

22   A.   I can still do what I need to do.  I still

23        function.  I still get out of bed.  I'm trying to

24        get out of bed every day.

25   Q.   Knowing what you've now, I guess, learned today
```

1       maybe from Misty Johnson and Matt Strickland and

2       some of the teachers, I don't know if that came as

3       -- I get the sense that that came as news to you.

4   A.   It did.

5   Q.   Okay.  So now that you know that, I mean, do you

6       look back now?  Do you rethink this, that maybe

7       there wasn't a future at Bissler for you?

8   A.   I have not been told any of the things that you

9       have told me, and I don't know for those things to

10      be true, so my answer to that is no.  I don't -- I

11      don't -- let me stop.

12          Please ask your question again.  I want

13      to make sure I answer that correctly.

14  Q.   Do you think you had a future at Bissler knowing

15      what you've learned today?

16  A.   I don't know.  I don't -- the information that you

17      have -- I have not been talked to, so it is a

18      surprise to me.  I wasn't doing anything that I

19      have been spoken about in working there.

20          Nobody brought up my smoking, going and

21      taking breaks.  Misty never said anything.  Nobody

22      ever said anything.  Nobody came to me and said

23      that, you know, we want you to do something

24      different.

25          I did my job.  I did it throughout the

```
 1        day every day.  I was welcomed back.  The

 2        superintendent, you know, wanted me back.  They

 3        sent emails requesting me back.

 4   Q.   Is your -- I have these two visits, April and May.

 5        You said you've been back since then.  Are things

 6        getting better?

 7   A.   In the VA?

 8   Q.   Yeah.

 9   A.   Yes.

10   Q.   So you're starting to cope with a lot of these

11        conditions?

12   A.   I'm learning.

13   Q.   Does the medication help?

14   A.   It's trying to.  It's trying to find a combination

15        that works.

16   Q.   So as far as trying to find some supplemental

17        income, it's all or nothing with regards to law

18        enforcement?  You're not willing to try to find a

19        job outside of law enforcement to supplement your

20        income?

21   A.   It's what I know.  It's my career, it's my love,

22        it's my passion, it's my life.  It was my life.

23   Q.   I see some records that were provided to me from

24        the Safety Forces Support Center.  I only saw one

25        visit.  Have you gone more than that?
```

Page 120

1    A.    Yes, weekly.

2    Q.    My client has -- I should mark these.

3                My client has been attending services for

4          depressed mood and anxiety.

5                Are you still going to the Safety Forces

6          Support Center?

7    A.    Yes.

8    Q.    How often do you go?

9    A.    I was going weekly, and then it went to two weeks.

10         And now I have another appointment with the VA

11         that's going to supplement me going to the Safety

12         Forces.  I have to go to the counseling at VA

13         next.

14   Q.    What kind of things do they do for you at the

15         Safety Forces Support Center?  Is it counseling?

16   A.    Counseling.

17   Q.    Do your sons work or do you support them?

18   A.    My oldest son who's been diagnosed with

19         schizophrenia is not working.  He can't hold a

20         job.  My second son, he works part-time doing

21         carts at Acme, my autistic son.  And my youngest

22         son is a Kent State student.

23   Q.    Having an autistic son and a recently diagnosed

24         schizophrenic child, that's got to be a lot of

25         stress.  Would you agree?

Page 121

```
 1   A.   Not my autistic son.

 2   Q.   No?

 3   A.   No.  He's a joy in my life.  He's amazing.

 4   Q.   How are your parents' health?

 5   A.   They're older.  They're older.

 6   Q.   Do you take care of them at all?  Are you a

 7        caregiver for them?

 8   A.   No.  They take care of each other still.

 9   Q.   Are they in the area?

10   A.   Yes, in Tallmadge.

11   Q.   When we went through that disciplinary file, and I

12        asked you this, but you said you really don't know

13        how to compare it to other deputies.  Do you get a

14        sense that you've had a lot of episodes of

15        discipline or do you consider that normal based on

16        your experience?

17   A.   Yeah.  Yes, I do, honestly.  There's -- Captain

18        Cottle has been written up for -- quite a few

19        times.  Another detective that I worked with,

20        Billy McKinney, he was written up quite a few

21        times.  So it's -- it's not unfamiliar for law

22        enforcement to be written up.  I mean, 30 years.

23        I think that I did pretty good at the end.  I

24        retired.

25                MR. REECE:  Okay.  Well, I don't think I
```

```
                                                    Page 122
 1              have anything more for today.  I'd like to
 2              see those medical record visits since --
 3                   MR. TORCH:  Supplemental ones?
 4                   MR. REECE:  Yeah.
 5                   MR. TORCH:  Sure.
 6                   MR. REECE:  I don't know if I would have
 7              questions about those documents, but....
 8     BY MR. REECE:
 9     Q.   That conversation you had with Bill Lee, not to go
10          back over that, but why call him up and tell him
11          to cover over to your house?
12     A.   He was picking up equipment.  He had equipment.
13          He had to pick up the radio and the charger.
14                   Well, not the radio.  He had had the
15          radio because he had picked it up before, but he
16          had to come and pick up the charger for the radio.
17                   I think he had it.  Yeah, that's how it
18          worked.  I gave him my radio and my charger.
19     Q.   But that was after your commission was revoked?
20     A.   No.
21     Q.   Oh.  Then why -- were you giving it to him because
22          he was working the job?
23     A.   When I went back to work for that week and day, I
24          had my radio and equipment back, and then I had to
25          go back off because of my ankle, so he came back
```

1       to pick up that equipment.

2   Q.  Did you have any talk about him taking the

3       position full-time?

4   A.  No.

5   Q.  You didn't discuss it at all?

6   A.  No.  I didn't know that there was any issue.  No

7       clue.

8   Q.  Well, now that you seem to have some clue, does it

9       surprise you?

10  A.  Yes.

11              MR. REECE:  Okay.  I don't think I have

12          anything further.  Thank you.

13              THE WITNESS:  Thank you.

14              MR. TORCH:  I have one question.

15              Ms. Clark, when you were working as a

16          special deputy for the Summit County

17          Sheriff's Office, do you know what your

18          approximate average hourly rate was?

19              THE WITNESS:  It was approximately $50 an

20          hour.  $42 an hour for certain jobs and then

21          $50 an hour for the other job.  And then they

22          raised the $42 up to $46.  So my ending was

23          $46 at Bissell Elementary.  It went from 42

24          to 46.

25              MR. TORCH:  That's it.

Page 124

```
 1              Anything else?

 2              MR. REECE:  No.

 3              MR. TORCH:  We'll read.

 4              THE COURT REPORTER:  Would anyone like to

 5        order?

 6              MR. REECE:  Yes, please.

 7              THE COURT REPORTER:  Regular delivery?

 8              MR. REECE:  Yeah, that's fine.

 9              THE COURT REPORTER:  Would you like a

10        copy, to order a copy?

11              MR. TORCH:  Can I get a quote first?

12              THE COURT REPORTER:  Sure.

13              (Signature was not waived.)

14                        - - -

15        (The deposition was concluded at 12:52 p.m.)

16                        - - -

17

18

19

20

21

22

23

24

25
```

Page 125

1          W I T N E S S   C E R T I F I C A T E

2

3       I, STACY CLARK, do hereby certify that I have read

4   my deposition taken on August 11, 2025, in the case of

5   Stacy Clark versus Kandy Fatheree, et al., consisting

6   of 127 pages, and that said deposition is a true and

7   correct transcription of my testimony with changes as

8   noted on the errata sheet.

9

10                  _____
                         Stacy Clark
11

12   Dated this _____ day of _____ 2025.

13

14

15       Sworn to and subscribed before me this _____

16
     day of _____ 2025.
17

18

19                  _____
                         Notary Public
20

21   My commission expires _____.

22

23

24

25

Page 126

1                          ERRATA SHEET

2     Witness Name:  Stacy Clark
      Date of Deposition:  August 11, 2025
3     Case:  Stacy Clark versus Kandy Fatheree, et al.

4     Page    Line    Change and Reason for Change

5     _____   _____   _____

6     _____   _____   _____

7     _____   _____   _____

8     _____   _____   _____

9     _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25    _____   _____   _____

Page 127

1                    C E R T I F I C A T E

2    STATE OF OHIO,    )
                       ) SS:
3    COUNTY OF STARK.  )

4         I, Sandra Johnson, a Registered Professional
     Reporter and Notary Public within and for the State of
5    Ohio, duly commissioned and qualified, do hereby
     certify that the within-named Witness, STACY CLARK, was
6    by me first duly sworn to testify the truth, the whole
     truth and nothing but the truth in the cause aforesaid;
7    that the testimony so given by her was by me reduced to
     Stenotype in the presence of said witness, afterwards
8    prepared and produced by means of Computer-Aided
     Transcription, and that the foregoing is a true and
9    correct transcription of the testimony so given by her
     as aforesaid.

10
          I do further certify that this deposition was
11   taken at the time and place in the foregoing caption
     specified.

12
          I further certify that I am not a relative,
13   employee of or attorney for any party or counsel, or
     otherwise financially interested in this action.

14
          I do further certify that I am not, nor is the
15   court reporting firm with which I am affiliated, under
     a contract as defined by Civil Rule 28(D).

16
          IN WITNESS WHEREOF, I have hereunto set my hand
17   and affixed my seal of office at Canal Fulton, Ohio,
     this 22nd day of August 2025.

18

19
               Sandra Johnson, RPR, Notary Public
20             My commission expires September 24, 2029.

21

22

23

24

25

**A**

A-H-W-A-J-E...
8:24
**a.m** 1:19
**Aaron** 54:21,25
55:19,19,22
**ability** 82:4
**able** 10:19 13:2
24:16 31:18
33:5 82:9
91:19 92:5
105:17 106:20
107:3 108:4
117:4,20
**absolutely** 57:11
**abusing** 44:12
44:15,20 50:6
50:8,18
**acceptance**
83:23
**accident** 59:6,22
59:22 60:10
67:15
**account** 29:18
29:21
**accountability**
81:9
**accurate** 60:8,9
60:14 61:17
107:21
**acknowledgm...**
83:24
**Acme** 120:21
**action** 127:13
**actions** 81:9
**active** 15:4,16
23:7,14,18
**activities** 23:1
**add** 16:4
**added** 83:9,10
**additional** 13:9
14:7 15:5
44:11
**address** 8:6,14
11:24
**Administration**

2:15
**administrative**
47:12,17 51:10
51:13
**administrator**
29:9
**advance** 7:18
**advanced** 10:20
**Affair** 37:5
**affiliated** 127:15
**affiliation** 22:21
**affixed** 127:17
**aforesaid** 127:6
127:9
**ages** 9:1
**agree** 27:1 41:1
42:22,22 49:9
49:23 57:25
58:7 69:13
70:9 73:1
76:17 79:5
104:24 105:1
120:25
**agreed** 72:1
**agreeing** 79:9
**agreement** 5:10
20:22 21:16
69:17 70:9
71:23 72:12
73:22 76:16,19
76:23 77:4
**Ah** 69:6
**ahead** 12:24
34:11 35:14
43:16 52:1
73:9 86:25
87:1 99:20
107:25
**Ahwajee** 9:23
44:7
**aide** 31:16 32:23
**Air** 15:2,3
**Akron** 1:18 2:10
8:4 16:5,9
34:23 54:24
**al** 1:7 5:9 125:5
126:3

**alcohol** 36:22
**Alexander** 22:7
22:12,25
**allegation** 44:25
47:6 61:15,16
98:11
**allegations** 48:5
48:6,21 65:24
104:21
**allegedly** 46:5
**allowed** 63:6,19
**Allyson** 44:10
**amazing** 121:3
**Amendment**
101:14
**Angela** 61:12,23
62:2 64:1
67:10,10
**ankle** 30:14,18
30:25 31:9,13
32:2,5,7 33:3,7
85:2 86:3
91:12,15,17,19
92:1,4,10
122:25
**anomaly** 32:12
32:14
**answer** 6:22
23:16 28:21
29:6,24 39:13
40:25 49:11
58:25 72:23
92:24 94:16
96:23 97:16
99:20 102:1
103:11 117:18
118:10,13
**answered** 105:8
**answers** 6:25
14:20 95:16,22
**anticipated**
24:11
**anxiety** 120:4
**anybody** 7:20
11:23,25 51:19
59:13 61:18
87:10 102:18

104:15
**anymore** 19:15
108:5
**anyway** 91:12
**apartment**
64:23
**apologize** 21:11
45:25 72:23
**apologized**
45:21
**apparently** 17:1
**APPEARAN...**
2:1
**appears** 25:12
78:11 83:21
**application**
14:18 66:17
67:16 107:14
**applications**
106:17
**applied** 14:18
16:1,8 17:25
105:11,13
106:10
**apply** 107:3
**appointed** 26:5
**appointment**
3:12 44:10
100:20 120:10
**appointments**
18:8 22:6
**appreciative**
88:24
**approached**
98:22
**appropriate**
90:14
**approximate**
123:18
**approximately**
10:8 12:12,21
16:14 18:14
19:7 36:9
37:24 123:19
**April** 67:21,21
105:11 106:10
119:4

**arbitration** 76:5
76:9,14
**Arbitrator**
76:10
**arbitrator's**
76:14
**area** 11:12 19:14
88:10 121:9
**arrest** 64:20
82:8,15
**arrived** 55:17
**aside** 13:11
73:15 94:24
**asked** 12:25 25:3
32:24 34:16
42:2 64:16
65:2,13 75:6
81:1 83:5 85:5
91:18 96:8,20
102:2 103:6,7
121:12
**asking** 40:8
65:14 75:3
**assessment**
79:11
**assets** 39:15
**assigned** 18:11
19:13 37:8,21
37:22
**assignment**
37:12,17
**assignments** 6:1
22:3 37:6,10
38:25
**assist** 29:1 59:9
67:17 75:7
**assistance** 10:23
32:24
**Assistant** 2:9
**assisted** 34:6,8
61:22
**assume** 68:5
**Attached** 3:22
**attempt** 48:25
**attend** 16:21
**attended** 23:24
97:12 98:3,12

100:5
**attending** 41:3
120:3
**attention** 64:11
**attitude** 104:20
**attorney** 2:9
5:23 6:10
30:10 102:20
127:13
**attorneys** 80:11
**ATTORNEYS'**
108:21 109:12
110:12 111:12
112:12 113:12
114:12 115:12
116:11
**August** 1:19
16:24 33:5
47:11,15 48:16
53:5 107:8
116:25 125:4
126:2 127:17
**authority** 48:24
57:3 62:7 63:3
63:12
**autistic** 10:18
120:21,23
121:1
**auxiliary** 105:12
105:15
**Avenue** 2:10
61:11
**average** 123:18
**avoid** 6:23,23
**aware** 52:18
64:25 65:23
80:14,16,21,24
87:7,25 90:9

**B**

**B** 3:11 17:4,6
39:23 40:9
43:7
**back** 7:2 9:15
11:5 14:18
20:17 21:1,18
37:21 44:15

48:12,13,18,19
52:15 55:8
56:13 57:16
60:15 64:18
66:9 71:22
72:16 75:5,5
75:12 77:7
79:22 89:11
90:7 91:11,19
92:1,12 94:8
100:3,4 101:5
103:23 107:18
116:24 118:6
119:1,2,3,5
122:10,23,24
122:25,25
**background**
5:24 14:15,16
**bad** 44:24 45:9
**Bailey** 52:21
**bank** 29:21 55:1
**bankruptcy**
36:10,12,17,19
**bar** 60:17
**Barker** 22:22,22
23:19 41:3
94:21,25 96:23
99:13,15
**Barker's** 100:5
105:6
**Barry** 3:19 22:7
22:12,25 74:7
75:22
**based** 23:16
121:15
**basic** 17:21
**basis** 53:18
**Bates** 3:10,11,13
3:14,16,17,21
3:23 4:2 44:4,5
45:11 49:16
53:3 56:24
94:5,13
**bear** 35:15
**bed** 117:23,24
**bedroom** 55:25
**before-and-aft...**

102:3
**began** 46:16
78:3
**beginning** 9:13
18:3 42:2
95:14 107:11
**Behalf** 2:2,7
**behavioral**
32:25
**Behavorial**
106:12
**belief** 104:20
**believe** 19:20
20:25 27:7
28:24 29:1
35:2,11 36:13
36:18 49:19
70:12 71:4,5
74:15 78:25
82:11 84:11
85:17 97:9
98:11 101:24
102:25
**bell** 42:25 54:17
73:16
**benefits** 106:3
**Benjamin** 8:24
9:2,4,11,15
10:14
**bent** 60:17
**Bertina** 54:24
**better** 95:8
119:6
**Bettes** 61:11
**bicycle** 19:13
**bid** 37:18
**big** 97:7,7,9
**Bill** 88:16 92:25
93:2,3,25 99:6
122:9
**bills** 13:3
**Billy** 121:20
**birth** 7:25
**Bissell** 6:5,8,8,9
28:15 29:16
30:6,8,25
31:11,12,14

32:4,17 33:6
34:4,12,17,21
35:8 39:20
84:10,20,23
85:3,14,15
87:17 88:17
89:5 90:12
92:18 93:25
123:23
**Bissler** 87:7,10
98:18 101:17
118:7,14
**bit** 14:14 34:11
**blank** 48:1
**blocking** 34:9
**Blossom** 28:15
34:2,4 82:20
84:12 92:6
**blossomed** 66:23
68:7
**Board** 21:15
37:10,23 38:9
38:23 46:15
47:3 49:13
51:2,14 59:9
59:23 61:10
62:16,20 63:13
67:17,23 70:23
**Board's** 59:6
**born** 8:2,4
**Boston** 19:14
**bottle** 48:10
**bottom** 44:5
**boundaries**
90:19,24
**brace** 31:18
**Brady** 80:5,6,18
80:21 81:25
82:10,12 83:1
83:5
**break** 7:6,7
42:12,13,17
68:15 108:7,11
**breaks** 7:4 90:10
90:12 118:21
**breathe** 14:1
**Bressi** 51:7

**briefly** 5:15
**Briggs** 64:15
65:2,4,13,19
65:20
**bring** 63:15 65:5
91:19
**bringing** 89:13
**brings** 69:22
**broke** 30:18
31:9 33:2 85:2
86:3
**broken** 33:6
59:3,20
**brought** 32:19
63:17 118:20
**Brown** 2:15 4:3
38:13,16 86:21
87:4 89:3
**building** 1:17
2:9 38:1 56:23
73:13 91:5
**bully** 62:12
**bumper** 60:17
**bureau** 21:21,23
25:1 39:4
73:20 77:13
78:1,3,4,7,12
78:17 79:1,12
79:17,23
**bus** 35:19
**business** 52:17
86:13 87:6
**busy** 100:22

**C**

**C** 3:12 25:9,11
39:23 43:7
125:1,1 127:1
127:1
**call** 21:16 33:25
41:19,23 59:10
61:8 76:15
80:15 87:5
88:6,11 92:15
92:17,25 93:3
99:23,25
100:13,15,21

101:6 102:3
122:10
**called** 1:13
20:10 28:4,19
45:19 48:12
54:24 60:22,24
61:2 64:15
65:13 83:3
85:5 88:23
91:18,21 98:25
100:1,2,3,17
100:19,23
101:1
**calling** 59:9 89:2
89:3 100:4
**calls** 76:16 99:4
102:17 105:7
**campaign** 105:6
117:9
**Canal** 127:17
**candidate** 95:8
**Capacity** 4:5
**Captain** 24:25
34:16 78:18,22
79:3,5 80:25
83:3 85:5 98:7
100:17 105:3
121:17
**caption** 127:11
**car** 10:24 52:21
52:22 53:25
54:4 60:16
**cards** 13:7 81:22
**care** 36:23 100:6
103:22 121:6,8
**career** 13:19
14:10 23:5
78:4,20 79:1
119:21
**caregiver** 121:7
**cars** 54:3
**carts** 120:21
**case** 1:4 5:8
11:13,17,20
40:22 67:9
125:4 126:3
**cash** 52:8

**caught** 44:4
45:10 64:10
**cause** 68:9 69:15
127:6
**causing** 60:18
**Center** 34:2,4
46:17 82:20
102:22,23
119:24 120:6
120:15
**certain** 6:24
123:20
**certainly** 57:18
**certified** 5:4
34:25 35:1,2,3
**certify** 125:3
127:5,10,12,14
**chain** 3:24 38:7
39:9
**chance** 76:16,18
76:23 77:4,22
**change** 99:2
104:16,20
107:23 126:4,4
**changed** 102:6
**changes** 24:9
80:1 102:13,15
125:7
**charge** 60:20
**charger** 122:13
122:16,18
**cheat** 14:16
73:10
**check** 27:20
63:10 94:7
106:4,5
**checks** 36:1
**chemical** 70:14
70:19 72:6,11
72:20
**Chief** 2:15 4:3
86:21 89:2
**child** 120:24
**children** 9:3
11:3 36:3 38:2
**choice** 19:1,3
20:12

**choices** 104:2
**Chris** 94:4
**Christian**
102:1
**Christmastime**
84:13 100:23
**Christopher** 2:8
5:16
**chronological**
43:5 73:7
**circumstances**
41:17
**circumvented**
88:18 89:20
90:2,6
**City** 86:13
105:10
**civil** 1:14 20:14
20:17 53:5
127:15
**claim** 30:24 31:5
31:6,8,10
60:14
**claims** 30:2
**clarify** 6:16
**Clark** 1:4,7,12
3:12 5:2,9,10
5:11 7:23
28:20 44:12
53:5 63:5,8
65:3,14 69:16
71:25 123:15
125:3,5,10
126:2,3 127:5
**Clark's** 53:7
66:13 67:24
**class** 17:21,21
35:7
**classes** 16:5 36:6
**classroom** 36:5
**classrooms**
32:25
**clear** 12:9,10
26:20 63:21
**Clermont** 15:23
16:1,3,5,8,10
16:13,22 17:8

17:11,20,22
**client** 120:2,3
**clinic** 49:6 51:4
**clue** 123:7,8
**cobbled** 83:14
**code** 96:19
**Cody** 80:19 81:2
83:6
**Cole** 49:14
**colleagues** 39:14
**collect** 52:5
**collected** 52:7
53:21
**collective** 61:8
**color** 27:4
**combination**
119:14
**come** 17:9 34:12
37:17 48:13
55:13 82:25
84:20 85:3
87:18 88:2,20
88:21 93:3,5
93:24 103:23
107:4 122:16
**comes** 24:12
89:8 104:13
117:15
**coming** 91:11
**command** 38:8
39:10
**commander**
57:2
**comment** 78:22
**commission** 6:4
25:8,23 40:12
40:19,24 41:2
41:6 84:3
92:11 98:17
99:13 100:9,19
101:5 103:9
104:4,17,17
105:4 108:4
116:24 122:19
125:21 127:20
**commissioned**
127:5

**commissions**
41:12
**committed** 55:1
**communication**
88:16 92:13
**communicatio...**
25:16,18 86:10
87:23
**community**
18:25 19:6,12
19:17 37:7
39:3
**Comp** 27:8
**compare** 121:13
**compares** 58:24
**compartment...**
117:20
**Compensation**
30:2,24 31:5,6
31:10
**compiling** 83:8
**complaints**
90:10
**completed** 70:12
**completion** 72:6
**Complying**
43:17 67:6
87:3
**Composite** 3:18
**comprehend**
117:12
**Computer-Ai...**
127:8
**concern** 63:2
72:10,21
**concerns** 50:10
89:13
**concessions**
20:16
**concluded** 47:16
124:15
**conditions**
119:11
**conduct** 76:20
**confided** 74:17
**confidential** 4:7
103:1 108:21

109:12 110:12
111:12 112:12
113:12 114:12
115:12 116:11
**confirmed** 83:7
**confused** 83:2
**consider** 11:13
23:6,12,13
99:18 103:20
121:15
**considered**
15:11 29:2
37:11 38:10
99:17
**consisting** 125:5
**constructive**
78:24
**contacted** 34:16
**context** 54:16
88:11
**continue** 13:19
79:22 92:2
**contract** 84:14
127:15
**control** 19:23
34:8
**conversation**
86:23 88:8
89:24 90:21
91:9 122:9
**conversations**
65:10 87:23
89:16 99:9
**cope** 119:10
**copy** 17:13,15
124:10,10
**correct** 12:16
15:20 22:10,12
22:13,22 24:5
25:14 26:6
27:15,16,21
28:2,17 32:8
32:10 40:20,21
40:24 41:16
45:5 51:22
55:11 56:5
57:8 61:24

62:1 64:5 70:3
71:9,13,24
76:2,3,4 77:21
78:8 82:10,11
82:13 84:10,11
86:6 90:16
94:22,23 97:4
103:3,14 125:7
127:9
**correctional**
106:11
**corrections**
20:10 21:4,20
39:4 73:20,23
77:7,9,16,25
**correctly** 9:16
44:8 57:5
118:13
**Cottle** 24:25
25:16 34:16
78:18 79:3,5
80:25 83:3
85:5 98:7,14
99:8,11 100:17
101:1 105:3
121:18
**Cottle's** 78:22
**counsel** 5:10
51:19 80:19
127:13
**counseling** 6:11
36:23 120:12
120:15,16
**country** 117:2
**county** 2:9 5:17
12:5,8,13
14:19 15:23
16:1,3,5,8,11
16:13,22 17:4
17:8,9,11,20
17:22,23,25
18:8,10 20:18
22:3 26:24
27:1,14,19,25
28:7,9,12,19
28:22,24 29:2
29:22 37:9

67:23 70:10
71:2,3 72:1
74:11 102:9
103:10,11,17
123:16 127:3
**couple** 51:11
59:18 96:2
99:16 100:22
**course** 51:17
**court** 1:1 7:1
19:20,22,23,24
20:1,6 37:7,8
37:13,14 39:3
39:25 43:8
53:23 62:7
66:4 82:5,10
82:21,24 124:4
124:7,9,12
127:15
**courthouse**
20:18 21:18
61:1,3 63:22
64:18 70:25
**cover** 47:11
91:22 122:11
**coverage** 35:13
91:23
**covered** 27:6
**crash** 59:24
**credit** 13:7
**crimes** 18:19
**criticism** 78:24
**Cross-Examin...**
1:13 5:6
**crowd** 34:8
**Cummings**
60:25 67:11
**curious** 32:21
**current** 8:6
**Custody** 19:23
**Cuyahoga** 46:18
51:3

---

**D**

**D** 3:1,13 39:24
40:1,4 43:7
**daily** 53:18

**damage** 60:18
**Darvocet** 45:14
**date** 7:25 17:1
20:4 24:7 51:7
68:25 69:2,7,8
72:18 107:8
126:2
**Dated** 3:22,22
125:12
**dates** 19:5 81:21
**daughter** 9:6
**day** 24:12 35:18
41:4 45:19
74:24 85:13
91:24 100:11
117:2,21,24
119:1,1 122:23
125:12,16
127:17
**days** 33:5 38:5
59:8 70:11,17
**days'** 72:2
**daytime** 36:2
**DD** 21:15 37:9
37:23 38:9,22
59:9 60:20
62:20 63:21
67:17,22 70:23
**deceit** 51:16
**deceive** 48:22,25
**December** 18:3
78:13
**decent** 65:3
**decision** 98:16
**decommission**
26:15
**deep** 117:17,19
**Defendant** 4:5
**defendants** 1:8
1:13 2:7 99:12
**Defendants'** 3:9
4:1 16:17,20
17:3,6 25:9
40:1,4 43:9,12
46:7 51:23
54:12 58:10
68:19 73:4

74:2 78:5 80:2
83:17,20 86:17
87:20 95:12
108:16
**defense** 80:11
**defined** 127:15
**delivery** 124:7
**Denise** 67:11
**department** 6:1
6:3 34:23
50:11 54:25
80:20 105:11
**depended** 36:9
**dependency**
36:23 70:14,19
72:6,11
**deposit** 29:22
**deposited** 53:18
**deposition** 1:6
1:12 5:10,19
6:17 7:9,14,20
12:25 55:9
84:2 88:22
96:8,21 124:15
125:4,6 126:2
127:10
**depressed**
102:19 120:4
**Depression**
102:16
**deputies** 29:1,12
40:5,14 74:17
103:14,16
121:13
**deputies'** 41:12
**deputy** 2:15
3:12 6:4,5 9:23
16:10 17:5
24:16 25:3,8
25:13 26:5,15
26:21,24 27:15
28:10 29:3
30:1 33:20
34:1,5 37:25
40:12,17 44:12
52:21 53:5
58:22,24 63:5

63:8 65:3,14
66:13 74:16,18
74:22 75:11
76:8 82:7,13
82:16 84:3,7,9
84:22 92:5,11
103:13 123:16
**describe** 103:8
**designation**
103:24 104:16
107:19
**Detail** 28:4,8,9
29:8,13,18,23
**detailed** 56:21
**details** 56:19
**detective** 16:12
17:20 21:21,22
25:1 39:4
77:13 78:1,2,4
78:7,12,16
79:1,12,17,23
121:19
**determined**
66:13
**devastated**
117:6
**Developmental**
21:15 37:9
**diagnosed**
120:18,23
**Dick's** 84:14
**different** 5:24
27:22 39:15,17
41:23 49:20
58:14 59:3
62:22 95:11
118:24
**difficult** 6:25 7:2
**difficulties** 39:8
39:9
**direct** 25:17
67:12
**directly** 98:25
**director** 67:22
**Disability** 21:14
21:15 37:9
**disabled** 62:2

**disagree** 27:12
41:1 42:22,22
**disagreement**
63:11
**disagreements**
39:9
**discharge** 76:19
**discharged** 15:9
**disciplinary** 6:2
7:17 20:19,20
41:20,24 42:21
43:1 58:18
74:5,8,14
75:22 121:11
**discipline** 50:1
53:15 54:8
56:1,2 57:1
58:5 68:9
69:12,15 73:8
73:24 76:21
77:17,19
121:15
**disciplined** 64:5
66:21 82:1
**disciplines** 58:23
77:20
**discover** 6:19
11:16 93:24
**discovered** 56:4
**discovery** 6:17
6:18 81:18
94:7 95:17
**discretion** 40:13
40:19,23 41:5
41:8,11,15
**discuss** 7:20
25:20 30:8
59:12 67:4,8
67:13 123:5
**discussed** 7:13
100:17
**discussion** 63:1
79:2
**dishonest** 80:9
80:10,13 81:6
82:2
**dishonesty**

81:22,23
**disobedience**
67:12
**disobeyed** 67:9
67:19
**dispensing**
48:23
**displayed** 23:23
96:24
**dispute** 28:23
98:15 101:15
101:15,17,22
**dissatisfaction**
65:19 87:11
89:4 92:17
98:18 101:16
**dissatisfied**
89:20 101:20
**DISTRICT** 1:1
1:1
**division** 1:2
15:17 17:12
18:11,13,18,21
19:20 20:14,17
57:2
**divisions** 39:10
**divorce** 36:16
44:19,24 45:9
50:15
**doctor** 37:1,4
52:17
**Document** 3:18
3:19 4:4
**documentation**
103:19
**documentations**
88:14
**documents** 4:6
7:13,17 86:8
94:12 122:7
**doing** 31:15
32:22 35:22
65:3 88:25
92:2 93:10
117:7 118:18
120:20
**Donna** 100:7

**door** 5:15 35:25
55:17 60:17,17
**doors** 35:24
63:10
**doubt** 92:22
98:15,19
**downstairs**
75:12
**downtown** 52:23
62:21 63:16,17
**Dr** 51:7
**drama** 65:6
**drastic** 102:13
102:15
**drug** 36:22
**drugs** 44:13,15
44:21 50:7,9
50:18,22
**due** 41:3 103:19
105:4
**duly** 5:3 127:5,6
**duties** 86:5 92:5
98:22
**duty** 15:4,16
56:7,9 91:16

────────────
**E**

**E** 3:1,14 43:7,9
43:12 125:1,1
125:1 127:1,1
**E-V-E-R-A** 8:7
8:11
**earlier** 24:10
40:9 84:1
**early** 33:4 66:15
66:15 73:10
75:20 76:1
96:21
**EASTERN** 1:2
**eat** 14:2
**educational**
14:15
**Edward** 9:7,9
10:5,6,6,14,22
11:2,7 36:15
44:7
**effect** 69:25 77:5

91:10 93:17
**effective** 40:5
69:4 74:12
**efforts** 24:18
103:6,8
**eight** 26:3
**either** 41:1
**election** 22:22
23:4,25 41:4
97:10,12 98:4
98:12 99:14,16
100:5
**elementary** 6:6
6:9 28:15 30:6
31:12,14 32:17
34:12,18,19
35:17 87:7,17
90:15 98:19
123:23
**email** 3:24 80:5
**emails** 80:18
81:18 119:3
**emotionally**
117:6,13
**employ** 103:14
**employed** 16:22
22:9
**employee** 26:25
27:9 28:20,22
28:24 29:2
64:21 65:9
127:13
**employees** 65:7
**employment** 2:4
13:9 14:15,18
18:7 25:13
74:10 103:9
106:7 117:2
**empty** 47:20
**encompass**
67:15
**ended** 19:14
70:13,18 78:13
**ends** 14:5
**enforcement**
13:11,20,22
14:4,9 15:22

27:5 38:3
56:10 107:1
119:18,19
121:22
**enjoy** 39:2
**ensure** 24:15,19
62:13
**entail** 35:6 37:20
**enter** 70:13
**entered** 68:10
69:16 70:8
71:22
**Enterprises** 52:6
**entire** 66:16
73:14
**episodes** 121:14
**equipment** 93:5
93:15 122:12
122:12,24
123:1
**errata** 125:8
126:1
**escorted** 32:24
**escorting** 31:16
**Esq** 2:3
**et** 1:7 5:9 125:5
126:3
**evaluation** 78:10
79:14
**evaluations**
78:12
**events** 41:24
75:3
**eventually** 25:6
**Evera** 8:7,11,14
8:20 11:24
**everybody** 35:22
76:16
**evict** 61:12,21
**evicted** 62:5
**evicting** 61:18
**eviction** 59:10
61:19,20 66:12
67:2,18
**evidence** 97:13
98:3,9,10
101:13,16

**ex-boyfriend**
102:12
**ex-husband** 11:2
44:8,17 50:12
**exact** 89:21
**exactly** 33:19
79:13
**EXAMINATI...**
3:3
**exclusively** 14:8
**executed** 69:5
**execution** 52:5
53:22
**exercise** 43:3
**exercised** 40:23
41:7,10
**exhibit** 16:17,20
17:4,6 25:9,11
40:1,4 43:9,12
46:7,10 51:23
54:12 55:9
58:10,12 66:1
66:6 67:14
68:19,23 69:18
73:4 74:2
75:17,23 76:6
76:9 78:5 80:2
80:4,17 83:16
83:17,20 86:16
86:17 87:20
90:17 94:5,15
95:12 108:16
**exhibits** 3:6,9
4:1 92:14
**existence** 69:15
**expectations**
25:24,25
**experience**
95:10 121:16
**expires** 125:21
127:20
**explain** 10:17
31:4 74:1
**explaining** 73:16
**explore** 24:1
**express** 25:24
65:19 89:18

99:7
**expressed** 25:2
88:23 90:8
95:11 101:2
105:15
**expresses** 99:4,5
**extension** 27:5
**extensive** 46:22
**extent** 10:17
24:2 96:22
**extra** 17:15
28:14,16 29:12
34:1 84:8
**extremely**
102:18
**eye** 44:4 45:10
**eyebrows** 49:7
**EYES** 108:21
109:12 110:12
111:12 112:12
113:12 114:12
115:12 116:11

---

**F**

**F** 3:15 46:7,10
125:1 127:1
**fabricated** 50:13
**fact** 20:16 68:7
76:19 98:16
101:15 105:5
**failed** 59:23
66:16,18
**failure** 53:7,21
57:1,2 59:11
67:15
**Fair** 11:23 54:8
95:25
**fairness** 46:23
**fall** 30:12,15
31:18,25 33:6
33:18 36:25,25
37:4 73:23
85:1,14,15,18
86:2,9 87:22
88:5 94:19
**Falls** 46:17,18
51:3

**familiar** 34:23
**families'** 23:24
**family** 11:12
**fancy** 95:18
96:14,19
**far** 11:10 92:10
119:16
**father** 11:7
**Fatheree** 1:7
2:14 5:9,17
22:7,13 25:18
33:12 41:10
62:25 63:5
88:23 89:3
92:14 95:7
97:14,22 98:3
98:16 104:24
107:21 116:24
125:5 126:3
**Fatheree's** 4:5
88:22 103:25
104:10
**fault** 77:4
**favorite** 39:2
**feasible** 105:16
**February**
103:18
**Federal** 1:14
**feedback** 98:23
98:24
**Feldman** 76:10
**felt** 90:19
**field** 14:4
**Fifty-five** 117:16
**file** 7:17 14:17
20:20 21:13
36:12,17 41:20
42:23 43:1
58:24 74:5
121:11
**filed** 5:18 36:10
36:18,20
**fill** 106:20
**filled** 14:17
30:13 33:19
39:20 45:14
47:8 48:10

**filling** 33:15
**final** 69:4
**financial** 10:15
**financially**
127:13
**find** 13:9 14:4
45:15 48:11,12
56:8 103:8
119:14,16,18
**fine** 5:12 8:23
13:16 19:11
21:10 24:24
46:24 124:8
**finish** 6:21 78:4
**finished** 16:24
69:23
**fired** 101:13
**firm** 127:15
**first** 4:5 5:3 10:4
11:25 15:22
18:9 35:9 59:2
59:18 60:24
71:21 84:9
89:10 95:18
99:22 101:14
124:11 127:6
**fit** 81:20
**fits** 104:5
**five** 10:7 38:5
**five-minute**
42:12,13
**folder** 41:18
**followed** 72:5
107:7
**following** 61:7
**follows** 5:4
59:20
**Force** 15:2,3
**Forces** 15:17
102:22,23
119:24 120:5
120:12,15
**foregoing** 127:8
127:11
**formal** 58:23
**forms** 66:17
**forums** 95:11

forward 56:2 71:5 101:20
found 68:9 74:9 76:20 77:3 80:10 82:2,3 83:2,4 89:10
four 15:4,16 18:8 22:9 58:14 59:3,19 66:15 67:14 70:21
fourth 59:11 67:3
frame 95:4
fraud 47:7
French 60:22 61:5,6
friend 61:11,23 62:13 64:1 67:10
friends 95:1,2
fulfilling 91:15
full 7:23 30:11
full-time 103:14 103:16 123:3
fullest 22:18
Fulton 127:17
function 117:23
funds 52:14 53:4 53:8,17,21
funny 58:19
further 76:17 123:12 127:10 127:12,14
future 118:7,14

G

G 2:3 3:16 51:23 51:25
garage 54:3,4 60:16,17
gate 15:18
GAUGHAN 1:5
general 8:2 36:35 37:1,3 97:10
Gerone 60:22

getting 13:21 32:24 91:2,6 106:15 107:18 119:6
give 6:21,24 7:16 11:1 20:16 25:8,23 43:12 44:11 54:14,16 59:4 80:15 101:5 102:6
given 41:20 43:6 59:12 92:4 127:7,9
giving 122:21
go 7:2 18:21,24 19:19,24 20:8 20:12 21:1,20 23:3,7 32:11 34:21 35:19 40:7 41:25 43:16 52:1,5 55:7 57:14 58:21 59:1 62:7,21 63:14 63:19,24,25 66:9 67:5 68:13 72:20 73:9,23 75:6 75:12 77:4,7 77:25 82:9,21 86:25 87:1 90:15 92:1 96:3 99:9,20 102:17 103:4 106:21 107:25 108:9 120:8,12 122:9,25
goal 78:2
goes 56:19
going 5:23 6:12 14:5,6,14 16:15 19:4 20:4 22:5 24:1 24:14 25:7 30:7 36:16 40:3 41:18

42:20,24 43:11 44:19 46:9 48:17 51:3 53:12 54:10,11 67:1,22 68:13 68:22 69:24,24 70:4 71:14 72:20 73:3,25 74:1 82:9,20 85:19 87:8,25 88:21 94:20 100:8,8 101:4 107:16 108:9 117:4,13 118:20 120:5,9 120:11,11
good 42:14 54:19 100:4 121:23
Goods 84:15
gotten 65:7
grabbed 75:1
grading 78:20
graduated 14:21
graduating 15:1
grateful 88:23
grew 8:4
grievant 76:18 76:20
groceries 10:24
grounds 63:9
group 17:22
grow 19:7
guard 15:18
guess 18:5 27:11 29:5 32:21 41:1 52:2 56:22 57:17 64:7 66:12 80:10 95:25 117:25
guilty 76:20 82:2
gun 55:1,19,22 56:8,8,11,13 56:15 57:3,15
guns 57:12

guy 38:13,23
guy's 39:19 64:7

H

H 3:17 54:11,12
half 74:23
Hall 33:10 39:19 39:20 86:1 87:25
hallways 32:22
hammer 23:10 23:21,21
hand 17:2 23:12 25:11 40:3 43:11 46:9 51:25 54:10 68:22 127:16
handed 16:19 45:20 81:17 83:19
Handing 17:16
hands-on 32:11
handwriting 79:8
happened 30:17 46:13 48:14,15 52:9,10 55:3 61:2 69:19 71:7,18 74:18 75:4 99:24 105:13 106:13
happening 70:17
happy 99:5
harassing 74:16
Hays 61:12,23 64:1
head 33:12 47:22 75:24
heal 92:12
health 27:14,17 102:14 106:12 121:4
hear 107:2
heard 88:13
hearing 68:8 69:14 74:9,14

75:22
heart 117:17,19
Heartland 106:11
heels 50:4
Heights 19:14
help 64:1 105:19 119:13
helped 61:11
helpful 39:16
hereinafter 5:3
hereunto 127:16
Hey 34:14 56:7
high 14:21,22
hired 16:10,12 17:5 18:9 106:17
hiring 5:25
history 6:2 22:2
hold 19:4,10 20:4 71:18 120:19
home 31:1 52:19 55:17,24 61:18 63:19 75:13 102:14
homes 61:13
honestly 22:17 57:14 70:16 82:14 92:21 121:17
honorably 15:9
hope 19:7
horrific 117:11 117:12
Hoskins 78:18
Hospital 48:9
hot 33:2
hour 57:21 74:23 105:18 123:20,20,21
hourly 123:18
hours 36:8 66:15 66:15
house 55:14 62:3,5,14 93:4 93:12,14

122:11
**Hunt** 106:15
**hunting** 103:7
  106:24
**hurt** 31:13 91:12
  117:18
**hurts** 117:17,19
**husband** 44:17

**I**

**IA** 73:12
**ideas** 13:12
**identification**
  16:18 17:7
  25:10 40:2
  43:10 46:8
  51:24 54:13
  58:11 68:20
  73:5 74:3 78:6
  80:3 83:18
  86:18 87:21
  95:13 108:17
**identify** 102:3
**ignored** 100:25
**II** 40:9
**immediately**
  52:8,14 53:18
  57:2 60:19
**improve** 78:23
  79:15
**improvement**
  78:21
**inaccurate** 59:7
  67:16
**incident** 44:2
  49:14 53:10,11
  59:8,16,16,16
  59:16,21 60:3
  61:8 66:1,9
  67:3 69:22
  71:4,11 74:13
  76:1 102:5
**incidents** 20:20
  21:14 42:3,21
  54:7 58:15
  59:4,19 69:10
**includes** 58:14

**including** 56:21
**income** 10:20
  12:3,12 13:1,2
  14:6,7 24:16
  105:21 106:9
  119:17,20
**incorrect** 71:1
**Independence**
  2:5
**independent**
  42:6
**indicating** 45:17
  60:4,5,6 96:17
**indication** 87:10
**Individual** 4:5
**information**
  6:18 11:15
  25:7 44:11,20
  50:6 80:12
  95:10 97:13,21
  98:2 106:16
  118:16
**informed** 103:19
**informing** 83:22
**informs** 67:23
**injure** 30:25
**injured** 27:6
  30:5,24 52:16
**injury** 30:14
  31:12 32:2,4,5
  32:6,7,8 92:4
**inmates** 19:23
  74:17
**instructed** 63:14
**insurance** 27:14
  27:17
**integrity** 117:9
**intentionally**
  31:20
**interested** 11:18
  11:19 34:17
  56:22 85:7
  127:13
**internal** 66:11
**interrogatories**
  4:6 95:23
**Interrogatory**

96:4,6 102:2
  103:7
**interrogatory's**
  96:14
**interrupt** 13:17
  24:23 36:6
**intersections**
  34:9
**interview** 38:23
  64:9 65:1,18
  67:8
**interviewed**
  107:6
**interviews** 56:21
**investigate**
  46:16 57:24
  65:9 74:20
**investigated**
  18:19 45:5
  67:19 77:3
**investigation**
  3:15 43:20
  44:3 46:2,12
  46:19,25 47:1
  47:3,14,15,18
  49:13,15,18,19
  49:22 50:4,5
  51:9,14 56:21
  57:19 58:3
  59:12 64:19
  65:24,25 66:11
  66:23 67:1
  68:6 72:13
  74:6 75:7
**investigations**
  15:18 49:8,22
  81:5,6
**investigator**
  46:15 47:4
**involuntarily**
  21:3
**issue** 27:11 29:5
  88:19 89:21
  102:5 123:6
**issues** 48:18,19
  65:9 67:25
  68:4,6 75:9

89:19 90:4
  106:14
**items** 54:4

**J**

**J** 3:19 68:19,23
**Jacobs** 64:7,10
  64:11,13 65:2
  65:4,11,11,13
  65:15,23
**Jacobs'** 65:1
**jail** 20:9,15,18
  20:23,24 21:3
  21:17 29:1
  34:6 39:4 57:6
  57:12 70:2,10
  70:24 71:2,3,8
  71:12,18 72:2
  72:25 102:9
**January** 3:22
  70:6 71:6 74:7
  74:12 100:13
  100:15
**Jerome** 33:10
  39:19,20 86:1
  87:24
**job** 6:5 13:12,14
  13:21 14:3,4
  14:19 15:22
  19:21 22:18,19
  28:14 29:12
  34:12,13 65:3
  85:3 88:25
  93:6,10,16
  103:6 106:24
  107:14 117:7
  118:25 119:19
  120:20 122:22
  123:21
**jobs** 27:22 28:16
  34:1,1 84:8,17
  100:7 123:20
**Joel** 102:11
**John** 2:8
**Johnson** 1:15
  52:7 87:14,18
  88:4,8 89:2,12

89:14,18,24
  90:17 91:10
  92:16 101:19
  118:1 127:4,19
**joke** 93:18
**joy** 121:3
**jreece@prose...**
  2:11
**JUDGE** 1:5
**July** 30:18 31:2
  31:9 33:3 86:3
  106:25 107:10
  107:11
**jump** 71:5 96:2
**jumping** 33:1
  34:11 35:14
**June** 9:16 69:8
  71:22 72:17
  106:25

**K**

**K** 3:21 73:3,4
  75:17,20
**Kandy** 1:7 2:14
  4:5 5:9,16
  100:7 125:5
  126:3
**keep** 73:6
**Kent** 120:22
**kids** 35:20
**Kim** 45:20
**kind** 23:17
  30:12 34:3
  43:18 63:11
  72:10,22 83:2
  88:15 120:14
**kinds** 15:15
  18:17 19:9,11
  25:20 35:14,16
  48:16 84:8
  92:5
**King** 54:24
**knee** 31:13 32:4
  32:6,8
**knew** 57:11
  64:17 97:14,18
  97:22,24 98:3

98:6,9,10,12
102:4
**know** 7:5,12
10:3 14:1,11
14:20 21:6,6,6
21:7 22:2 27:7
29:6,9,17,23
29:24 33:4,19
36:18 37:3
38:17,19,20
39:1,13 40:25
41:10,13 43:19
44:16,22 46:22
53:14 54:5
56:1,19 57:13
61:19 63:24
64:11,12 65:15
68:24,24 69:7
71:14 72:9,14
72:15,22 76:22
80:6,12,14,14
80:16 81:15,15
81:21,23,23,25
82:4,14 84:20
85:11 86:2,11
87:14 88:21
89:21,23 92:23
93:19 94:1,2,6
94:9,16 96:12
97:8,16,17,24
98:6,8 99:1
103:25 104:1,5
104:10 105:8,9
117:14,18,21
118:2,5,9,16
118:23 119:2
119:21 121:12
122:6 123:6,17
**knowing** 117:25
118:14
**knowledge**
97:21 98:2
**Kommander**
28:5,8,9 29:8
29:13,19,23
**Kosovo** 15:7

**L**

**L** 3:22 74:2,4,4
75:20 76:6
**language** 40:16
**Lappin** 45:1
**larger** 66:23
**Larry** 2:15 4:3
86:21 87:4
100:7
**late** 18:14
**laughing** 57:10
57:17
**law** 2:4 13:11,19
13:21 14:4,8
15:22 27:5
38:2 56:10
76:15 107:1
119:17,19
121:21
**lawsuit** 5:17
**lawyer** 7:10,13
7:21 51:18
95:17
**lawyers** 95:18
96:19
**lead** 107:7
**learn** 81:3 88:2
88:20
**learned** 117:25
118:15
**learning** 119:12
**leave** 27:10 29:5
47:12,18 51:10
51:13 53:6
54:4 61:10
62:15,18,19,23
63:3,4,6,7,8,13
63:18 66:17
67:17 75:5
77:25 102:16
**leaving** 63:2
64:14,25 74:15
74:24 76:1,1
100:1
**Lee** 30:13 33:10
33:20 39:20

78:18 86:2
87:24 88:16
89:6 92:25
93:1,25 99:5,6
101:21 122:9
**left** 21:19 35:11
59:8 62:5
63:23 64:13
66:15 67:17
73:10,13 75:10
75:13,20 98:11
**legal** 27:11 29:5
62:7
**legs** 31:17,17
**length** 54:23
**Leonard** 44:11
**let's** 6:20 28:3
42:16 55:21
59:1,21 83:15
83:15 95:18
107:19 108:6
**letter** 3:22,22
17:2 18:2
47:11 77:12
83:21 90:5
**Letterhead** 3:20
**letters** 93:8
**lie** 81:11
**lieu** 68:11 71:25
**lieutenant** 38:8
39:12 47:2
49:12 63:4
75:2
**life** 119:22,22
121:3
**lights** 55:18
**liked** 65:5,6
**liking** 22:19,19
**Limbert** 75:2
**line** 35:21 57:21
126:4
**list** 80:6,6,9,11
80:13,15,16,18
80:22 81:1,3,4
81:11,15,16,25
82:1,10,12
83:1,5,8,12,13

**literature** 23:12
**little** 13:4 14:14
24:1,10 34:11
38:22 44:5
54:14 58:13
**live** 9:11 13:2
**lived** 8:14 9:13
11:24,25
**lives** 8:20 11:12
**living** 11:7 62:14
**LLC** 2:4
**local** 56:10
**locally** 107:2
**lock** 35:25
**locked** 14:8
**long** 6:21 8:14
10:3,6 15:3
16:13 18:12
19:4,5 20:1
37:22 57:13
77:9 84:12
117:18
**longer** 61:3
67:24 108:8
**look** 43:14 57:16
74:4 118:6
**looked** 85:12
**looking** 13:12
60:14 105:21
**looks** 17:4 47:13
56:20
**lose** 117:2
**lost** 48:10 100:7
**lot** 33:15 46:10
46:10 54:19
65:4 119:10
120:24 121:14
**love** 119:21
**loved** 39:5 117:7
117:7
**low** 53:13
**lunch** 63:18,19
**lunchtime** 36:3
**luxury** 7:4

**M**

**M** 1:17 3:23

78:5
**mad** 90:2
**Main** 1:18
**maintenance**
60:20
**management**
46:17 48:8,17
49:6 51:3
78:23
**manager** 86:13
87:6
**manner** 53:8
**March** 66:14,14
**mark** 17:3 26:14
40:7 54:11
66:18 68:13
73:25 85:24
86:16 87:19
120:2
**marked** 16:17
16:19 17:6
25:9,11 40:1,3
43:9,11 46:7,9
51:23,25 54:12
58:10 68:19,22
73:4 74:2 78:5
80:2,4 83:17
83:19 85:14
86:17 87:20
95:12,14
102:25 108:16
**MARKED/FI...**
3:6,9 4:1
**marking** 16:15
18:6 58:12
78:15
**married** 10:1,3,6
10:9,10,12
36:14
**Marvin** 76:10
**Matt** 86:11,24
87:5 90:17
101:19 118:1
**matter** 22:17,19
25:5 67:4,13
91:11 103:12
**matters** 58:18

67:14
**McGhee** 54:21
54:25 55:20,22
**McKinney**
121:20
**mean** 10:24 11:6
12:10 13:15
15:11 21:12
23:5 24:13,22
27:24 28:15
32:12 33:5
34:8 38:8 42:9
42:25 44:16
48:4 50:8
51:10,13 55:7
56:20 57:17,20
58:19 72:21
76:25 77:9
78:7 79:17
83:1 91:4,6
92:4 93:12,22
96:1,10 101:12
102:13,14
107:19 117:1
117:14 118:5
121:22
**meaning** 26:13
61:20
**means** 6:18
26:12 89:23
90:18 96:12
102:4 108:4
117:21 127:8
**meant** 89:12
90:22 100:6
**medical** 4:7 6:10
102:20 103:4
108:10 122:2
**medically** 27:6
**medication**
119:13
**Medications**
50:24
**meet** 7:10 14:5
**meeting** 7:9
25:21 73:12
88:4,6 89:14

**100:24 101:3,4**
**Memo** 4:3
**memorialized**
86:23
**memory** 42:10
44:1 63:24
68:14
**mental** 102:14
**messages** 100:2
**met** 5:15 17:22
25:22 52:7
75:2 103:17
**Michael** 80:19
**middle** 7:7 8:21
10:18 76:9
**Mike** 81:2 83:6
**Miksch** 47:1
49:16
**military** 12:18
15:2,19 16:1,4
105:24
**millimeter** 55:11
**mind** 13:18
24:13 99:2
**mine** 85:17
**minute** 70:11
71:6
**minutes** 59:15
75:14
**missing** 45:8
55:15 56:4,4
56:11 57:4,25
**Misty** 87:14,18
88:4,8 89:2,12
89:14 90:17
91:9 92:16
94:2 101:19
118:1,21
**misunderstan...**
45:7
**Mm-hmm** 39:25
**moment** 43:18
**Monday** 1:19
89:10 91:20,22
100:12
**monetary** 11:10
**money** 11:1,1

12:17,20 27:22
28:13,16,16
29:20 53:23,25
**month** 12:9,22
61:7 106:4,6
106:25 107:10
**monthly** 12:12
**mood** 120:4
**morning** 35:20
94:3
**mortgage** 8:18
13:6
**motivated** 44:23
50:15
**move** 66:10
77:23 89:5
94:4 117:4
**moved** 9:15
**MRDD** 59:6,23
61:10 62:16
63:2,13 65:16
65:22 68:1
69:11
**multiple** 99:11
**Muncy** 102:7,8
**Municipal** 82:24
**Music** 34:2,4
82:20
**mutual** 28:3

---
### N

**N** 3:1,24 80:2,4
125:1
**name** 8:21,25
9:7,8,17,18
10:4 33:11
38:15,17,20
39:19 60:21
64:7,8 126:2
**name's** 5:16
7:23 38:23
**named** 38:13
46:16 67:10
**names** 83:8
**narcotics** 17:12
17:19,20,21,23
18:11,12,17,19

18:21 39:3
78:3
**nature** 22:4
23:22 39:12
42:11 91:13
**need** 6:19,22,23
6:23 11:16
17:13 37:25
42:13 67:24
78:25 88:2
117:22
**needed** 35:12
48:12 61:4
63:17 81:1
83:5
**needs** 11:1 78:21
**negative** 98:23
**net** 12:10
**networking**
107:1
**never** 28:22 63:5
70:13 72:5
81:12,14 82:3
83:11 98:22
101:23 118:21
**nevertheless**
46:2 53:15
**news** 89:8
104:13 118:3
**night** 97:12 98:4
98:12
**Nikki** 45:1,19
**Nodded** 33:12
47:22 75:24
**normal** 121:15
**NORTHERN**
1:1
**Notary** 1:16
125:19 127:4
127:19
**noted** 103:2
125:8
**notes** 24:4 73:10
86:21 87:4
**notice** 94:5
**notify** 56:7,10
64:12

**notifying** 56:3
**November** 24:5
25:12 41:4
84:1 91:22
99:22,24 100:1
100:10,18
**now-ex-husba...**
50:5
**number** 41:23
58:22 70:20
72:5 94:6 96:3
96:10
**numbers** 94:13
**numeral** 40:9
**nurse** 46:16 47:9
48:7,13,22
49:1,5 102:8

---
### O

**O** 4:2 83:16,17
83:20
**obey** 59:11
**Objection** 49:10
99:19 107:24
**obligation** 56:9
**obtain** 51:15
**obviously** 27:10
77:2 93:22,23
**occasion** 82:8,15
**occasions** 99:12
**occur** 71:11
**occurred** 17:21
**occurs** 29:17
**October** 73:9
86:9
**oddly** 71:16
**office** 12:13
14:20 17:12
26:25 29:3
38:12 53:5
67:23 69:18
74:11 83:3,22
88:10 95:4,5
103:10,12,17
103:20 123:17
127:17
**officer** 30:6

34:18,22 35:4
35:9,10,17
103:15 105:12
106:11
officers 34:24
107:2
Official 4:5
ogadory 96:12
Oh 17:14 31:15
70:21 79:7
96:16 106:3
107:18 122:21
Ohio 1:1,17,18
2:5,10 46:15
47:3 49:13
51:1,14 127:2
127:5,17
okay 5:8 7:16
8:6 10:21 11:2
11:9,18,23
12:17 15:9,15
16:7,15,24
20:8 21:19,19
21:25 28:11
30:23 31:7,9
32:2 33:1,9
34:11 37:6,15
42:9 43:3,18
44:4 45:18
46:2,6,22
47:23 48:19
49:25 54:5,10
54:19 55:6,21
56:1,17,19
57:16 58:21
60:10 61:16
68:15 71:1,5
71:10,15 72:5
72:25 75:20
79:9,11 84:25
85:19,21 88:2
88:7 94:10,18
96:18 97:25
103:17 106:5
118:5 121:25
123:11
old 9:2,9 117:15

older 121:5,5
oldest 10:22
11:7 120:18
once 16:8
one-sentence
54:14
ones 19:24 85:12
122:3
online 35:7
106:18,20
open 55:18
OPERS 80:1
opinion 22:15
opinions 39:14
OPOTA 16:21
103:19 104:8
104:15,22
105:7
OPOTA's 104:9
107:22
opportunity
42:3 43:13
order 4:8 43:5
53:9,17 59:11
67:9,12,19
73:7 76:10,15
103:2 124:5,10
ordered 53:23
67:3
orders 53:17
organize 41:22
organized 41:22
outcome 47:13
outset 96:8
outside 7:21
38:7 90:15
119:19
overall 59:4
overstepping
90:19,24
Owagee 9:20,21

_____

**P**

P 4:3 86:17
p.m 124:15
page 3:3,9 4:1,4
40:8 47:14

49:12 53:3
56:24 59:2
60:2 62:24
64:10 65:1
66:9 67:5 69:3
76:6,9 95:19
96:4 126:4
pages 3:18,24
59:19 125:6
paid 27:19,25
28:4,8 29:7,14
29:15,24
pain 46:17 48:8
48:17 49:5
51:3
painkiller 50:22
painkillers 50:9
paint 50:17
Paolucci 47:2
49:12
paper 46:10,11
47:20
papers 61:21
71:16,17
paperwork 9:18
52:20 59:24
62:22 63:16,17
73:12 74:6
106:19,21
parade 92:8
parades 23:7
34:6,8
Paragraph
76:14
paragraphs
45:10
Pardon 77:18
parent 35:21
parents' 121:4
Parks 107:13
part 44:2 47:7
50:13 56:1,2
64:24 75:13
77:23
part-time 10:19
120:20
participate 23:1

particularly
48:15 86:9
parties 23:3,25
76:17
Partners 2:4
party 41:3 97:12
98:4,13 100:5
105:5,6 117:10
127:13
passing 28:12
passion 13:25
14:10 119:22
Pat 106:15
patients 51:8
PATRICIA 1:5
patrol 15:18
19:13 52:20
60:16
pay 28:16 29:13
84:18 105:15
paying 13:2
payment 13:6
payments 10:25
payroll 28:7,19
29:10,11
pending 47:12
pension 12:7
105:22,24
106:2,5
people 17:23
29:12 49:21
56:3 59:9
61:12,23 62:4
63:21 80:13
82:1 92:22
93:24 97:5
101:25 102:4,6
117:2
perform 10:19
86:5 92:6
performance
67:25 68:4,5
78:10,11 79:13
87:12 90:4
98:18 101:21
performing
49:21

period 53:7 78:8
permission 45:3
62:15,18,19
63:25 64:3,14
73:11
permitted 63:5
PERS 12:14
person 39:15
75:8 106:14,19
personal 39:8,14
91:2 97:23
personally 78:24
personnel 14:17
21:13
Pharmacy 46:16
47:4 49:14
51:2,15
phone 45:20
92:15 99:23
100:13,21
physician 37:1,3
pick 52:21 93:5
93:15 104:3
122:13,16
123:1
picked 122:15
picking 122:12
pickup 41:21
picture 50:17
piece 21:12
piecing 89:1
pills 43:21 45:1
45:2,7,13,21
46:5 48:11
pipe 14:13
place 70:14
127:11
placed 47:12
51:13
Plaintiff 1:5,12
2:2
PLAINTIFF'S
3:6
plan 79:21,22
92:10
planned 24:7
plans 13:8 24:12

**please** 19:7 93:6
  93:16 118:12
  124:6
**point** 15:19
  19:16 20:19,21
  21:19 24:13
  42:20,23 43:2
  64:15 79:1
  81:20 85:19
  106:21 107:17
  117:1,3,15
**pointing** 75:17
**Police** 34:23
  54:25 105:10
**policing** 18:25
  19:6,12,17
  37:8 39:3
**policy** 26:13
  40:5,10,16
  41:6 53:24
  77:1
**political** 22:21
  23:1 35:12
  96:22 99:18
**politically** 23:7
  23:14,18
**Portage** 103:17
**position** 16:9
  17:9 18:1
  19:15 35:12
  39:7 76:8 85:9
  106:11 108:5
  123:3
**positions** 103:15
  105:12,17
**positive** 98:23
**post** 34:13 61:10
  62:15 63:2,6,7
  63:13 73:10,13
**posting** 34:14
  85:4
**potentially**
  11:19
**preapproved**
  63:8
**predicate** 76:21
**predisciplinary**

68:8
**prefer** 5:11
  39:22
**preparation** 7:8
  7:14
**prepared** 127:8
**preschool** 38:1,4
**prescription**
  44:12,15 45:14
  48:14 50:9,9
  50:18,22
**prescriptions**
  47:8 48:9,10
  48:23 51:15
**presence** 38:3
  127:7
**present** 2:13
  28:21
**presume** 90:18
  107:19
**pretty** 56:20
  83:20 121:23
**preventing**
  91:15
**preview** 54:14
**previous** 23:25
**previously** 35:11
**principal** 33:21
  87:17 88:5,22
  89:3 98:25
  99:4
**printout** 51:1
**prior** 23:3 24:15
  28:8 35:3
  40:16 48:15
**probably** 5:22
  6:12 27:11
  41:18
**problems** 65:8
  106:18
**Procedure** 1:14
**process** 107:15
**produced** 94:6
  127:8
**Production** 4:6
**professional**
  1:16 91:4

94:24 127:4
**prompted** 49:17
  57:18 58:3
  79:25 89:14
  100:15
**pronounce** 9:18
**proof** 97:18
**proper** 56:3 57:3
  66:17
**properly** 75:10
**properties** 23:24
  61:24
**property** 8:16
  23:23 59:7,23
  64:13,14
**Prosecuting** 2:9
**protective** 4:8
  103:1
**provided** 6:10
  30:10 102:21
  119:23
**providing** 76:19
**Pry** 1:17
**Public** 1:16
  125:19 127:4
  127:19
**pull** 54:3
**purpose** 47:21
  107:19
**pursuant** 1:14
**pursuing** 84:2
**put** 23:10 43:5
  45:11 51:10
  52:18 72:11
  80:11 83:15
  89:5 91:8 94:1
  101:19 117:4,8
**puts** 117:8

**Q**

**qualified** 127:5
**quality** 78:20
**question** 6:21,22
  7:7 9:1 12:24
  23:17,20 33:23
  37:2 41:5
  51:12 58:25

96:15,20 99:9
  107:20 117:9
  118:12 123:14
**questions** 5:24
  5:25,25 6:2,3,4
  6:13,15 7:16
  22:20 122:7
**quiet** 52:3
**quite** 121:18,20
**quote** 124:11

**R**

**R** 3:12 4:5 95:12
  125:1 127:1
**radio** 122:13,14
  122:15,16,18
  122:24
**raised** 49:7
  123:22
**Randy** 64:15
  65:19,20
**rate** 123:18
**reached** 107:17
**reactivated** 15:6
  15:7
**read** 7:2 43:18
  46:24 48:4
  52:1 54:19
  55:7,8 57:5,21
  57:21 59:15
  70:21,21 73:9
  87:2 124:3
  125:3
**readdress**
  103:23
**reading** 43:25
  43:25 45:15
  52:2,3 55:4
  57:5 73:15
**reads** 59:17
**ready** 92:2
**really** 17:24 45:9
  45:9 83:11
  121:12
**reason** 26:16
  28:23 40:7
  44:16,22 78:15

92:22 98:15,19
  100:4 101:22
  101:24 126:4
**recall** 9:17 20:1
  20:6 21:13
  42:24 43:20
  45:8 53:10,11
  53:11 57:4
  64:16 72:16
  76:12
**recalls** 87:4
**receive** 12:17,20
  49:25
**received** 17:25
  25:7 48:9 50:1
  56:25 87:5
  92:15
**recess** 36:4
  42:18 68:18
  108:13
**reclassify** 40:12
**recognize** 94:14
  94:15
**recollection** 42:7
**record** 22:1 54:7
  56:23 101:22
  103:2 122:2
**recorded** 101:6
**recording** 101:8
**records** 4:7 6:10
  102:20 103:4
  108:10 119:23
**redo** 48:14
**reduced** 127:7
**Reece** 2:8 3:4
  5:7,16 17:14
  33:11,14 39:23
  42:16,19 43:7
  66:2 68:21
  69:2,6,9 94:9
  94:11,16 96:6
  103:3 108:9,12
  108:14 121:25
  122:4,6,8
  123:11 124:2,6
  124:8
**reference** 74:15

**REFERENCED**
3:6,9 4:1
**referencing**
75:23
**refers** 74:8
**reflected** 73:14
**refresh** 43:25
**regard** 13:5
**regarding** 6:11
**regards** 119:17
**regime** 22:9
**Registered** 1:15
127:4
**Regular** 124:7
**regulation** 74:10
**regulations** 53:9
53:16
**rehash** 42:21
**rehashing** 54:6
**reinstated** 76:7
76:10 77:6
**reinstatement**
71:17
**reinstating** 76:6
**related** 31:2,11
75:18,20 83:16
**relationship**
49:3 94:25
96:22
**relative** 127:12
**relies** 10:20,22
**relieved** 74:21
74:23,24 75:11
**relocation** 41:2
**rely** 10:14
**remain** 91:4
**remained** 82:12
**remember** 9:16
20:15 42:6
43:23 44:2
46:19 47:9,17
47:19 48:3
53:2 55:6
56:12,16 59:25
64:19 65:17,20
66:19 68:1,3
68:11 69:24

70:15,15,16,17
73:19 79:2,21
84:12 88:3
**removal** 87:6
**removed** 62:5
83:10
**removing** 61:23
**renew** 41:12
98:17
**renewed** 104:18
**rent** 8:16 10:25
**repay** 45:13
**repeat** 37:2
**replace** 35:8
62:23 63:23
87:24
**replaced** 64:16
65:14,16
**report** 38:12
46:25 47:1,2
49:13,15 57:1
57:3 59:23
60:12 61:4,8
67:15 71:17
74:6 107:21
**reported** 43:21
60:19,21,23
61:5 74:19
**reporter** 1:16
7:1 39:25 43:8
66:4 124:4,7,9
124:12 127:4
**reporting** 54:15
127:15
**reports** 3:15
42:9 46:11
49:17,20 62:22
104:8,8 105:9
**represent** 5:16
**represents** 41:19
**requested** 96:23
**requesting** 87:6
119:3
**Requests** 4:6
**required** 28:25
34:7 59:24
63:8

**rescind** 100:8
**rescinded** 41:11
100:19 104:4
104:17 108:3
116:24
**rescinding** 105:4
**reservations**
65:5
**Reserve** 15:25
48:8
**reserves** 15:5
40:11
**residence** 8:20
9:15 62:6
**resolve** 56:13
**resolved** 81:13
**resource** 30:6
34:18,22,24
35:4,9,10,17
103:15
**respectfully**
27:12
**response** 20:5
**responsibilities**
19:21,21 86:7
**responsibility**
36:5
**restitution** 52:6
**restriction** 52:19
**restrooms** 7:5
**result** 69:14 76:5
**resulted** 58:5
69:11 73:8
**rethink** 118:6
**retire** 79:19
**retired** 15:11,13
21:22 24:4
77:10 78:9,13
78:14 84:4,5
121:24
**retirement** 12:4
12:5,7,14 24:7
24:9,10,12,15
24:17 27:20
77:12 79:25
**retiring** 83:23
**returned** 56:17

100:21
**returning** 73:13
**review** 7:13,18
42:3,24 84:18
**reviewed** 20:19
**revoke** 40:11,18
40:23 41:6
**revoked** 41:11
99:12 103:9
122:19
**Richard** 17:3
47:2 49:12
**ridiculous** 57:11
**right** 6:7 7:6
10:22 11:8,21
12:3 13:4 24:1
30:1,21 33:11
35:14 38:19
39:18 40:11,18
42:4,16 49:7
50:2 53:22
54:24 55:16
58:9 59:1 60:4
60:6 61:14,19
64:22 68:7
69:9,19 70:4
71:23 73:6
75:23 79:16
81:17 84:10,16
85:3,6,8 89:25
94:11 96:3
101:14 102:22
105:22 106:9
108:15
**ring** 54:17 73:16
**Road** 2:4 8:7,13
**robbery** 55:2
**Robert** 49:14
**Rockside** 2:4
**role** 65:8
**rolled** 60:16
**Roman** 40:9
**rounds** 32:23
63:9
**RPR** 127:19
**rule** 74:10
127:15

**rules** 1:14 53:8
53:16
**run** 35:11
**running** 35:21
94:21 95:6
**Russell** 1:17

**S**

**S** 4:7 108:16
125:1,1
**safety** 2:9 62:4
62:13 102:21
102:22 119:24
120:5,11,15
**Sammy** 9:2
**Samuel** 8:21 9:3
9:11 10:14,18
**Sandra** 1:15
127:4,19
**sat** 36:3 57:21
**saw** 15:22 17:8
20:20 22:5
30:10 33:15
34:1 38:23
49:25 81:20
85:4 119:24
**saying** 44:7
72:19 92:23
93:9 102:22
**says** 54:22 60:3
72:3 78:21
90:17 104:17
**scales** 105:15
**scenes** 94:20
**schedule** 100:20
**scheduled** 25:21
25:21
**schedules** 44:10
**schizophrenia**
120:19
**schizophrenic**
120:24
**school** 6:6 14:21
14:22 28:15
30:5,21 31:24
31:25 32:17
33:4 34:12,18

34:19,22,24
35:4,9,10,16
35:17,20 36:1
84:21,23 87:7
90:15 92:3
102:9 103:15
**schools** 86:14
93:25
**Scott** 24:25
25:16 34:16
78:18 83:3
85:5 98:7,14
99:8,11 101:1
101:8 105:3
**seal** 127:17
**searching** 64:8
106:6
**seat** 91:6
**second** 13:12
47:14 69:3
120:20
**secure** 35:24
53:23 55:23
**secured** 35:25
55:13,15
**security** 15:17
63:9
**see** 33:9,9 34:13
42:24 44:5
59:2,18 72:18
81:21 88:14
91:21 119:23
122:2
**seeing** 9:17
21:13
**seek** 51:18
**seen** 81:14,17
83:12,14 86:19
87:1 91:5
**seize** 64:23
**send** 57:14
**sense** 23:17 89:4
89:6 92:16,20
118:3 121:14
**sent** 64:17 90:6
93:8 95:17
119:3

**separate** 46:11
49:8,22
**separated** 15:19
**separates** 104:5
**separating** 68:1
**September** 15:8
127:20
**sergeant** 39:11
44:7 60:24,25
61:5,6 67:11
78:18
**series** 5:23 21:14
**serve** 26:8
**served** 22:8,8
**service** 12:17,18
54:15 72:6
**services** 19:20
19:22 20:1,6
37:7,8,13,14
39:3 65:22
67:24 107:14
120:3
**serving** 40:17
70:18
**set** 4:5 24:8
79:18 127:16
**Setting** 13:11
94:24
**settlement** 20:22
68:10 69:4,17
70:9
**Seven** 36:8
**sexually** 74:16
**Shane** 22:22
23:19 41:3
94:21 96:22
105:5
**she'd** 25:23
**sheet** 14:16
66:18 73:10,24
125:8 126:1
**sheets** 30:9,11
33:9,15 59:7
66:24 67:2,16
73:14 85:11,15
**sheriff** 3:12,19
9:23 16:10

17:5 22:6,6,7,7
22:13,15,17
24:21 25:4,4
25:13,18,22
26:2,5,8,14
27:4,5 33:12
40:10,18 41:10
41:16 74:8
75:22,25 76:8
88:21,23 89:3
92:14 94:22
95:7 97:14,22
98:3,16 100:5
100:20,24
101:2 103:18
103:24 104:10
104:24 107:21
116:24
**sheriff's** 6:1,3
12:13 14:20
17:12 26:25
29:3 38:11
40:13 53:4,9
53:17 67:23
69:17 74:11
80:19 83:22
95:4,5 103:10
103:12,17
123:17
**sheriffs** 22:10,25
23:6 58:22,24
**shift** 66:16 73:11
73:14 74:22,25
75:16
**Shocked** 92:20
**short** 78:8
108:11
**shortly** 52:16
**show** 26:14
34:21 79:14
**showed** 29:21
55:15 57:24
92:13
**showing** 57:6
85:19
**siblings** 11:16
**sic** 25:5 26:12

41:2 62:17,19
87:11 96:12
**sick** 53:6,13,13
63:7
**side** 95:3,3
**sideways** 38:22
**sight** 24:8 79:18
**sign** 72:12
**signature** 71:23
72:18 79:6
124:13
**signed** 20:21
21:16 72:16
73:22 106:23
**significance**
100:10
**significant** 57:23
**signing** 76:22
**signs** 23:10,10
23:22,23 96:24
97:1,7,7,9,15
97:18 98:9
99:16
**sir** 5:14 6:9 7:22
7:24 9:22,25
10:2 11:14,21
12:19,23 13:10
13:13,17,23
14:10,23 15:10
15:12,14,21,24
16:2,23,25
18:4,16,23
19:18,25 20:7
20:11 21:18,24
22:14,17,23
23:4,11,15
24:3,6 25:15
25:19 26:7,10
26:11,17,19,22
27:2,18 28:1,6
28:18 29:9,23
30:3,16,22
31:23 32:1,3
32:16,18 33:8
33:17 34:10
35:5,10 36:11
36:16,21 37:16

37:19 38:6,14
39:5 41:14,17
42:1,5,8,15
43:4,22,24
44:6,9 45:6,15
45:22,24 46:1
46:4,21 47:19
47:25 48:20
49:19,24 50:3
50:14,16,19,21
50:23,25 51:5
51:20 52:11,13
53:2,14 54:1,9
54:18,20,23
55:5,12 56:14
56:18 57:9
58:2,4,6,8,20
58:25 60:9,11
60:13 61:15,18
64:6,17 66:22
71:20 72:4,7
72:15,18,23
73:2,21 76:13
76:24 77:8,11
77:15,17,24
78:9 79:10,20
79:24 80:7
82:3,6 83:25
84:6,17,24
86:4 88:1 92:7
92:9 97:11
105:20,23,25
107:5
**sit** 13:8 54:5
117:8
**sitdown** 88:4
**sitting** 86:22
**Six** 3:24
**Sixty-three** 66:5
**skip** 12:24 56:2
108:6
**slip** 85:18
**slips** 63:16
**smaller** 97:7
**smart** 77:23
**smiling** 39:21
58:16

**smoke** 90:10,12
  90:15
**smoking** 93:9
  118:20
**smoothly** 35:22
**software** 29:14
**sole** 98:11
**somebody** 11:15
  27:8 28:14
  35:8 55:7
  74:19 81:20
  91:19,21 104:8
  107:7,13
**son** 8:21,24 9:6
  9:7 10:18,22
  11:7 120:18,20
  120:21,22,23
  121:1
**sons** 11:24 12:1
  120:17
**soon** 60:16
**sore** 91:17
**sorry** 13:15
  14:12 17:14,17
  21:7 24:22
  33:1 37:2
  45:12,16 58:17
  66:8 72:24
  75:24 85:23
  94:17 96:7,13
  96:16 105:8
**sort** 14:6 34:22
**sound** 38:19
  61:14 69:19
**sounds** 57:11
  61:20
**source** 12:3
  81:24
**South** 1:18
**speak** 13:3 33:2
  44:10 66:12
  67:19 81:1
  83:5 94:20
  117:1
**speakerphone**
  45:12
**Speaking** 11:11

**special** 3:12 6:4
  6:5 24:16 25:2
  25:8,13 26:5
  26:15,20,24
  27:15 28:10
  29:3,12 30:1
  34:1,5 40:5,12
  40:14,17 41:12
  82:7,13,16
  84:3,7,9,22
  92:5,11 103:13
  123:16
**specific** 19:5
  20:4
**specified** 127:11
**sped** 24:10
**spell** 8:8
**spend** 18:12
  22:24 41:18
**spoke** 24:20,22
  24:25 25:6
  62:4 81:2 83:6
  105:14 107:13
**spoken** 118:19
**Sporting** 84:14
**spring** 30:11,15
  32:9 76:12
  85:12
**squatters** 62:3
  62:14
**SRO** 86:5 91:16
  93:10 94:1
**SS** 127:2
**Stacy** 1:4,7,12
  3:12 5:2,9,10
  5:11,13,15
  7:23 16:19
  25:11 28:20
  40:3 42:20
  43:18 44:12,20
  45:11,12,19,20
  46:9 50:6
  68:22 69:10
  71:25 80:4
  83:19 95:15
  125:3,5,10
  126:2,3 127:5

**Stacy's** 5:12
**stamp** 44:4
  45:11 49:17
  53:3 56:24
**stamps** 44:5
**STARK** 127:3
**start** 16:15 33:6
  59:21 84:9
  107:14
**started** 16:5
  18:5 46:14
**starting** 59:2
  119:10
**starts** 33:4 64:10
**State** 1:17 46:15
  47:3 49:13
  51:2,14 120:22
  127:2,4
**stated** 45:12
  88:13
**statement** 62:25
**statements**
  66:14
**states** 1:1 15:2
  45:19
**stay** 26:2 62:20
  63:9 77:9
**stayed** 102:16
**staying** 11:6
  54:21 61:13
  88:16
**Stenotype** 127:7
**Steve** 3:19 74:7
**stole** 45:1 55:1
**stolen** 54:16
  55:10 57:25
**stop** 51:3 118:11
**stores** 84:13
**Stow** 82:23
**straightforward**
  83:21
**Street** 1:18
**stress** 78:22
  120:25
**Strickland** 86:11
  86:24 87:5
  89:2 90:18

101:19 118:1
**struck** 78:19
  103:11
**Stuart** 2:3 96:7
**stuart@emplo...**
  2:6
**stubs** 84:18
**student** 31:16,17
  32:11,23
  120:22
**students** 90:20
  90:25
**styles** 39:17
**subject** 4:7
  53:24 76:18
  99:8
**submit** 59:24
  66:16
**submitting**
  73:12
**subscribed**
  125:15
**substance** 53:20
**Suite** 1:18 2:4
**sum** 53:20
**summary** 59:19
**summer** 32:5,6,7
  73:22
**Summit** 2:9 5:17
  12:5,8,13
  14:19 17:4,9
  17:23,24 18:8
  18:10 20:18
  22:2 26:24,25
  27:14,19,25
  28:7,9,12,19
  28:22,24 29:2
  29:22 37:9
  67:23 71:2,3
  72:1 74:11
  102:9 123:16
**superintendent**
  93:9 119:2
**supervisor** 25:1
  38:7,9,10 56:7
  60:22 67:7
  78:16 91:18,25

105:14 106:16
**supervisor's**
  73:11
**supervisors**
  38:11 52:18
  63:22 64:24
**supplement**
  119:19 120:11
**supplemental**
  105:21 106:6
  119:16 122:3
**support** 10:15
  11:2,6 22:21
  23:18 24:2
  99:15,18
  119:24 120:6
  120:15,17
**supported** 99:13
**supporters**
  96:25
**supposed** 35:23
**sure** 27:7 35:21
  38:10 41:17
  51:12 68:16
  83:11 88:13
  94:8,14 118:13
  122:5 124:12
**surmise** 55:21
**surprise** 118:18
  123:9
**surrender** 52:8
  52:14 53:4,7
  53:21
**suspected** 54:25
  55:10 61:9
**suspend** 40:11
  40:18
**suspension** 41:2
  70:11,18 72:2
**swallowed** 14:12
**sworn** 5:3
  125:15 127:6
**synopsis** 60:2,3
**system** 24:9 28:4
  29:11,13,14
  80:1

**T**

**T** 125:1,1,1
127:1,1
**table** 86:22
**tailed** 30:13
**take** 7:1,6,7
31:22 42:12,13
42:16 45:3,23
46:23 57:15,20
59:15 68:15
74:4 78:24
81:9 90:12
93:6,16 101:4
102:17 108:7
108:11 121:6,8
**takeaway** 66:25
**taken** 1:14 5:19
42:18 46:5
55:23 68:18
103:22 108:13
125:4 127:11
**talk** 6:20 11:17
24:21 25:3,4
44:14 45:20
47:5 50:8 52:2
65:7 69:20
70:8 71:6,21
82:25 96:19
101:25 102:18
103:5 123:2
**talked** 50:5
67:10 69:11
81:12 84:1
89:9 91:25
94:2 101:23
104:15 118:17
**talking** 21:2
75:4 106:15
**talks** 67:7 76:6
80:5
**Tallmadge** 8:5
8:13 14:21
56:11 105:10
121:10
**taxes** 12:15
**teacher** 90:1

**teachers** 33:22
89:13,17,19
90:9,10,19
93:8 118:2
**telephone** 86:23
100:15
**tell** 6:15 26:11
40:4,15 46:24
48:3 55:6
58:13 59:14
69:13 79:8
85:25 88:3
93:3,6,8,11
101:8 104:21
122:10
**telling** 107:20
**terminate**
104:25 108:2
**terminated**
68:10 69:16
70:1 71:25
74:12 75:25
77:5 104:9
108:3 117:8
**terminating**
69:20 70:8
**termination**
68:11 69:23
71:7,16 103:20
103:24 104:22
105:7 107:18
107:22,22
108:5
**Termination's**
104:4
**testified** 5:4
**testify** 82:5
127:6
**testimony**
101:20 102:6
125:7 127:7,9
**Thank** 21:8
30:20 48:2
68:17 96:18
123:12,13
**theft** 43:21
**then-Lieutenant**

62:24 63:4
**then-Sheriff**
17:2
**Theresa** 102:7,8
**they'd** 91:18
**thing** 7:5 21:2
84:20 97:23
**things** 6:24
15:15 16:16
18:17 19:11
22:3 25:20
34:3 35:14,16
38:22 48:16
57:14 63:15
75:1 118:8,9
119:5 120:14
**think** 11:22
15:22 20:21
23:16 26:23
34:24 38:21
41:22 48:21
49:25 51:9
56:9 57:4
58:23 61:9
66:23 79:11,17
84:1 89:12
90:14,24 93:22
95:6 108:8
117:3,13
118:14 121:23
121:25 122:17
123:11
**thinking** 18:6
**third** 49:14 76:6
105:10
**Thomas** 46:16
46:25 47:8
48:7 49:16
**thought** 13:21
57:23 65:3
95:8 106:1
**thoughts** 79:25
107:23
**Thrasher** 67:11
**three** 3:15 11:3
22:25 46:11
49:8,17,21,22

70:21 97:2,14
97:18 100:2
**tight** 71:18
**till** 28:20 77:16
**time** 15:6 18:12
20:23 22:8,9
22:24 25:22
26:15 28:25
29:4 30:8,9,11
33:9,15 34:7
35:9,20 36:14
36:20 41:19
44:18 46:23
49:4 50:10
52:25 53:7,13
53:13,13 54:23
57:18 59:7
61:1 63:4,6,15
63:16,22 64:12
64:25 66:18,24
67:2,16 73:14
73:24 74:8
75:8 78:8,23
81:5,22 84:12
85:10,10,15,18
93:10 95:4
106:22 107:6
127:11
**timely** 53:8
**times** 36:4 70:21
100:2 121:19
121:21
**today** 5:8 7:20
13:8 89:8
107:8 117:25
118:15 122:1
**today's** 7:9
**told** 13:1 25:5
48:13 61:2,4
65:4 67:8 68:3
74:21 75:11
80:25 81:16
92:1,14 94:3
98:7,14 99:11
99:22 100:13
101:3 103:21
105:4 108:3

118:7,8,9
**Tom** 38:13,13
38:18,20,24
49:1 60:21
64:7,9 65:11
65:15
**tomorrow** 54:6
**topic** 33:2 96:16
**topics** 5:24
**Torch** 2:3 17:13
21:5 43:14
47:22 49:10
66:6 69:3,7
94:4,10,12,18
96:4,11,17
99:19 102:25
107:24 108:7
108:11 122:3,5
123:14,25
124:3,11
**traffic** 67:15
**training** 34:22
**transcribed**
92:15
**transcription**
125:7 127:8,9
**transfer** 18:22
21:17
**transferred**
19:17 20:12,17
20:22 28:17
61:4 70:10
71:2,3 72:1,25
**transferring**
20:6
**transition** 29:17
**transport** 19:25
**treatment** 6:11
**trick** 6:17 9:1
**tricky** 58:13
**tried** 43:5 48:22
73:6
**trigger** 42:10
**trouble** 64:17
69:25
**true** 118:10
125:6 127:8

**truth** 50:20
127:6,6,6
**truthful** 81:7
**try** 6:16,20 14:5
24:14 47:7
63:25 66:10
75:7 100:19
119:18
**trying** 22:1
31:22 45:15
50:17 51:15
63:24 87:24
117:23 119:14
119:14,16
**turned** 81:18
**TVs** 55:18
**Twenty-four**
9:10
**Twinsburg**
34:20 35:12
86:13 93:25
**two** 11:24 12:1
16:14 19:7,16
20:3 23:23
45:2 59:7
66:15 97:5
119:4 120:9
**Two-Page** 3:19
**Typed** 4:4

——————
**U**
——————
**uh-huh** 6:24
**uh-uh** 6:24
**ultimate** 78:2
**ultimately** 21:22
24:4 51:2,21
56:12 66:21
82:7
**unable** 14:3 86:5
**unaware** 88:15
**undercover**
18:20
**undergone**
36:22
**underlying**
44:25 74:5,13
**undersigned**

1:15
**understand** 6:14
6:15 21:25
23:20 26:9,12
26:18,23,23
34:13 48:4,6
51:12 69:10
72:14 76:25
81:4,7,10
87:18 89:13
**understanding**
26:4 28:2,3
35:13 46:14
52:4,9,24
58:22 61:14
80:8 83:13
84:22 104:2
**understood** 48:5
100:23
**unfamiliar**
121:21
**unfounded** 50:3
51:22
**unhappy** 65:23
**uniform** 61:22
62:10
**United** 1:1 15:2
**University** 2:10
16:6,9
**unlocked** 55:17
**unring** 42:25
**unruly** 32:23
**Unsecured** 54:2
**unsure** 55:3
**upset** 51:16
64:13 82:6
88:17 94:3
**upstairs** 75:2
**use** 17:24 39:1
**utilizing** 19:15

——————
**V**
——————
**V-A-N** 8:7,9
**VA** 102:21
106:3 119:7
120:10,12
**vacation** 52:12

53:1,2,6,12,12
**Van** 8:7,9,14,20
11:24
**various** 18:7
22:5 84:17
**vendor** 29:11
**verb** 61:19
**verification**
95:19
**verified** 66:13
95:22
**verse** 57:22
**versus** 1:6 5:9
125:5 126:3
**Veterans** 37:5
**Vicodin** 43:21
45:2,21 46:5
**view** 59:5
**violated** 53:8,24
**violation** 53:16
74:9 77:2
101:14
**violations** 56:25
**visit** 119:25
**visits** 119:4
122:2
**volunteer** 28:25
**voted** 97:10,22
97:24 98:10
99:17

——————
**W**
——————
**W** 125:1
**wait** 70:11 82:18
**waited** 100:21
**waived** 124:13
**walk** 23:7 35:25
**walked** 38:1
**walking** 32:22
36:5 91:7 92:2
**walks** 36:1
**want** 7:12 8:8,21
9:15 29:12
30:7 33:25
34:14 35:15
41:25 43:12
46:23 54:6

59:10 66:9
71:21 75:9,12
85:24 103:2,5
118:12,23
**wanted** 19:1
24:15 25:3,4
26:2 38:2
63:20 65:15
75:6 78:3 89:5
93:20,25
101:13,21
119:2
**wants** 55:7
**war** 15:6
**warranted** 49:21
**Warren** 17:3
22:6,12,15,25
49:1
**wasn't** 9:24
22:18 28:11
29:22 55:13
69:23 118:7,18
**watch** 97:12
98:4,12
**way** 14:18
**Wayne** 103:10
103:11
**we'll** 27:10 29:5
58:7 72:25
124:3
**we're** 5:8 30:7
33:2 41:18
63:24 96:19
99:8
**we've** 32:4 46:9
68:22 96:19
102:25
**weapon** 54:16
57:7,24
**weapons** 64:23
**week** 35:7 38:5
88:20 91:17
122:23
**weekend** 53:19
57:6
**weekly** 120:1,9
**weeks** 51:11

100:22 120:9
**weird** 68:25
93:21
**welcomed** 119:1
**went** 5:22 15:2,4
19:20 20:9,24
21:1,3,3,18
36:4 38:22
47:14 52:12,17
52:19 53:1
61:11,22 62:3
70:23 73:24
75:1,5,5,5
77:13 93:12
94:19 102:9
105:5 117:9
120:9 121:11
122:23 123:23
**weren't** 23:18
65:22 71:1
82:9
**Werner** 46:17
47:8 48:7,22
48:22 49:1,3
**Western** 48:8
**Wheeler** 74:22
75:11
**WHEREOF**
127:16
**Wickens** 52:6
**wife** 44:12
**Wilcox** 34:19
**William** 30:13
33:10 39:20
86:1 87:24
89:6 92:25
99:5 101:21
**Williams** 88:24
**willing** 119:18
**winding** 78:19
**withdrew** 16:9
**within-named**
127:5
**witness** 11:13,20
21:8 47:23
96:18 123:13
123:19 126:2

127:5,7,16
**witnesses** 102:3
**wondering**
17:15
**word** 6:18 39:1
96:14 104:9,10
104:21,22
107:23
**words** 48:3
103:25
**work** 10:18,20
27:4 28:14,25
29:8 31:2,11
39:1 57:7
66:16 78:21
89:11 92:6,8
92:12 95:1,3
105:17 108:5
120:17 122:23
**Work-related**
48:19
**worked** 18:19
20:14 22:17,24
23:5 29:15,21
34:6,20 35:3
49:5 60:25
73:14 84:15
91:20,23 102:8
121:19 122:18
**Workers'** 30:2
30:23 31:4,10
**working** 17:11
17:19 22:16
27:22 30:5,12
34:17 57:13
61:1,3 84:8,12
85:13 95:10
105:3 118:19
120:19 122:22
123:15
**Workman's**
27:8 31:6
**workplace** 65:6
**works** 82:14
107:13 119:15
120:20
**world** 76:15

**wouldn't** 28:11
62:23 88:6
105:19
**wrap** 103:5
**wrapped** 31:17
**writ** 52:5 53:21
**written** 23:17
52:24 69:12
95:16 96:14,20
99:9 121:18,20
121:22
**wrong** 14:13
28:3
**wrote** 102:14

___

**X**

**X** 3:1

___

**Y**

**yard** 96:24 97:1
97:3,7,7,9,14
97:18 98:9
99:16
**Yeah** 8:10,23
21:12,12 32:15
33:14,21 39:6
43:16 48:1
60:6 68:16
69:3 72:19
83:13 92:25
96:16 108:12
119:8 121:17
122:4,17 124:8
**year** 9:14 11:25
14:24 30:19
31:24,25 37:24
67:21 68:8
70:6 84:23
106:23
**years** 9:2 10:7
14:1 15:4,5,16
16:14 18:8
19:7,16 20:3,3
20:3 26:3
41:24 84:21
117:15 121:22
**yes-or-no** 6:25

**youngest** 8:24
120:21

___

**Z**

**Zoom** 35:7
**Zuchowski**
103:18

___

**0**

**000021** 4:2
**000022** 4:2
**000032-000034**
3:23
**000063-000064**
3:11
**000266** 3:10
**000458-000464**
3:16
**001485-001487**
3:13
**001494-001498**
3:21
**002165-002181**
3:17
**002277-002281**
3:14

___

**1**

**1** 59:16,21 60:3
**10** 15:5 20:3
**108** 4:7
**10th** 107:8
**11** 1:19 96:3,4,5
96:6,17,20
125:4 126:2
**1180** 1:18
**11th** 15:8 107:9
107:10
**12** 99:9
**12:52** 124:15
**127** 8:7 125:6
**13** 70:7 73:9,22
73:23
**14** 74:7 75:25
76:7 77:16
105:17
**15** 75:14

**1544** 60:2
**1546** 66:9
**1561** 64:10
**1562** 65:1
**1564** 62:24
**1576** 67:5
**16** 3:10
**17** 3:11 45:1,1,7
**18** 53:5 99:22
**1881** 47:14
**1882** 47:24
**1883** 49:12
**1893** 49:14
**18th** 99:24 100:1
100:10,18
**19** 77:16 78:1
**1988** 14:25 15:1
**1994** 18:3,5

___

**2**

**2** 40:8 59:16
61:8 78:21
103:7
**2/1/70** 8:1
**20** 9:2 30:10
72:2 78:13
85:11
**20-day** 70:11
**2000** 18:14,14
18:15
**2003** 10:9
**2006** 43:20 44:7
44:15 50:4
**2007** 36:13
46:13,20 48:15
48:16
**2008** 10:12
**2009** 20:15 52:1
53:5
**2010** 54:16
**2013** 20:21 60:2
63:25 69:8,20
71:22
**2014** 3:22,22
71:7 76:12
77:6
**2019** 8:15 77:13

77:14
**2020** 78:19
80:20 81:21
84:21
**2021** 24:5 25:12
28:20 40:6,15
40:17 77:10
79:19,25 84:1
**2022** 84:7,21
**2024** 30:20 32:6
32:7 36:25
37:4 85:14,16
85:18 86:9,10
87:22 88:5
94:19 99:22
116:25
**2025** 1:19
100:14 116:25
125:4,12,16
126:2 127:17
**2029** 127:20
**21** 78:14
**216.382.2501**
2:5
**2178** 56:24,24
**22** 9:2
**22-23** 84:23
**2278** 44:4
**2279** 45:11
**22nd** 127:17
**23** 30:11,15 32:9
85:12
**23-24** 85:1
**23rd** 47:15
**24** 30:12,15 31:2
31:9,25 32:5
33:3,6,18 85:1
86:2,3 127:20
**241** 1:18
**25** 3:12 70:10
105:11 106:10
**28(D)** 127:15
**28th** 66:14
**29th** 66:14

___

**3**

**3** 36:8 40:8 59:8

**59:16 66:1,9**
76:14
**3,000** 12:9
**3:30** 36:9
**30** 13:25 121:22
**30th** 24:5 25:12
**31** 3:22
**31st** 30:18 70:6
71:6 74:7,12
**330.643.8577**
2:11
**37** 3:18

**4**

**4** 30:21 36:9
59:17 70:20
72:5
**40** 3:13
**42** 123:20,22,23
**43** 3:14
**44131** 2:5
**44308** 2:10
**46** 3:15 123:22
123:23,24
**464** 53:3
**4700** 2:4
**4th** 91:23

**5**

**5** 3:4 20:3
**5:25-cv-00106**
1:4
**5:25-cv-106** 5:8
**50** 123:19,21
**51** 3:16
**52-card** 41:21
**53** 2:10
**530** 2:4
**54** 3:17
**55** 117:15
**56** 117:15
**58** 3:18
**5th** 41:4 100:14
100:16

**6**

**68** 3:19

**6th** 47:11

**7**

**7** 3:22
**7:30** 36:9
**700** 12:21,22
**73** 3:21
**736** 61:11
**74** 3:22
**78** 3:23
**784.35** 52:7
**7th** 76:7

**8**

**8** 36:9 102:2
**80** 3:24
**82** 47:20
**83** 4:2
**86** 4:3
**87** 4:4

**9**

**9** 55:11
**9:26** 1:19
**93** 16:24
**94** 17:4 18:15
**95** 4:5